# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

RICHARD YOUNG and PATRICIA YOUNG,

      Plaintiffs,

vs.

                                           No. CIV 19-0688 LF\GJF

HARTFORD CASUALTY INSURANCE
COMPANY and PROPERTY &
CASUALTY INSURANCE COMPANY
OF HARTFORD.

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendants' Amended Motion to Dismiss and to Strike the Plaintiffs' Complaint, filed February 4, 2020 (Doc. 23)("MTD"). The Court held a hearing on April 15, 2020. See Clerk's Minutes Before the Honorable James O. Browning at 1, taken April 15, 2020 (Doc. 41)("Clerk's Minutes"). The primary issues are: (i) whether the Court should, pursuant to rule 12(b)(6) of the Federal Rules of Civil Procedure, dismiss Counts I, II, III, IV, V, and VI from the Plaintiffs' First Amended Complaint for Breach of Contract and Related Causes of Action, to Recover UM/UIM Benefits for Property Damage and for Declaratory Judgment, filed November 8, 2019 (Doc. 11)("Complaint"); (ii) whether the Court, pursuant to rules 12(b)(6) and 12(f), should dismiss and strike the Plaintiffs' request for punitive damages in ¶¶ 53, 65, 68, and 74, see Complaint ¶¶ 48-74, at 6-11; and (iii) whether the Court should certify to the Supreme Court of New Mexico the questions: (a) whether punitive damages are available on a breach-of-contract claim in the context of an insurance contract; (b) whether the Uninsured Motorist Act's ("UMA") § 66-5-301 covers automobile theft and loss-of-use damages arising from

the theft of personal property, see NMSA 1978, § 66-5-301; and, (iii) whether punitive damages are available to insured persons ("insureds") under the UMA's § 66-5-301, see NMSA 1978, § 66-5-301.

The Court grants the MTD in part, and denies it in part.  The Court denies the Defendants' -- Hartford Casualty Insurance Company and Property & Casualty Insurance Company of Hartford (collectively, "Hartford Insurance") -- Motion to Dismiss Count I of Rich Young's and Patricia Young's ("the Youngs") Complaint, because the Court concludes that questions of fact exist as to (i) whether Hartford Insurance breached its Automobile Policy with the Youngs by not paying the Youngs the full amount they argue they are entitled to related to their 2007 Case Tractor theft, and (ii) whether Hartford Insurance breached its Homeowners Policy with the Youngs by allegedly paying the Youngs only 12.48% of the amount to which the Youngs argue they are entitled to based on their March 30, 2016, property damage.  The Court, relatedly, denies Hartford Insurance's Motion to Dismiss Count IV of the Youngs' Complaint, because the Court concludes that questions of fact exist whether Hartford Insurance breached its implied covenant of good faith and fair dealing with the Youngs when allegedly breaching the terms of the Youngs' Homeowners Policy and Automobile Policy.  The Court grants Hartford Insurance's Motion to Dismiss the Youngs' request for punitive damages, pursuant to the Youngs' breach-of-contract claim against Hartford Insurance, see Complaint ¶ 53, at 7, because the Youngs do not advance evidence showing that Hartford Insurance acted with "wanton disregard" for the Youngs' rights, Romero v. Mervyn's, 1989-NMSC-081, ¶ 23, 784 P.2d 992, 998, or with an "evil motive or a culpable mental state," Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 25, 880 P.2d 300, 308, when allegedly underpaying the Youngs under the Automobile Policy or the Homeowners Policy.  The Court denies Hartford Insurance's Motion to Dismiss Counts II and III of the Youngs' Complaint,

because the Court concludes that the Youngs advance sufficient facts to show that Hartford Insurance committed unfair trade practices in violation of New Mexico's Unfair Insurance Practices Act ("UIPA"), NMSA 1978, § 59A-16-1, and in violation of New Mexico's Unfair Practices Act ("UPA"), NMSA 1978, § 57-12-2(D).   The Court grants Hartford Insurance's Motion to Dismiss Count V of the Youngs' Complaint, because the Court concludes that the UMA's § 66-5-301(A)  does not cover  "property theft" and "loss of use" damages, see NMSA 1978, § 66-5-301(A).   The Court, in turn, grants Hartford Insurance's Motion to Dismiss the Youngs' request for punitive damages pursuant to the UMA's § 66-5-301(A), because of the Court's conclusion that the  UMA's § 66-5-301(A) does not cover the Youngs' theft and property damage.  See NMSA 1978, § 66-5-301(A); Mortensen v. Liberty Mut. Ins., 2019 WL 1571730, at *3 (D.N.M. Apr. 11, 2019)(Khalsa, M.J.); Arnold v. Farmers Ins. Co., No. CIV 09-0030 JB\WDS, at 28, filed May 10, 2012 (Doc. 130)("Arnold III");  Arnold v. Farmers Ins. Co., 827 F. Supp. 2d 1289, 1300-1301 (D.N.M. 2011)(Browning, J.)("Arnold II"); Arnold v. Farmers Ins. Co., 760 F. Supp. 2d 1272, 1286 (D.N.M. 2010)(Browning, J)("Arnold I").   In addition, the Court grants Hartford Insurance's Motion to Dismiss Count VI of the Youngs' Complaint -- the Youngs' request for a Declaratory Judgment on their rights, status, and liabilities related to their UM/UIM benefits under the Hartford Insurance Automobile Policy -- because of the Court's determination that the UMA's § 66-5-301(A) does not cover the Youngs' March 30, 2016, theft and related property damage.  Finally, because the Court determines that New Mexico courts have charted a "reasonably clear and principled course" on the Youngs' state law questions, the Court concludes that there is no sound reason to certify the Youngs' state law issues to the Supreme Court of New Mexico.  Pino v. United States, 507 F.3d 1233, 1236 (10th Cir. 2007).

**FACTUAL BACKGROUND**

The Court takes its facts from the Complaint.  The Court accepts the factual allegations as true for the purposes of a motion to dismiss.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  The Court does not, however, accept as true the legal conclusions within the Complaint.  See Ashcroft v. Iqbal, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

This case arises out of breach of contract and related causes of action claims that the Plaintiffs, the Youngs, filed against the Defendants, Hartford Casualty Insurance Company and Property & Casualty Insurance Company of Hartford (collectively, "Hartford Insurance"), on November 8, 2019.  See Complaint ¶ 1,  at 1.  The Youngs are currently residents of Sandoval County, New Mexico.  Complaint ¶ 1, at 1.  Hartford Insurance is "a foreign corporation, doing business in New Mexico."  Complaint ¶ 1, at 1.  The Superintendent of Insurance, located in Santa Fe County, New Mexico, is Hartford Insurance's  agent for service of process.  Complaint ¶ 1, at 1.

**PROCEDURAL BACKGROUND**

In their Complaint, the Youngs allege six causes of action.  See Complaint ¶¶ 48-74, at 6-11.  In the MTD, Hartford Insurance asks the Court to "dismiss Counts I-VI of the First Amended Complaint against it," which allege "breach of contract, breach of the Unfair Claims Practices Act (UCPA), the Unfair Practices Act (UPA), and breach of the covenant of good faith and fair dealing" because each Count (i) "fail[s] to state a claim upon which relief can be granted"; (ii) and "lacks a factual basis to support a prima facie claim against Hartford and is therefore legally insufficient as a matter of law."  MTD at 2.

1.      **The Complaint.**

The Youngs' six causes of action relate to their prior ownership of the following property: (i) a 2004 Ford F-350, (ii) a 2010 JB trailer; (iii) a 2007 Case Tractor with attachments; and (iv "other miscellaneous property that was identified."  Complaint ¶ 6, at 2.  On March 30, 2016, the Youngs "reported to the Rio Rancho Police Department" that the aforementioned property -- the "2004 Ford F-350, 2010 JB trailer, 2007 Case Tractor with attachments," as well as "other miscellaneous property" -- "had been stolen during the night from the side of their residence." Complaint ¶ 7, at 2.  The Youngs contended that "[a]t the time of the theft, the 2010 JB trailer was loaded with the 2007 Case Tractor and attachments, and was attached to the 2004 Ford F-350," Complaint ¶ 8, at 2, and "[t]he configuration of the truck and trailer was such that they could not have been carried away," Complaint ¶ 9, at 2.  They allege further that "[a]n unknown motorist, with no permission, took the 2004 Ford F-350, 2010 JB trailer, 2007 Case Tractor with attachments, and other miscellaneous items."  Complaint ¶ 10, at 2.

Following the theft, Richard Young signed and submitted Vehicle Theft Declarations for "the stolen vehicles and property."  Complaint ¶ 11, at 2.  "On or about April 8, 2016," according to the Youngs, they "were advised the 2004 Ford F-350 was recovered by the Bernalillo County Sheriff's Department and towed . . . ."  Complaint ¶ 12, at 2.  Thereafter, the 2004 Ford F-350 was recovered with the following damage "by the perpetrators: "blown tire with possible rim damage, possible front-end damage, door lock, ignition lock, steering column, unclean interior, engine and transmission needed to be checked, scratched paint on driver's side door, damage to custom floor mats, dent in front bumper, broken light left front, and spare tire."  Complaint ¶ 13, at 2.  The Youngs assess that "[b]ased upon the property damage, the thief(ves) conduct was malicious,

willful, reckless and wanton," therefore entitling them "to recover punitive damages."  Complaint ¶ 14, at 2.

Following the assessment of damage to their stolen property, the Youngs "made claims under their homeowners and automobile insurance policies."  Complaint ¶ 15, at 3.  On March 30, 2016, the Youngs had been "named insured on homeowners' insurance policy no. 55 RBC 929354," which was issued by Hartford Insurance.  Complaint ¶ 16 at 3.  The Homeowners Policy's coverage was "in force at the time of the theft at issue."  Complaint ¶ 16, at 3.  See Hartford Insurance Homeowners Policy at 1, filed November 8, 2019 1 (Doc. 11-1)("Homeowners Policy").  However, the Youngs contend that "[w]hen the homeowner policy was purchased [they] did not receive a copy"; rather, "they only received a copy of the policy after they made a claim." Complaint ¶ 18, at 3 (emphasis in original).

To their Complaint, the Youngs attach the Homeowners Insurance Policy issued by Hartford Insurance that had been effective on March 30, 2016.  See Homeowners Policy at 1-59. The Homeowners Policy provides coverage for personal property at an amount of "$140,250," Complaint ¶ 19, at 3; Homeowners Policy at 2, and the "insured location includes the grounds of [the Youngs'] residence."  Complaint ¶ 20, at 3.

According to the Youngs, the property damage they suffered constitutes applicable "property damage as defined by the homeowner's policy."  Complaint ¶ 21, at 3.  This is because, as the Youngs explain, "[t]he homeowner's policy covers the materials and supplies located on or next to the residence premises used to construct, alter or repair the dwelling or other structures on the residence premises."  Complaint ¶ 22, at 3.  In addition, as the Youngs explain further:

> The homeowner's policy covers personal property owned or used by an insured while it is anywhere in the world.  After a loss and at the insureds' request, the homeowner's policy will cover personal property owned by others while the party is on the part of the residence premises occupied by the insured.

Complaint ¶ 23, at 3.

In addition to obtaining personal property insurance coverage through Hartford Insurance, on March 30, 2016, the Youngs were covered under a Hartford Insurance Automobile Policy -- Policy "no. 55 PHK 936317." Complaint ¶ 24, at 3. The Youngs also attach the Automobile Policy to their Complaint. See Hartford Insurance Automobile Policy at 1-47, filed November 8, 2019 (Doc 11-2)("Automobile Policy"). This Automobile Policy, according to the Youngs, provided "comprehensive coverage as well as coverage for UM/UIM . . . in the amount of $50,000." Complaint ¶ 26, at 4; Automobile Policy at 2. The Youngs explain further that "[t]he UM/UIM property damage coverage of $50,000.00 is not equal to the liability property damage coverage of $100,000.00," Complaint ¶ 27, at 4, and "[u]pon information and belief, Defendant Hartford Casualty Insurance Company does not have a valid rejection for the $50,000.00 Step-down in coverage." Complaint ¶ 28, at 4 (citing Jordan v. Allstate Ins. Co., 2010-NMSC-051, 245 P.3d 1214). Because, as the Youngs allege, they had "two vehicles" under the Automobile Policy, they are entitled to "stacked property damage coverage totaling at least $200,000.00." Complaint ¶ 29, at 4. In addition, as conforming to the Automobile Policy's provisions, the Youngs allege the that the March 30,2016 thief or thieves, who stole the Youngs' property, are "unknown and there is no liability bond or policy that applied at the time of the incident, and therefore, the thief or thieves are uninsured." Complaint ¶ 30, at 4.

Finally, because "[t]he conduct of theif(ves) in this matter was malicious, willful, reckless and wanton," the Youngs contend that they are entitled "to recover punitive damages stemming from property loss." Complaint ¶ 31, at 4 (citing Fred Loya Ins. Co. v. Swiech, 2018-NMCA-022, 413 P.3d 530 for its discussion of "punitive damages being recoverable from UM/UIM property damage limits"). Relatedly, the Youngs claim that they are entitled to "UM/UIM benefits for

punitive damages stemming from the loss to their property." Complaint ¶ 32, at 4 (citing <u>Stewart v. State Farm Mutual Automobile Ins. Co.</u>, 1986-NMSC-073, ¶ 9, 726 P.2d 137, for the proposition "that uninsured motorist coverage includes punitive damages"; <u>Stinbrink v. Farmers Ins. Co. of Arizona</u>, 1990-NMSC-1 08, ¶¶ 4-5, 803 P.2d 664, for the proposition that "the purpose of 66-5-301 requires UM/UIM coverage to include punitive damages").

The Youngs' allegations, therefore, relate to Hartford Insurance's alleged actions after the Youngs filed claims for their stolen property under their Automobile Policy and Homeowners Policy. <u>See</u> Complaint ¶ 32, at 4. First, according to the Youngs, Hartford Insurance "did not compensate Plaintiffs for punitive damages stemming from loss of property." Complaint ¶ 33, at 4. Second, the Youngs allege that they "suffered injury and destruction to [their] property that is compensable pursuant to Part C and Part D of the automobile policy, including the New Mexico coverage endorsement." Complaint ¶ 34, at 4. According to the Youngs, they followed the proper procedures in filling their claims with Hartford Insurance, which included "tender[ing] an itemized list of stolen personal property, including the 2007 Case Tractor with attachments, totaling approximately $68,541.90 (not including the 2004 Ford F-350 vehicle) to enable the insurers to evaluate Plaintiffs' claims." Complaint ¶ 35, at 4. In addition, the Youngs allege that they paid for the stolen property from a personal account that "was registered and/or leased" in their names. Complaint ¶ 36, at 4.

"On or about July 1, 2016," the Youngs state that "they received a check from Hartford Casualty Insurance Company under their automobile policy for $12,120.61," which was intended to cover the "damage to the 2004 Ford F-350 only" that resulted from the theft. Complaint ¶ 37, at 4. Thereafter, "[o]n October 31, 2016," the Youngs received another "check for the deductible of $250 from Hartford Casualty Insurance Company" under their Automobile Policy. Complaint

¶ 38, at 4.  However, in breach of their Automobile Policy, the Youngs allege, Hartford Insurance "did not compensate Plaintiffs for the total amount of their compensatory and punitive damages." Complaint ¶ 39, at 5.  The Youngs allege that Hartford Insurance responds that the Youngs are incorrect regarding the total amount of compensatory damages they are owed, because Hartford Insurance states that "the 2007 Case Tractor with attachments was business property and therefore subject to a cap of $2,500" on insurance payouts.  Complaint ¶ 44, at 5.  The Youngs, however, argue that Hartford Insurance's characterization of the 2007 Case Tractor as "business property" is incorrect, because they "purchased the property from a personal account, registered the property in their names, and/or leased the property in their names and have always maintained these items as mixed-use."  Complaint ¶ 44, at 5.  The Automobile Policy, therefore, as the Youngs explain, was "not subject" to the $2,500.00 cap.  Complaint ¶ 44, at 5.

The Youngs also allege that Hartford Insurance breached their Homeowners Policy.  See Complaint ¶¶ 40-42, at 5.  The breach, according to the Youngs, came about because "[o]n or about September 3, 2016," the Youngs "received a check from Property & Casualty Insurance Company of Hartford for only $7,490.96 under the homeowners claim," Complaint ¶ 40, at 5, and then, "[o]n or about October 27, 2017," the Youngs received another "check from Property & Casualty Insurance Company of Hartford for an additional amount only of $1,063.13 on the homeowners claim."  Complaint ¶ 41, at 5.  This meant that Hartford's "total payments under the homeowner's policy totaled only $8,554.09 or 12.48% of the total loss" attributable to the March 30, 2016 theft, which the Youngs state "was covered by the policy in force."  Complaint ¶ 42, at 5.  The Youngs, therefore, argue that they were not "made whole by the payments made by Property & Casualty Insurance Company of Hartford."  Complaint ¶ 43, at 5.

In sum, then, the Youngs allege that Hartford Insurance has violated the terms of their Automobile Policy and Homeowners Policy because (i) the Youngs were "covered by the policies," Complaint ¶ 45, at 5; (ii) Hartford Insurance "failed to pay for the coverage" of which the Youngs were entitled, Complaint ¶ 46, at 5; (iii) and Hartford Insurance made "false or misleading . . . representations in the declarations pages, policies, in letters and communications . . . in the sale of insurance, and in advertising" with the Youngs related to the issuing of the policies.  Complaint ¶ 47, at 5.

For Count I -- Hartford Insurance's alleged "Breach of Contract" -- the Youngs "incorporate by reference all prior allegations" outlined by the Court.  Complaint ¶ 49, at 6.  See id. ¶¶ 1-47, at 1- 6.  Count I, therefore, involves the Youngs' allegations that Hartford Insurance's "acts and failures to act" in relation to the payout of the full amount under the Automobile Policy and the Homeowners Policy "constitute[s] a willful breach of its contracts with Plaintiffs." Complaint ¶ 48, at 6.  Hartford Insurance's acts constituted a "willful breach of its contracts," because, according to the Youngs, they had "performed all conditions precedent to their contracts" with Hartford Insurance.  Complaint ¶ 49, at 6.  Furthermore, the Youngs argue that Hartford Insurance's breach of the contract is "a direct and proximate" cause of the damages the Youngs have suffered.  See Complaint ¶ 51, at 6.  Instead of providing a specific damages amount, however, the Youngs request that this number be determined at trial.  See Complaint ¶ 51, at 6.  In addition to the compensatory damages amount under the breach-of-contract claim, the Youngs request "an award of reasonable attorney fees and costs pursuant to Section 39-2-1 NMSA 1978" because Hartford Insurance's actions under the contracts represented an "unreasonable failure to pay a first party coverage claim."  Complaint ¶ 52, at 7.  See id. ¶ 54, at 7  The Youngs also request "punitive damages in an amount to be determined at trial," because Hartford Insurance's actions

were "malicious, willful, reckless, wanton, oppressive, in bad faith and/or fraudulent."  Complaint ¶ 53, at 6.

In support of Count II -- Hartford Insurance's alleged "violation of Unfair Insurance Claim Practices" -- the Youngs  "reallege and incorporate by reference all prior allegations" outlined by the Court.  Complaint ¶ 55, at 6.  Referencing the Unfair Claims Practices Act ("UCPA"), NMSA 1978, § 59-A-16-20 , a section of the UIPA, NMSA 1978, §§ 59A-16-1 through -30, the Youngs allege that Hartford Insurance has committed "unfair insurance claims practices" under the following provisions:

> A.     misrepresenting to insureds pertinent facts or policy provisions relating to coverages at issue;. . .
>
> . . .
>
> E.     not attempting in good faith to effectuate prompt, fair and equitable settlements of an insured's claims in which liability has become reasonably clear; .
>
> . . .
>
> G.     compelling insureds to institute litigation to recover amounts due under policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds when such have made claims for amounts reasonably similar to amounts ultimately recovered;
>
> . . .
>
> N.     failing to promptly provide an insured a reasonable explanation of the basis relied on in the policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

Complaint ¶ 56, at 7 (quoting UCPA, NMSA 1978, § § 59A-16-1 – 59A-16-30).  In addition to these violations, the Youngs allege that Hartford Insurance, "knowingly and willfully, or with such frequency as to indicate its general business practice in this State, engaged in unfair insurance claims practices prohibited by UCPA, NMSA 1978, § 59A-5-26(C)(2)(a) and (b)," because Hartford Insurance:

a.        has without just cause failed to pay, or delayed payment of, claims arising under its policies, whether the claim is in favor of an insured or in favor of a third person with respect to the liability of an insured to such third person; or

b.        without just cause compels insureds or claimants to accept less than the amount due them or to employ attorney or to bring suit against the insurer or such an insured to secure full payment or settlement of a claim.

Complaint ¶ 58, at 8 (quoting UCPA, NMSA 1978, § 59A-5-26(C)(2)(a) and (b)).

The Youngs, in turn, claim they have suffered "damages in a monetary amount to be determined at trial" based on Hartford Insurance's violations of UCPA, NMSA 1978, Section 59A-5-26(C)(2)(a) and (b).  Complaint ¶ 59, at 8.  The Youngs also request an award of attorney fees and costs under the statute.  See Complaint ¶ 60, at 8.

As with Counts I and II, for Count III -- Hartford Insurance's alleged commission of "Unfair Trade Practices" -- the Youngs "incorporate by reference all prior allegations" as the Court has outlined above.  Complaint ¶ 61, at 8.  Specifically, the Youngs allege that "[t]he acts and failures to act by Defendants . . . constitute unfair and deceptive trade practices and unconscionable trade practices which are illegal and prohibited pursuant to the New Mexico Unfair Trade Practices Act, NMSA 1978, §§57-12-1 et seq."[1]  Complaint ¶ 62, at 8.  Based on Hartford Insurance's alleged violation of New Mexico's Unfair Trade Practices Act ("NMUPA"), NMSA 1978, § 57-12-1, the Youngs purport to "have suffered damages in a monetary amount to be determined at trial," Complaint ¶ 63, at 8, and request "attorney fees, statutory and treble damages."  Complaint ¶ 64, at 8.  In addition, the Youngs claim they are entitled "to recover punitive damages in an

[1]Although the Youngs allege that "[t]he acts and failures to act by Defendants . . . constitute unfair and deceptive trade practices and unconscionable trade practices which are illegal and prohibited pursuant to the New Mexico Unfair Trade Practices Act, NMSA 1978, §§57-12-1 et seq," Complaint ¶ 62, at 8 (emphasis added), the Court assumes, based on the Youngs' statutory citation, that they are referring to the New Mexico Unfair Trade Practices Act ("UPA"), NMSA 1978, §§ 57-12-1 through -24.

amount to be determined at trial," because Hartford Insurance's actions were "malicious, willful, reckless, wanton, oppressive, in bad faith and/or fraudulent."  Complaint ¶ 65, at 9.

For Count IV -- Hartford Insurance's alleged "Violation of Implied Covenant of Good Faith and Fair Dealing" -- the Youngs similarly "reallege and incorporate by reference all prior allegations" as outlined by the Court.  Complaint ¶ 66, at 9.  The Youngs state that Hartford Insurance has violated its implied covenant of good faith and fair dealing, because "[i]n issuing insurance policies to Plaintiffs and adjusting claims," Hartford Insurance had preexisting "duties to act in good faith and to treat its policyholders in a fair manner, to hold its insureds' interests equally to that of its own, and to act honestly, both in fact and in law, in these dealings."  Complaint ¶ 67, at 9.  See Complaint ¶ 68, at 9.  Based on this violation, the Youngs claim damages "in an amount to be proven at trial," and also request "the imposition of punitive damages as permitted by law."  Complaint ¶ 68, at 9.

For Count V -- the Youngs' claim that Hartford Insurance failed to provide them UM/UIM coverage -- the Youngs also "reallege and incorporate by reference all prior allegations as if set forth herein in full."  Complaint ¶ 69, at 9.  Pursuant to this claim, the Youngs argue that they are entitled to "recover the full extent of the uninsured/underinsured motorist benefits issued by Hartford Casualty Insurance Company and which might be otherwise available to Plaintiffs as a result of the damages sustained in the subject loss," because the loss of their property fulfilled the provisions under their Automobile Policy.  Complaint ¶ 70, at 9.  Specifically, the Youngs state that Hartford Insurance owes them UM/UIM reimbursement under their policies, because (i) "the theft of property was caused by one or more unknown motorist [sic]; no one walked away with the property," Complaint ¶ 71, at 9; (ii) "[a]t the time of the loss, [they] were insureds under one or more    Hartford    Casualty    Insurance    Company    automobile    policies    providing

uninsured/underinsured motorist coverage," Complaint ¶ 72, at 9; and (iii) they "have fully and completely complied with all applicable terms and conditions contained in the State Farm [sic] insurance policies at issue in this litigation,"[2] Complaint ¶ 73, at 9.  For the aforementioned reasons, as well, the Youngs contend that they are entitled "to all compensatory and punitive damages caused by the unknown motorist."  Complaint ¶ 74, at 9.

As to the final count, Count VI -- the Youngs' claim for Declaratory Judgment against Hartford Insurance -- the Youngs "reallege and incorporate by reference all prior allegations" outlined above.  Complaint ¶ 75, at 10.  For the same reasons, the Youngs argue that they are entitled "to all compensatory and punitive damages caused by the unknown motorist."  Complaint ¶ 75, at 10.  Pursuant to this claim, the Youngs argue that Hartford Insurance acted improperly in its failure to "stack the UM/UIM coverage equal to the liability limits on one or more automobile insurance policies," Complaint ¶ 76, at 10, and failed to offer "a proper rejection for the aforementioned step-down in coverage," Complaint ¶ 77, at 10.  The alleged failure to "stack the UM/UIM coverage," Complaint ¶ 76, at 10, according to the Youngs, is in violation of the holding in Jordan v. Allstate Ins. Co., 2010-NMSC-0851, 245 P.3d 1214.  See Complaint ¶ 76, at 10.  The Youngs also allege that Hartford Insurance did not adhere to the provisions of the Mandatory Financial Responsibility Act ("MFRA"), NMSA 1978 § 66-5-201, and its subsequent amendments and interpretations, which state that Hartford Insurance is "required to provided [sic] stacked

---

[2]In their Complaint, the Youngs state that they have "fully and completely complied with all applicable terms and conditions contained in the State Farm insurance policies at issue in this litigation."  Complaint ¶ 73, at 9.  Because the Youngs are suing Hartford Insurance based under their Hartford Insurance Automobile Policy and Homeowners Policy, however, the Court assumes this stipulation was copied and pasted from a boilerplate insurance policy complaint, and therefore, the Youngs here meant that they have complied with all applicable terms and conditions under the Hartford Insurance Automobile Policy and Homeowners Policy.  See Complaint ¶ 73, at 9.

UM/UIM coverage equal to the liability limits to Plaintiff under one or more automobile insurance policies in the absence of a waiver or rejection of UM/UIM coverage."  Complaint ¶ 78, at 10. The Youngs, therefore, "request the Court to declare the rights, status and liabilities of the parties under insurance coverage provided by Hartford Casualty Insurance Company pursuant to the Declaratory Judgment Act, NMSA 1978, Section 44-6-1 through 15, et seq."  Complaint ¶ 79, at 10-11.  Equally, the Youngs request that the Court determine that "stacked UM/UIM coverage equal to the liability limits exists for Plaintiff on all policies issued to Plaintiffs by Hartford Casualty Insurance Company due to the company's failure to comply with statutory and common law."  Complaint ¶ 79, at 11.  The Youngs emphasize that they bring this action "to recover the full extent of all available policy limits from any and all underinsured motorist policies issued by Hartford Casualty Insurance Company and which might be available" to them stemming from "the injuries and damages sustained in the collision which is the subject of this litigation."[3]  Complaint ¶ 80, at 11.

The Youngs request that the Court impanel a jury to evaluate their claims against Hartford Insurance.  See Complaint ¶ 80, at 11.  Finally, the Youngs conclude their Complaint with a request for judgment against Hartford Insurance for "all damages as determined at trial," in addition to "the costs of this litigation, pre-judgment and post-judgment interest, reasonable attorney fees, punitive damages, as well as an early mediation at Defendants' expense as set forth in NMSA 1978

---

[3]The Court is unclear as to which "collision" the Youngs refer in this statement.  Complaint ¶ 80, at 11.  After research into the matter, however, the Court assumes that the Youngs are also copying and pasting boilerplate language from a Declaratory Judgment Act claim and, therefore, inadvertently, left in the word "collision" when meaning to refer to the theft of their property on March 30, 2016.  Complaint ¶ 80, at 11.

Section 57-12-1 *et seq*, and for such other relief as the Court may deem just and proper."
Complaint ¶ 80, at 11.

    **2.**    **<u>Motion to Dismiss</u>.**

    Hartford Insurance filed the MTD. <u>See</u> MTD at 1. Pursuant to rule 12(b)(6), Hartford
Insurance seeks to dismiss Counts I, II, III, IV, V, and VI from the Youngs' Complaint, <u>see</u>
Complaint ¶¶ 48-80, at 2-11, on the grounds that the Youngs "fail to state a claim upon which such
relief can be granted," MTD at 1. Pursuant to rules 12(b)(6) and 12(f), Hartford Insurance moves
to strike and dismiss ¶¶ 53, 65, 68, and 74 from the Youngs' First Amended Complaint, and the
prayer for punitive damages, against Hartford Insurance, arguing that (i) "punitive damages are
not available in a contract claim," MTD at 1; and (ii) "this First Amended Complaint is devoid of
the factual specificity required to support a claim for punitive damages against Hartford," MTD at
1.

    Before outlining its arguments for the Court to dismiss Counts I through VI of the
Complaint, Hartford Insurance notes that it disputes whether the Youngs, as they contend in their
Complaint, have provided a list of personal property to Hartford Insurance as part of their
Automobile Policy claim relating to the personal property that was stolen from the side of their
residence on the night of March 30, 2016, which includes the 2007 Case Tractor with attachments.
<u>See</u> MTD at 2, n. 1 (citing Complaint ¶ 35 at 5). <u>See</u> Automobile Policy at 1-13. Nonetheless, for
the MTD's purpose, Hartford Insurance takes the Youngs' stated contention pertaining to them
having provided a thorough list of personal property as true. <u>See</u> MTD at 2, n. 1.

    Hartford Insurance, thereafter, begins its arguments by requesting that the Court dismiss
Count I -- the Youngs' contract claim against Hartford Insurance -- because the cause of action
"lacks any detail on how Hartford breached its contract with Plaintiffs and vaguely lumps the two

policies and insurers together."  MTD at 2.  Referencing New Mexico law, Hartford Insurance explains that, "[o]ther than conclusory language suggesting both Defendants were willful in breaching their respective contracts, it is not clear what allegations" relate to the Youngs' specific contract clause of action against Hartford Insurance, "particularly in light of Count V that discusses the UM/UIM benefits owed under the auto policy."  MTD at 3.  Furthermore, under New Mexico law, as Hartford Insurance argues, the claim is deficient, because the Youngs have not advanced evidence supporting all of the elements of a contract claim.  MTD at 8 (citing Abreu v. N.M. Children, Youth and Families Dep't, 797 F. Supp. 2d 1199, 1247 (D.N.M. 2011)(Browning, J.)("The elements of a breach-of-contract action are the existence of a contract, breach of the contract, causation, and damages.")).  If the Court does not dismiss the Youngs' contract claim, Hartford Insurance requests, in the alternative, that the Court strike ¶ 53 of the Youngs' First Amended Complaint, in which the Youngs request punitive damages pursuant to their breach-of-contract claim against Hartford Insurance, because, "[u]nder New Mexico law, punitive damages are not recoverable for mere breach of contract."  MTD at 3.

Hartford turns next to Counts II and III of the Youngs' Complaint, under which the Youngs allege that Hartford Insurance has committed unfair insurance claim practices in violation of the UCPA, which is found within § 59A-16-20 of New Mexico's UIPA, NMSA 1978 §§ 59A-16-1 through -30, and in violation of New Mexico UPA, NMSA 1978, §§ 57-12-1 through -24.  See MTD at 3.  See also Complaint ¶¶ 55-60, at 7-8; id. ¶¶ 61-65, at 8-9.  Hartford Insurance requests that the Court dismiss both Counts, because the Youngs "merely recite the provisions of the UCPA and the UPA (the Acts)," and "end[] with the conclusory allegation that Hartford's 'actions . . . set forth above' constitute violations of the Acts."  MTD at 3.  As Hartford Insurance references, under New Mexico law, a violation of the UPA requires a "misleading, false, or deceptive statement

made knowingly in connection with the sale of goods or services."   MTD at 9 (quoting Diversey Corp. v. Chem-Source Corp., 1998-NMCA-112, ¶ 17).   To demonstrate a claim under the UPA then, Hartford Insurance argues, the Youngs  First Amended Complaint must allege sufficient facts showing that: (i) Hartford Insurance "made an oral or written statement, a visual description or a representation of any kind that was either false or misleading," MTD at 9 (citing NMSA 1978, § 57-12-2(D)); (ii) "the false or misleading representation was knowingly made in connection with the sale, lease, rental, or loan of goods or services in the regular course of [Hartford Insurance's] business," MTD at 9 (citing NMSA 1978, § 57-12-2(D)); and (iii) "the representation was of the type that may, tends to, or does deceive or mislead any person," MTD at 9 (citing NMSA 1978, § 57-12-2(D)).   Hartford Insurance argues that the Youngs have failed to meet any of the aforementioned elements.   See MTD at 9.   Instead, Hartford Insurance argues that the Youngs do no more than "recite" language from the UPA and UCPA statutes, rather than setting forth any actions or facts related to either claim.   MTD at 4.   Mere recitation, according to Hartford Insurance, "is not a substitute for setting forth the facts that allegedly support a claimed violation." MTD at 4.   See id. at 9.

For similar reasons, Hartford Insurance argues that the Court should dismiss Count IV in the Youngs' Complaint, in which the Youngs allege that Hartford Insurance violated the implied covenant of good faith and fair dealing.   See MTD at 4.   See also Complaint ¶¶ 66-68, at 9.   Once again, when referencing the Youngs' accusations that "Defendant Hartford had a duty of good faith," MTD at 4 (quoting Complaint ¶¶ 67-68, at 9), and that "the wrong acts describe herein demonstrate that Hartford Insurance breached its duty of faith and fair dealing," MTD at 4 (quoting Complaint ¶¶ 67-68, at 9), Hartford Insurance emphasizes that the Youngs neither describe any wrongful acts, nor do they "plead any additional facts" to support their claim of Hartford

Insurance's bad faith, MTD at 4.  See Complaint ¶¶ 66-68, at 9.  As Hartford Insurance notes, under New Mexico law, "[a]n insurance company acts in bad faith when it refuses to pay a claim of the policy holder for reasons which are frivolous or unfounded."  MTD at 9 (quoting UJI 12-1702 NMRA).  Moreover, New Mexico law is clear, as Hartford Insurance also explains, that "[i]t is not bad faith for an insurer to deny a claim 'for reasons which are reasonable under the terms of the policy,'" MTD at 9 (quoting UJI 13-1702 NMRA), and "'[a]n insurer's incorrect decision to refuse benefits, without more, is not enough to establish bad faith.'"  MTD at 9 (quoting Winters v. Transamerica Ins. Co., 194 F.3d 123 (10th Cir. 1999)(unpublished)).  See id. at 9 (citing United Nuclear Corp. v. Allendale Mut. Ins. Co., 1985-NMSC-090, ¶¶ 16-17, 709 P.2d 649, 654 (reversing a finding of the defendant's bad faith because while the insurer-defendant wrongly withheld payment, there were legitimate reasons to question the plaintiff's stated damages)).  "To prove an insurer acted in bad faith, 'there must be no reasonable basis for denying the claim.'"  MTD at 9 (quoting Winters v. Transamerica Ins. Co., 194 F.3d at 1321 (citing United Nuclear Corp. v. Allendale Mut. Ins. Co., 1985-NMSC-090, ¶ 13, 709 P.2d 654)).  Here, however, Hartford Insurance contends, the Youngs fail to allege any facts that Hartford Insurance's alleged refusal to pay UM/UIM benefits was "'frivolous or unfounded,'"  MTD at 9 (quoting UJI 12-1702 NMRA), and therefore, the Youngs fail "to raise a right to relief above the speculative level . .. . ."  MTD at 9 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. at 555.  In addition, Hartford Insurance contends that the Court should dismiss Count IV -- the Youngs' implied covenant of good faith and fair dealing claim against Hartford Insurance, see Complaint ¶¶ 66-68, at 9 -- and Count V -- the Youngs' request for full UM/UIM coverage from Hartford Insurance -- because none of the facts that the Youngs proffer establish that "they could be entitled to additional benefits under the Hartford Insurance policy" based on the insurance policy's language and New Mexico law.  MTD

at 4.  Benefits are not available, Hartford Insurance explains, because the theft that the Youngs allege, "does not involve an uninsured vehicle driven by a third party, which is required by both the policy and New Mexico law to recover uninsured motorist benefits."  MTD at 11 (citing Automobile Policy at 40-45; Mortensen v. Liberty Mut. Ins., 2019 WL 1571730, at *9 (D.N.M. Apr. 11, 2019)(Khalsa, M.J.)(concluding that the loss of stolen cars is not covered under a different uninsured motorist statute); Mountain State Mut. Cas. Co. v. Martinez, 1993-NMSC-003, ¶ 7, 848 P.2d 527, 529 (assessing UM coverage for the purpose of avoiding insurer paying out for unnecessary duplication of coverage))).

Hartford Insurance explains further that the insurance policies do not cover the Youngs' alleged theft because, under the UM provisions at issue, "the policy excludes vehicles to which insurance applies." MTD at 12.   Hartford Insurance references the following provision that sets forth this exclusion: "Uninsured motor vehicle means a land motor vehicles of any type: (1) To which no liability bond or policy applies at the time of the accident . . . ." MTD at 12-13 (quoting Automobile Policy at 41).   See also MTD at 13 (citing Dockery v. Allstate Ins. Co., 2020 WL59885, *3-4 (D.N.M. Jan. 6, 2020)(Brack, J.)(concluding that the plain language of N.M. Admin. Code 13.12.3.14(C)(3)(b) -- the regulations implementing the UMA -- "exclude[] an insured's stolen vehicle from coverage under the UM statute"); Mortensen v. Liberty Mut. Ins., 2019 WL 1571730, at *1 (granting the defendant's motion to dismiss the plaintiff's breach of contract claims relating to UM claims asserted under the plaintiff's auto policy after concluding that the Supreme Court of New Mexico has not yet decided if auto theft constitutes "injury to or destruction of property" under the UMA)).

Based on New Mexico law and the policy provisions Hartford Insurance therefore argues that the Youngs lack any facts to support their claim that the theft of their personal property

includes acts that are "malicious, willful, reckless and wanton."  MTD at 4 (quoting Complaint ¶ 31, at 4).  Hartford Insurance argues that, because the Youngs cannot make this showing, they are not entitled to "recover punitive damages stemming from the property loss."  MTD at 4 (quoting Complaint ¶ 31, at 4).  Second, pursuant to Count V, Hartford Insurance argues that the Youngs similarly fail to advance facts supporting that the "theft of property was caused by one or more unknown motorist [sic]; no one walked away with the property."  MTD at 4 (quoting Complaint ¶ 71, at 9).  Hartford Insurance argues, accordingly, that the Youngs' request for a Declaratory Judgment, stemming from how much money that they believe they should receive from insurance proceeds based on what might be available under UM/UIM claims, see Complaint ¶¶ 75-80, at 10-11, is moot.  MTD at 4.

Hartford Insurance argues, in the alternative, that, even if New Mexico law allows the Youngs to recover under the UM, no recovery would be available in this case, because the Youngs cite only Hartford Insurance's underpayment in the form of punitive damages connected to its Automobile Policy.  See MTD at 14.  As Hartford Insurance contends, however, while New Mexico law allows for recovery of punitive damages in certain circumstances, it bars the payment of punitive damages in cases when a tortfeasor cannot be held liable.  See MTD at 14 (citing Jaramillo v. Providence Wash. Ins. Co., ¶¶ 19-26, 871 P.2d 1343, 1350-52 (barring recovery of punitive damages for a plaintiff based on the plaintiff's UM coverage, because the tortfeasor died); Dockery v. Allstate Ins. Co., 2020 WL59885 at *5 (holding that punitive damages could not be made available under a plaintiff's UM coverage against an unknown tortfeasor).  Ultimately, as Hartford Insurance argues, because the Youngs: (i) do not advance evidence satisfying the requirements either of an uninsured motor vehicle and/or of an "accident" under their Automobile Policy to trigger UM coverage, see MTD at 14; and (ii) and concede that the tortfeasor is unknown,

see MTD at 15, then, the Court should dismiss the Youngs' breach-of-contract claim against Hartford Insurance and determine also that the Youngs are not entitled to punitive damages, see MTD at 15.

Finally, Hartford Insurance argues that the Court must dismiss and strike ¶¶ 53, 65, 68, and 74 from the Youngs' Complaint -- in which the Youngs request punitive damages -- because the Youngs do not provide "any factual support for such relief." MTD at 5. See also id. at 15. The lack of factual support renders the paragraphs legally insufficient, as Hartford Insurance explains, because, (i) "under New Mexico law, mere breach of contract is not a sufficient basis to support a punitive damages award," MTD at 5; and (ii) the Youngs do not plead "any facts that support the allegation Hartford Insurance's conduct was maliciously intentional, fraudulent, oppressive, or committed recklessly or with a wanton disregard to Plaintiffs' rights in connection with the claim under the auto policy," MTD at 5.

     **3.**      **The Response.**

The Youngs respond to the MTD. See Plaintiff's Response to Defendant Hartford Casualty Insurance Company's Amended Motion to Dismiss and to Strike, filed February 28, 2020 (Doc. 29)("Response"). The Youngs argue, at the outset, that the Court should deny Hartford Insurance's MTD because (i) their "First Amended Complaint is plead sufficiently," Response at 1; (ii) "punitive damages are available in a contract clam and are pled sufficiently," Response at 1; and (iii) "UM/UIM benefits are available . . . based on the facts of this case," Response at 1.

          **a.**       **The Youngs argue that their Complaint alleges facts showing that each Count is plausible on its face on its face.**

The Youngs first respond to Hartford Insurance's argument that the Court should dismiss their claims alleging Hartford Insurance's breach of contract, violation of unfair insurance claim practices and unfair trade practices, and violation of the implied covenant of good faith and fair

dealing.  See Response at 4.  The Youngs rebut specifically Hartford Insurance's contention that

their claims should be dismissed "because they are based on patently conclusory assertions and

include no factual supporting allegations."  MTD at 8.  In issuing the rebuttal, the Youngs state

that their First Amended Complaint contains both "well-pled factual allegations" and "sets forth

sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face."

Response at 5.  Significantly, the Youngs argue, each cause of action they advance is "accepted

and common against first-party insurers like Defendant."  Response at 5.

        First, as the Youngs contend, they show sufficiently under their breach-of-contract claim

that Hartford Insurance "failed to perform a material obligation" of their "insurance contract,"

based on Hartford Insurance's "failure to pay for damages that are compensable under the

contract." Response at 5 (citing Complaint ¶ 24, at 3; id. ¶ 45, at 6; Automobile Policy; Complaint

¶ 15, at 3; id.  ¶¶ 33, 35, 37-39, 46, at 5-6).  Second, the Youngs argue that they have shown

sufficiently the requisite elements of Count II -- their allegation that Hartford Insurance has

committed unfair insurance claim practices -- because they show that (i) they are insureds through

the Automobile Policy; (ii) Hartford Insurance is an "insurer that is subject to the Trade Practices

and Frauds Act, NMSA 1978, § 59A-16-1," Response at 6; (iii) "there was a misrepresentation of

pertinent facts or policy provisions relating to coverages at issue resulting in a significant

underpayment to Plaintiffs," Response at 6; (iv) Hartford Insurance has not "attempted in good

faith to effectuate prompt, fair and equitable settlements of an insured's claims in which liability

has become reasonably clear," Response at 6; (v) Hartford Insurance's actions compel them to

"institute litigation to recover amounts due under the policy by offering substantially less than the

amounts ultimately recovered in actions brought by such insureds," Response at 6; and Hartford

Insurance has "failed to provide [them] a reasonable explanation for the basis relied on in the

policy," Response at 6.  See Complaint ¶ 15, at 3; id. ¶¶ 26-35, 37, 39, 45-47, at 4-6.  The Youngs allege that the aforementioned conduct also represents a violation of NMSA 1978, § 59A-5-26(c)(2)(a) and (b), because Hartford Insurance has "fail[ed] to pay or delay[ed] payment of claims," and has done so "without just cause," which has compelled the Youngs "to accept less than the amount due to them."  Response at 6.

Similarly, the Youngs allege that they advance facts demonstrating the elements of Hartford Insurance's commission of unfair trade practices, under the UPA, NMSA 1978, §§ 57-12-1 through -24.  See Response at 6.  The Youngs first reference the UPA's § 57-12-3 when outlining that "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful." NMSA 1978, § 57-12-3.  As the Youngs explain, therefore, to state a UPA claim, as the Plaintiffs, they must advance facts showing that: (i) Hartford Insurance "made an oral or written statement, a visual description or a *representation of any kind* that was either false or misleading," Response at 6 (citing Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 7, 166 P.3d 1091, 1093 (emphasis in original); NMSA 1978, § 57-12-2(D)); (ii) Hartford Insurance's "false or misleading representation was knowingly made in connection with the sale, lease, rental, or loan of goods or services in the regular course" of Hartford Insurance's business, Response at 6 (citing Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, 2007-NMCA-100, ¶ 7, 166 P.3d at 1093; NMSA 1978, § 57-12-2(D)); and (iii) Hartford Insurance's "representation was of the type that may, tends to, or does deceive or mislead any person," Response at 6 (citing Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 7, 166 P.3d at 1093; NMSA 1978, § 57-12-2(D)).  Furthermore, as the Youngs explain, "a nondisclosure is a 'representation' under the UPA." Response at 6 (citing NMSA 1978, § 57-12-2(D)(14) and quoting Richardson Ford Sales, Inc. v. Johnson,1984-NMCA-007, ¶ 10, 676 P.2d 1344, 1346

("[57-12-2(D)] does, however, require that a representation be 'knowingly made' [and] the failure to disclose must have been a knowing nondisclosure."). As the Youngs clarify, however, a claim under the UPA neither "require[s] a direct representation by the defendant to the plaintiff," Response at 7 (citing Lohman v. Daimler-Chrysler Corp, 2007-NMCA-100, ¶ 7, 166 P.3d at 1093), nor does it require an "intent to deceive," as long as the defendant makes "a knowing representation," Response at 7 (citing Richardson Ford Sales, Inc. v. Johnson, 1984-NMCA-007, ¶ 10, 676 P.2d at 1346). Rather, as the Youngs state, the "'knowingly made' requirement is made if a party was actually aware that the representation was false or misleading when made, or in the exercise of reasonable diligence, should have been aware that the statement was false or misleading." Response at 7 (citing Stevenson v. Louis Dreyfus Corp, 1991-NMSC-051, ¶ 17, 811 P.2d 1308, 1311-12)).

Finally, the Youngs explain that "the definition of unfair or deceptive trade practices includes, but is not limited to, seventeen specific practices which are enumerated in the statute." Response at 6 (citing NMSA 1978, § 57-12-2(D)(l)(17)). The Youngs proceed to outline the "non-exhaustive list of unfair or deceptive trade practices" that a party could commit, which include the party:

> causing confusion or misunderstanding as to the source, sponsorship, approval or certification of services; representing that services have sponsorship or approval that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that the person does not have; representing that services are of a particular standard, quality or grade; using exaggeration, innuendo or ambiguity as to a material fact or failing to state a material fact if doing so deceives or tends to deceive; or failing to deliver the quality of services contracted for.

Response at 6 (citing NMSA 1978, § 57-12-2(D)(2), (5), (7), (14) and (17)).

Under New Mexico state law, the Youngs argue then, that, that they allege "sufficient facts to support their UPA cause of action." Response at 7. Specifically, the Youngs contend that they

show that Hartford Insurance "made numerous representations in the policies regarding the coverages available to its insured as well as representations as to what damages are compensable." Response at 7-8 (citing Complaint ¶¶ 24-35, 37-39, 45-47, at 3-6).  Second, the Youngs argue that they "met the conditions precedent by paying deductibles and providing proof of loss" in compliance with their insurance policies issued by Hartford Insurance.  Response at 8 (citing Complaint ¶¶ 11, 15, 35 at 2-3, 5).  Finally, the Youngs argue that, in accordance with a UPA claim's requisite elements, they have shown that Hartford Insurance "misrepresented available coverages" to them, which includes Hartford Insurance's failure to "open a UM claim" after the Youngs filed a report of the   March 30, 2016, theft,   and Hartford Insurance's subsequent compensation of the Youngs with a monetary amount that was 'significantly less than what was provided for in the policies," Response at 8 (citing Complaint ¶¶ 26-34, 37-39, 46, at 3-6).

Next, the Youngs argue that that they have shown facts to establish Count IV -- that Hartford Insurance violated its duty of "good faith and fair dealing that the insurer will not injure its policyholders' right to receive the full benefits of the contract."  Response at 8 (quoting Dairyland Ins. Co. v. Herman, 1998-NMSC-005, ¶ 11, 954 P.2d 56, 60).  According to the Youngs, under New Mexico law, Hartford Insurance, as an "insurer," "assumes a fiduciary obligation" toward them, which "'pertains to the *performance* of obligations in the insurance contract.'"  Response at 8 (quoting Azar v. Prudential Ins. Co. of America, 2003-NMCA-062, ¶ 54, 68 P.3d 909, 925 (emphasis in original)(citation omitted)).  The Youngs next quote N.M.R.A., Civ. UJI 13-1701 to explain the duties required of Hartford Insurance as the insurer of their policies:

> A policy of insurance is a contract.  There is implied in every insurance policy a duty on the part of the insurance company to deal fairly with the policy holder. Fair dealing means to act honestly and in good faith in the performance of the contract.  [The insurance company must give *equal consideration* to its own interests and the interest of the policy holder.]

Response at 8 (quoting N.M.R.A., Civ. UJI 13-1701)(emphasis in original)(brackets in original). UJI 13-1701 means, the Youngs argue that, "[t]o fulfill the duty of giving equal consideration of the interest of the insured and the insurer," Hartford Insurance must ensure that "there must be a fair balancing of these interests."  Response at 8 (citing Lujan v. Gonzales, 1972-NMCA-098, ¶¶ 41-42, 501 P.2d 673, 680, cert. denied, 501 P.2d 553 (1972)(citation omitted)).

Under New Mexico precedent and the N.M.R.A., Civ. UJI 13-1701, the Youngs argue that they allege facts showing that Hartford Insurance violated the implied covenant of good faith and fair dealing standard.  See Response at 8 (citing Lujan v. Gonzales, 1972-NMCA-098, ¶¶ 41-42, 501 P.2d at 680).  First, according to the Youngs, "there was a valid insurance contract" between them and Hartford Insurance, which meant that there was "the implied covenant of good faith and fair dealing . . . inherent in the contract."  Response at 8.  Second, the Youngs explain that they advance facts showing that Hartford Insurance "did not act honestly and in good faith in performance of the contract," Response at 8, because they show that Hartford Insurance "offer[ed] substantially less than what Plaintiffs were entitled to recover" under their insurance policies, Response at 9 (citing Complaint ¶¶ 26-34, 37-39, 46, at 3-6).

> **b.**      **The Youngs argue that they are entitled to punitive damages because they proffer facts showing that Hartford Insurance committed "malicious, reckless, wanton, oppressive, or fraudulent conduct" when breaching the Youngs' Homeowners Policy and Automobile Policy.**

The Youngs rebut Hartford Insurance's contention that punitive damages are not available in breach-of-contract cases.  See Response at 9.  See also MTD at 1, 15.  The Youngs cite N.M.R.A., Civ. UJI 13-861, which they argue allows for the Court to award punitive damages to them if the Court finds that Hartford Insurance, as Defendant,  committed "malicious, reckless, wanton, oppressive, or fraudulent conduct."  Response at 9 (citing N.M.R.A., Civ. UJI 13-861)). In support of their argument, the Youngs cite Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-

079, ¶ 25, 880 P.2d 300, 307, for the principle that "a punitive damage award for a breach of contract may no longer be based solely on the breaching party's gross negligence for failing to perform a contract."  Response at 9 (citing Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 25, 880 P.2d 300, 307.  The Youngs also cite Sloan v. State Farm Mut. Auto. Ins. Co., 2004-NMSC-004, ¶ 23, 85 P.3d 230, 238, for the principle that "in most cases the plaintiff's theory of bad faith, if proven, will logically also support punitive damages."  Response at 9 (quoting Sloan v. State Farm Mut. Auto. Ins. Co., 2004-NMSC-004, ¶ 23, 85 P.3d at 238.

Under N.M.R.A., Civ. UJI 13-861, Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 25, 880 P.2d 300, 307, and Sloan v. State Farm Mut. Auto. Ins. Co., 2004-NMSC-004, ¶ 23, 85 P.3d at 238, the Youngs contend that their Complaint alleges facts and allegations that show Hartford Insurance's culpable mental state.  Response at 9-10.  First, the Youngs reference the facts that: (i) they suffered a loss, see Response at 9, (ii) Hartford Insurance "only paid a small fraction of the damages to which Plaintiffs are entitled,"  Response at 9 (citing Complaint ¶¶ 24-35, 37-39, at 3-6); and therefore (iii) Hartford Insurance "failed to pay for the coverage to which Plaintiffs were entitled,"  Response at 9 (citing Complaint ¶¶ 46, at 6).  These facts, according to the Youngs, support collectively that Hartford Insurance's actions when not paying the Youngs the full amount to which they were entitled, were "malicious, willful, reckless, wanton, oppressive, in bad faith and/or fraudulent," Response at 9 (quoting Complaint ¶ 53, at 7).  Hartford Insurance's conduct, in turn, as the Youngs contend, represents the requisite "culpable mental state" for the Youngs "to recover punitive damages in an amount to be determined at trial."  Response at 9 (quoting Complaint ¶ 53, at 7).

        c.        **The Youngs argue that UM/UIM benefits, including punitive damages, are available to them in this case.**

Next, the Youngs counter Hartford Insurance's argument that UM/UIM benefits are not available to them in this case.  Response at 10.  See MTD at 11-15.  Here, Hartford Insurance argues that the Youngs' vehicles were excluded based on the Automobile Policy's UM/UIM provisions of the policy and New Mexico law, because (i) the Youngs' vehicles were "insured," and therefore, the theft did not "involve an uninsured vehicle driven by a third party," MTD at 11 (citing Mortensen v. Liberty Mut. Ins., 2019 WL 1571730 at *9; Automobile Policy at 40-45; Mountain State Mut. Cas. Co. v. Martinez, 1993-NMSC-003, ¶¶ 8-10, 848 P.2d at 529); (ii) the theft itself does not entitle the Youngs to UM/UIM benefits, MTD at 11-12 (citing Dockery v. Allstate Ins. Co., 2020 WL 59885, *3-4); and (iii) even if UM/UIM benefits were available for theft, they would not be available based on the circumstances that the Youngs plead, MTD at 14-15 (citing Jaramillo v. Providence Washington Insurance Co., 1994-NMSC-018, ¶¶ 18-19, 871 P.2d at 1350-1351).

The Youngs argue that Hartford Insurance's argument, claiming that the Youngs' vehicle was excluded based on the UM/UIM provisions of the automobile policy, ignores "the full context of [Hartford Insurance's] own policy."  Response at 10.  The Youngs, therefore, urge the Court to read the policy "in full."  Response at 10.  The Youngs also direct the Court to the holding in NM Physicians Mut. Liab. Co. v. La Mure, 1993-NMSC-048, 1993-NMSC-048, ¶ 9, 860 P.2d 1306, 1308, which they contend stands for the principle that "[a]n insurance contract should be construed as a complete and harmonious instrument,"  Response at 10 (citing Physicians Mut. Liab. Co. v. La Mure, 1993-NMSC-048, ¶ 9, 860 P.2d at 1308,  and Manuel Lujan Ins., Inc. v. Jordan, 1983-NMSC-100, ¶ 6, 673 P.3d 1306, 1308,  which they contend stands for  the principle that "[e]ach part of the contract is to be accorded significance based on its place in the contract," Response at 10 (citing Manuel Lujan Ins., Inc. v. Jordan, 1983-NMSC-100, ¶ 6, 673 P.3d at 1308).  The Youngs

then explain that "[a]t the time . . . that the property damage occurred" to their vehicle, there was "no liability coverage in effect."  Response at 10.  Furthermore, the Youngs contend that their vehicle was not excluded from coverage because their vehicle did not fall under the New Mexico Administrative Code's ("NMAC") definition of "insured motor vehicle," which according to the Code, is a vehicle "to which the bodily injury and property damage liability coverages of the policy apply."  Response at 10 (quoting NMAC § 13.12.3.14(B)(l)).  In addition, the Youngs reference NMAC §13.12.3.14(B)(4)(6) to argue that their cars were not "insured," as to be excluded under the Hartford Insurance auto policy coverage, given that the Code states that, "the term 'insured motor vehicle' shall not include . . . [a] motor vehicle while being used with the permission of the owner . . . ."  Response at 10 (quoting NMAC § 13.12.3.14(B)(4)(6)).  Instead, as the Youngs clarify, an "uninsured motor vehicle" is defined as:

> a vehicle where there is no "bodily injury and property damage liability bond or insurance policy applicable at the time of the accident with respect to any person or organization legally responsible for the use of the motor vehicle, or with respect to which there is a bodily injury and property damage liability bond or insurance policy applicable at the time of the accident but the company writing the same denies coverage thereunder or is or becomes insolvent," [or] (ii) a "hit-an-run motor vehicle."

Response at 10 (quoting NMAC 13.12.3.14(C)(l)-(2)).  In addition, as the Youngs contend, the NMAC "explicitly ties the existence of liability coverage to the time of the accident, and not at some other time," meaning that if "the liability coverage does not apply at the time of the accident, then it is not in force and the vehicle in uninsured."  Response at 10 (citing NMAC 13.12.3.14(C)(l) - (2)).  The Youngs contend, therefore, that under NMAC 13.12.3.14(C)(l) and (2), their vehicle was "uninsured.  Response at 10 (citing NMAC 13.12.3.14(C)(l) and (2)).

In addition to their vehicle being "uninsured" under New Mexico law, the Youngs argue that their vehicles were "uninsured" under the language of the Hartford Insurance Automobile

Policy.  Response at 10.  The Youngs refer the Court to the following provision of their Automobile

Policy, in which Hartford Insurance states that:

> We will pay damages which an insured is legally entitled to recover from the owner
> or operator of an . . . uninsured motor vehicle because of property damage caused
> by an accident. . . The owner's or operator's liability for these damages must arise
> out of the ownership, maintenance or use of the uninsured motor vehicle.

Response at 10 (quoting Automobile Policy at 17).  The Automobile Policy, as the Youngs outline,

then defines "uninsured motor vehicle" in the following ways:

> a land motor vehicle or trailer of any type: 1. To which no liability bond or policy
> applies at the time of the accident. [or] 2. Which is a hit-and-run vehicle whose
> operator or owner cannot be identified and which hits or which causes an accident
> resulting in [. . .] property damage without hitting[. . .] your covered auto.

Response at 10 (quoting Automobile Policy at 17)(alternations in original).   Under Hartford

Insurance's own definition, then, as the Youngs explain, if there is no liability coverage at the time

of the theft -- which the Youngs state there was not -- or an unknown operator causes property

damage, regardless of hitting -- which the Youngs allege occurred here – then the Youngs, as

plaintiffs, are entitled to UM/UIM coverage.

　　Similarly, the Youngs contend that UM/UIM coverage also applies in this case because

Hartford Insurance's automobile policy only excludes liability coverages for those who (i)

"intentionally cause . . .  property damage;" Response at 11 (quoting Automobile Policy at

13)(alterations in original), or (ii) "[use] a vehicle without reasonable belief that the insured is

entitled to do so."  Response at 11 (quoting Automobile Policy at 13)(alterations in original).

According to the Youngs, because their vehicle was "operated by a thief without permission to do

so (i.e. intentional theft of Plaintiffs' property interest), there was no liability coverage which

applied."  Response at 12.  The Youngs conclude, therefore, that Hartford's argument that its

policy excludes the Youngs' vehicle must fail.  If the Court were to dismiss the Youngs' contention

here, however, the Youngs argue in the alternative, that "[t]o the extent that there is any ambiguity

in the language of the policy, the ambiguity must be construed against the insurer and in favor of

the insured.'."  Response at 12, n. 3.  To buttress their argument, the Youngs cite the holding in

United Nuclear Corp. v. Allstate Insurance Co.., 2012-NMSC-032, ¶ 10, 285 P.3d at 648, for the

principle that where a policy term "reasonably and fairly susceptible of different constructions," it

is deemed ambiguous and "must be construed against the insurance company as the drafter of the

policy."  Response at 12, n. 3 (citing United Nuclear Corp. v. Allstate Ins. Co., 2012-NMSC-032,

¶ 10, 285 P.3d at 648 (quoting Knowles v. United Servs. Auto. Ass'n, 1992-NMSC-030, ¶ 9, 832

P.2d 394, 396)).

The Youngs rebut Hartford Insurance's argument that it is not required to pay UM/UIM

coverage because it already provided compensation to the Youngs under Part D of the Hartford

Insurance automobile policy.  See MTD at 12.  To substantiate their argument, the Youngs cite

Montano v. Allstate, 2003-NMCA-066, 68 P.3d 1255, rev'd, Montano  v. Allstate Indem. Co.,

2004-NMSC-020, 92 P.3d 1255.[4]  Although in Montano v. Allstate, 2003-NMCA-066, 68 P.3d

1255, the Youngs concede that the Court of Appeals of New Mexico was assessing primarily

restrictions to uninsured motorist coverage stacking, the Youngs argue that the Court still

"specifically recognized that uninsured motorist property damage coverage provides more

coverage than that provided by the collision coverage under a policy."  Response at 12 (citing

Montano v. Allstate, 2003-NMCA-066, ¶ 45-52, 68 P.3d at 948-950).  The Youngs then reference

the New Mexico Court of Appeals' dicta, which the Youngs argue proves that uninsured motorist

---

[4]Although Montano v. Allstate, 2003-NMCA-066, ¶ 45-52, 68 P.3d at 948-950, was reversed by the Supreme Court of New Mexico, the Youngs argue that the case was reversed "only to the extent that the Supreme Court of New Mexico invalidated the attempted limitation of uninsured motorist stacking by Allstate."  Response at 12 (citing Montano v. Allstate, 2003-NMCA-066, ¶ 45-52, 68 P.3d at 948-950)).

property damage coverage is more expansive than collision coverage under their automobile
policy:

> We are not persuaded that the property damage premium is worthless when
> the insured also has collision coverage.  The Legislature has required an insurer
> to provide uninsured motorist coverage "in minimum limits . . . for injury to or
> destruction of property" in addition to "for bodily injury or death."  NMSA 1978,
> § 66-5-301(A) (1983).  Therefore, the Legislature does not consider uninsured
> motorist property damage coverage to be worthless or a duplication of collision
> coverage. Further, uninsured motorist property damage covers losses not covered
> by collision insurance, such as damage by an uninsured vehicle to any property
> owned by the insured, which would include damage to the insured's home.
>
> In addition, the compensation for damage may be different.  Under the
> policy's collision coverage, the insured's compensation is actual cash value, after a
> $500 deductible, and limited by "what it would cost to repair or replace the property
> or part with other of like kind and quality."  Under uninsured motorist property
> damage coverage, after a $250 deductible the insured receives the "damages that
> an insured person is legally entitled to recover from the owner or operator of an
> uninsured auto." Uninsured motorist property damage therefore may also provide
> greater benefits and coverages, such as, for example, loss of use benefits and
> perhaps even recovery when damage is due to an intentional tort.

Response at 12-13 (quoting Montano v. Allstate Indem. Co., 2003-NMCA-066, ¶¶ 51-52, 68 P.3d

at 949.).

This passage, argues the Youngs, suggests also that the New Mexico Court of Appeals

"recognized that the legislature does not consider uninsured motorist property damage to be

worthless or a duplication of collision coverage,"  Response at 13 (citing Montano v. Allstate,

2003-NMCA-066, ¶ 45-52, 68 P.3d at 948-950).  Rather, according to the Youngs, the New

Mexico Court of Appeals recognized actually that the legislature states "that uninsured motorist

coverage covers damages due to an intentional tort and other damages not covered under another

portion of an insured's policy."  Response at 13 (citing Montano v. Allstate, 2003-NMCA-066, ¶

45-52, 68 P.3d at 948-950)).  Based on the holding in Montano v. Allstate, 2003-NMCA-066, ¶

45-52, 68 P.3d at 948-950, and because the Youngs allege that they "were grossly underpaid for all damages, including total loss for the trailer and attachments, as well as punitive damages," the Youngs argue that the jury should be presented with these factual questions and Hartford Insurance's Motion to Dismiss Count V should be denied.

The Youngs turn next to Hartford Insurance's contention that the factual details relating to the March 30, 2016, theft do not entitle the Youngs to UM/UIM benefits.  See MTD at 11-12 (citing Dockery v. Allstate Ins. Co., 2020 WL59885, at *3-4).  To the contrary, the Youngs contend, based on Supreme Court of New Mexico precedent, their automobile theft is compensable in this case is compensable under their Hartford Insurance Automobile Policy.  Response at 13 (citing Britt v. Phoenix Indemnity Insurance Company, 1995-NMSC-075, ¶ 8, 907 P.2d 994, 997; State Farm Mut. Auto. Ins. Co. v. Blystra, 86 F.3d 1007 (10th Cir. 1996).  The Youngs refer the Court to Britt v. Phoenix Indemnity Insurance Company, 1995-NMSC-075, ¶ 8, 907 P.2d at 997, which, as the Youngs explain, established that "the only limitations on uninsured motorist coverage protection are those specifically set out in the [UM] statute itself."  Response at 13 (citing Britt v. Phoenix Indem. Ins. Co., 1995-NMSC-075, ¶ 8, 907 P.2d at 997).  This rule means, as the Youngs elaborate, that, to receive compensation on his or her claim, the insured: (i) must have incurred damages that must arise "out of the ownership, maintenance, or use of the uninsured motor vehicle," and (ii) is "legally entitled to recover monetary damages for the damage caused by the owner or operator of the uninsured motor vehicle."  Response at 13 (citing Britt v. Phoenix Indemnity Insurance Company, 1995-NMSC-075, ¶ 8, 907 P.2d at 997).

The Youngs argue that, because they contend that the damages they have incurred relate to their March 30, 2016, property theft, and are not excluded from coverage under Britt v. Phoenix Indemnity Insurance Company, 1995-NMSC-075, ¶ 8, 907 P.2d at 997, they have "suffered

compensable injuries for which they are entitled UM coverage." Response at 13.  <u>Britt v. Phoenix Indemnity Insurance Company</u>, 1995-NMSC-075, ¶ 8, 907 P.2d at 997, involves the Supreme Court of New Mexico holding that damages arising from the intentional stabbing of a claimant father by an unknown assailant qualifies as an accident for purposes of UM coverage.  See <u>Britt v. Phoenix Indemnity Insurance Company</u>, 1995-NMSC-075, ¶ 8, 907 P.2d at 997.  When assessing the definition of "accident" within the context of an UM claim, the Supreme Court of New Mexico declares that  "if the event causing the injury is unintended and unexpected from the injured party's viewpoint, the injury is deemed to have occurred as a result of an accident."  <u>Britt v. Phoenix Indemnity Insurance Company</u>, 1995-NMSC-075, ¶ 8, 907 P.2d at 997.  The Youngs, therefore, urges the Court to place weight on the Supreme Court of New Mexico's aforementioned conclusion,  <u>see</u> Response at 13, because "<i>Britt</i> is the seminal New Mexico case that articulates the test for determining whether intentional conduct and its resulting harm arises out of the use of an uninsured vehicle," <u>Crespin v. Safeco Ins. Co. of Am.</u>, 2018-NMCA-068, ¶ 15, 429 P.3d 968, 971 (internal quotations omitted).  Moreover, the Youngs urge the Court to view the factual scenario in this case as similar to that in <u>Britt v. Phoenix Indemnity Insurance Company</u>, 1995-NMSC-075, ¶ 8, 907 P.2d at 997, for, as similar to the situation in <u>Britt v. Phoenix Indemnity Insurance Company</u>, 1995-NMSC-075, ¶ 8, 907 P.2d at 997, the property damages that the Youngs allege are "unintended and unexpected," and, therefore, should as "qualify as compensable accidents."  <u>See</u> Response at 14 (citing <u>Britt v. Phoenix Indemnity Insurance Company</u>, 1995-NMSC-075, 907 P.2d at 997).  Moreover, as the Youngs contend, no bar exists to their recovery, even if the tortfeasor is unknown. Response at 14 (citing <u>Barncastle v. American Nat. Prop. and Cas. Companies</u>, 2000-NMCA-095, ¶¶ 9-12, 11 P.2d 1234, 1235-36).

The Youngs argue that, in New Mexico, UM coverage for property damages necessarily includes punitive damages.  Response at 15 (citing Uninsured Motorist Act ("UMA"), NMSA 1978, § 66-5-301).  The Youngs direct this Court to the UMA's  § 66-5-301(A) and § 66-5-301(C) as support for their argument:

> No motor vehicle or automobile liability policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person and for injury to or destruction of property of others arising out of the ownership, maintenance or use of a motor vehicle shall be delivered or issued for delivery in New Mexico with respect to any motor vehicle registered or principally garaged in New Mexico unless coverage is provided therein or supplemental thereto in minimum limits for bodily injury or death  and  for injury to or destruction of property as set forth in § 66-5-215 NMSA 1978. . . . for the protection of person insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness or disease, including death, and for injury to or destruction of property resulting therefrom, according to the rules and regulations promulgated by, and under provisions filed with and approved by, the superintendent of insurance.

> . . .

> The uninsured motorist coverage shall provide an exclusion of not more than the first Two Hundred Fifty Dollars ($250.00) of loss resulting from injury to or destruction of property of the insured in any one accident.

Response at 15 (quoting NMSA 1978, § 66-5-301(A); NMSA 1978, § 66-5-301(C)).

The Youngs explain further that the state appellate courts of New Mexico have interpreted the  UMA liberally to advance the UMA's intended purpose, which "is to place insured persons in the same position as if the uninsured motorist had insurance."  Response at 16 (citing Schmick v. State Farm Mut. Auto. Ins. Co. v. Luebbers, 1985-NMSC-073, ¶ 10, 704 P.2d 1092, 1095.  This goal means, according to the Youngs, that "[u]ninsured motorist coverage is intended to act in place of the tortfeasor's liability policy, placing victims in the same position they would have been in if the tortfeasor had coverage."  Response at 16 (citing  Schmick v. State Farm Mut. Auto. Ins. Co. v. Luebbers, 1985-NMSC-073, ¶ 10, 704 P.2d 1092, 1095).  Equally, the Youngs argue that

the UM Act has been "interpreted liberally to implement its remedial purpose," meaning that "any provision allowing for an exception to uninsured motorist coverage is strictly construed to protect the insured."  Response at 16 (quoting Phoenix Indem. Ins. Co. v. Pulis, 2000-NMSC-023, ¶ 7, 9 P.3d 639, 642).

The Youngs urge the Court to adhere to the liberal interpretation of the UMA for the purpose of evaluating punitive damages, as well.  See Response at 16.  Liberal interpretation of punitive damages under the UMA, would, according to the Youngs, be consistent with Stinbrink v. Farmers Insurance Company of Arizona, 1990-NMSC-108, ¶¶ 1-2, 803 P.2d 664, 664-65.  See Response at 16.  In Stinbrink v. Farmers Insurance Company of Arizona, 1990-NMSC-108, ¶¶ 1-2, 803 P.2d at 664-65, the Supreme Court of New Mexico was faced with the question of whether the UMA required an uninsured motorist insurance carrier to provide policyholders coverage for punitive damages against uninsured motorists.  Although the Supreme Court of New Mexico acknowledged that the UMA did not specifically provide for punitive damages, it questioned whether the state legislature intended that punitive damages be encompassed by the UMA's  term "legally entitled to recover," and ultimately answered the question in the affirmative, Stinbrink v. Farmers Insurance Company of Arizona, 1990-NMSC-108, ¶¶ 3-4, 803 P.2d at 665.  The Supreme Court of New Mexico, therefore, held that  while punitive damages are not a mandatory part of liability coverage and can be excluded by an insurer, under the UM Act, uninsured motorist coverage does encompass coverage for punitive damages and cannot be excluded from the UMA -- even if punitive damages are not addressed explicitly by the UM Act's language.   Response at 17 (citing Stinbrink v. Farmers Insurance Company of Arizona, 1990-NMSC-108, ¶ 5, 803 P.2d at 665)("We have thus determined that punitive damages are as much a part of the potential award under the Uninsured Motorist Statute as damages for bodily injury, and therefore they cannot be

contracted away.").  The Youngs argue that the aforementioned holding is applicable to this case, and, therefore, they argue that the Court should hold that the UMA provides the Youngs coverage -- despite them being insured -- for the same amount and damages they "would be entitled to recover against a culpable uninsured, even unknown motorists [sic]."  Response at 17.  See Stinbrink v. Farmers Insurance Company of Arizona, 1990-NMSC-108, ¶¶ 3-4, 803 P.2d at 665.

Consistent with the declarations set forth above, the Youngs advance two final contentions when addressing Hartford Insurance's argument that punitive damages cannot be awarded in this case.  See Response at 17.  First, the Youngs advance that Hartford Insurance relies improperly on the non-binding district court cases, Dockery v. Allstate Ins. Co., 2020 WL 59885, at *3-4, and Mortensen v. Liberty Mut. Ins., 2019 WL 1571730, at *4, in its attempt to create an exclusion that the Youngs are not entitled to punitive damages because the tortfeasor in this case is unknown. See Response at 17 (citing Dockery v. Allstate Ins. Co., 2020 WL 59885, at *3-4; Mortensen v. Liberty Mut. Ins., 2019 WL 1571730, at *4).  The Youngs state that Hartford Insurance's reliance on Dockery v. Allstate Ins. Co., 2020 WL 59885, at *3-4 and Mortensen v. Liberty Mut. Ins., 2019 WL 1571730, at *4, is improper, because both cases "contravene the public policy of the UM Act, which is to expand uninsured motorist coverage,"  Response at 17 (citing Progressive Nw. Ins. Co. v. Weed Warrior Servs.,, 2010-NMSC-050, ¶¶ 7-9, 245 P.3d 1209, 1212; Marckstadt v. Lockheed Martin Corp., 2010-NMSC-001, ¶ 14, 228 P.3d 462, 467.  The Youngs also argue that Hartford Insurance's reliance on Dockery v. Allstate Ins. Co., 2020 WL 59885, at *3-4 and Mortensen v. Liberty Mut. Ins., 2019 WL 1571730, at *4, is "inappropriate pursuant to the Mend the Hold Doctrine." Response at 22 (citing Irwin v. Sovereign Camp of Woodmen of the World, 1910-NMSC-023, 110 P. 550).).  Namely, as the Youngs explain, Hartford Insurance's attempt "to now change its factual basis for its evaluation" of their insurance claims "would be contrary to New

Mexico law and is further evidence of bad faith." Response at 22 (citing <u>Padilla, et al. v. Western</u>

<u>Heritage Insurance Co</u>, 2004 WL 5000111, at *5-6 (D.N.M. May 24, 2001)(Black, J.).   The

Youngs reference the following conclusions made by the Honorable Bruce D. Black, United States

District Judge for the District of New Mexico as further support for their contention:

> "The mend-the-hold principle is most frequently applied in contracts
> disputes, particularly to cases involving insurance coverage. <u>Harbor Ins. Co. v.</u>
> <u>Continental Bank Corp.</u>, 922 F.2d 357, 363 (7th Cir. 1990); Sitkoff, Robert H.,
> <u>"Mend the Hold" and Erie: Why an Obscure Contracts Doctrine Should Control in</u>
> <u>Federal Diversity Cases</u>, 65 U. Chi. L. Rev. 1059 (1998). It is based on the duty of
> good faith inherent in every contract, which is especially strong in insurance cases.
> <u>Id.</u>  Put simply, the doctrine says this: once an insurer has declined to provide
> coverage on one ground, the insurer will not be allowed to raise another ground as
> a defense to coverage (with exceptions discussed briefly below).  Applied to this
> case, the doctrine would mean that Defendant, which denied coverage and a
> defense on the basis that no occurrence had been alleged in the third-party
> complaint, cannot now raise a new argument that coverage was eliminated by
> certain exclusions contained in the policy. In other words, since Defendant
> never mentioned the applicability of any possible exclusions when it declined
> to provide a defense, Defendant may not now rely on any exclusions to justify
> its failure to defend."

Response at 23 (quoting <u>Padilla, et al. v. Western Heritage Insurance Co</u>, 2004 WL 5000111, at

*5-6).  Moreover, as the Youngs conclude, "the Mend the Hold Doctrine is applicable to this case

because Defendant relies upon nonbinding district court cases that were ruled upon years after the

significant underpayment of Plaintiffs' claim. Defendant could not have relied upon those cases to

support its denial of the claim."  Response at 23.  In sum, the Youngs request that the Court (i)

deny Hartford Insurance's Motion to Dismiss  the Youngs' Counts I  through VI; (ii) allow the

Youngs to proceed to discovery to further investigate Hartford Insurance's denial of the full extent

of their insurance coverage under their Hartford Insurance policies; and (iii) certify the issues

presented in this case to the Supreme Court of New Mexico pursuant to New Mexico Rule of

Appellate Procedure 12-607 NMRA.  <u>See</u> Response at 23.

**4.      The Hearing.**

The Court held a hearing on April 15, 2020.  See Clerk's Minutes at 1.  See also Transcript of Hearing at 1:2-18, taken April 15, 2020  (Court)("Tr.").[5]   Hartford Insurance first presented its motions before the Court, requesting that the Court (i) dismiss the Youngs' Counts I through IV pursuant to rule 12(b)(6), and (ii) strike the Youngs' requests for punitive damages against Hartford Insurance in ¶¶  53, 65, 68, and 74 of the Complaint.  Tr. at 2:11-14 (Wilson).

Hartford Insurance initially outlined its arguments for the dismissal of the Youngs' Counts I through IV.  The core issue across both motions, Hartford Insurance stressed, is whether the Youngs can prove "covered damages that can be recovered," and whether they advance "facts that would support their breach-of-contract claim" under "the two different insurance policies." Tr. at 2:11-18 (Wilson).  First, in connection to the Automobile Policy, Hartford Insurance stated that "[t]here are a number of different reasons why even with -- if you take everything that the Plaintiffs say is true in their pleading," the damages they claim related to the theft of their track are "not covered." Tr. at 3:1-6 (Wilson).  Significantly, as Hartford Insurance stressed, despite the Youngs' citing of a "number of cases" that they believe support their argument regarding their car being covered by the policies, in fact, "there are no cases in New Mexico that suggest that theft is covered by the uninsured motorist statute." Tr. at 3:1-6 (Wilson).   The only cases that would apply, then, as Hartford Insurance explained, are "in the United States District Court for the District of New Mexico, and those cases have found that the uninsured motorist statute is not to extend to theft or the types of circumstances that we have in this case." Tr. at 3:12-16 (Wilson).  Furthermore, as Hartford Insurance concluded on the point of the uninsured motorist statue, even if it the statute

_____

[5]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

"may be interpreted liberally" by district courts, the statute's coverages still does not include the particular factual scenario of theft that the Youngs allege.  See Tr. at 4:17-19 (Wilson).

After Hartford Insurance completed its initial arguments related to the uninsured motorist statute, the Court interjected regarding the interpretation and application of the statute in the District of New Mexico and within the New Mexico state courts.  See Tr. at 4:9-22 (Court).  Here, the Court noted that "there's still a legal issue buried" within the Youngs' pleadings, which relates to whether "the New Mexico State courts have not ruled on" the application of the UMA to issues of theft.  Tr. at 4:13-14 (Court).  For example, as the Court noted, some New Mexico courts "have looked at this issue and say theft doesn't come within the uninsured issue," Tr. at 4:15-16 (Court), but there have not been any rulings from the New Mexico Supreme Court on the issue, nor have there been any rulings from the New Mexico Court of Appeals.  See Tr. at 4:17-19 (Court).  Accordingly, as the Court explained, "there is a legal issue . . . buried in here that's going to have to be decided probably in this case."  Tr. at 4:19-21 (Court).   Hartford Insurance agreed with the Court's statement.  See Tr. at 4:23 (Wilson).

The Court then turned to the question of punitive damages, asking Hartford Insurance "what more would you want as far as to make" the Youngs' prayer for punitive damages "comply with Twombly and Iqbal?"  Tr. at 5:1-3 (Court).  See Bell Atlantic Corp. v. Twombly, 550 U.S. at 557; Ashcroft v. Iqbal, 556 U.S. at 679.  Elaborating on its position regarding the Youngs' punitive damage deficiencies, Hartford Insurance explained that, "to the extent the plaintiffs are claiming additional damages that weren't paid under the auto policy other than the punitive damage issues, then we would need more -- we would need factual allegations that talk about what types of those damages are."  Tr. at 5:4-9 (Wilson).  Hartford Insurance then outlined its position on the problems with the Youngs' contentions regarding punitive damages by stating:

From plaintiffs' pleading, I get the impression that the only issue with respect to the auto policy is punitive damages, because it's the only facts that are alleged as, you know, amounts that weren't' paid by Hartford. However, to the extent, since we have Count I and count [sic] -- I think it's five [sic], that seem to be talking about same thing [sic], it's almost a suggestion that there might be other damages that plaintiffs are trying to plead that constitute a breach of contract. To the extent that exists, I don't think there are facts that are alleged in the pleading that support that, and obviously we're not on notice of what those are.

So, to the extent there is something other than the punitive damages issues that needs to be employed, I don't think there are facts that are in the first amended complaint that tell us what those amounts are that weren't paid.

Tr. at 5:10-25 (Wilson);); id. at 6:1-2 (Wilson).

The Court then asked Hartford Insurance why it has filed two motions in the case -- a Motion to Strike and a Motion to Dismiss, see MTD at 1 -- instead of just one motion. See Tr. at 6:6-10 (Court). Replying to the Court, Hartford Insurance conceded that, although the "central issue" across both motions is the same, "the reason why there are two motions is because whether or not [the Youngs] can recover under the facts that are employed under the auto policy versus the homeowner's policy are actually very different." Tr. at 6:11-16 (Court). Hartford Insurance then elaborated on the Youngs' different prospects of recovery under the homeowner policy versus the automobile policy.

So obviously, plaintiffs are not, as far as I know, trying to allege they can get punitive damages under some part of the homeowner's policy. That is something that's very unique to uninsured motorist coverage in New Mexico.

Likewise, I don't think that the issue of whether or not property is business property or not is not an issue that arises under the auto policy. So that's part of the reason why there are two separate motions.

Tr. at 6:17-25 (Wilson).

Hartford Insurance outlined the similarities between the motions in response to the Youngs' request for "extra contractual damages." Tr. at 7:2 (Wilson).

The fact of the matter is there aren't specific allegations made against either of the companies that are unique to them or unique to the facts of this particular case but are the exception of maybe one with respect to the homeowner's policy . . .

I don't know that there were two separate motions that needed to be done because of that, both because of the timing of how the entities came into the case but also because of the separate issues, the separate coverage issues that are being looked at the two cases, it made more sense to do them in two motions.

Tr. at 7:1-16 (Wilson).

The Youngs issued their reply.  The Youngs emphasized that, because Hartford Insurance "request[s] that the claims get dismissed in whole or in part," Tr. at 7:23-25 (Zamora), the Court should be "well aware of the standards of taking all of the allegations as true, viewing those allegations in the light most favorable to the plaintiff and drawing all reasonable inference in plaintiffs' favor."  Tr. at 8:1-5 (Zamora).).  Under the rule 12(b)(6) standard, then, as the Youngs argued, the Court "must deny the defendant's motion."  Tr. at 8:5-6 (Zamora).

The Youngs then stated that Hartford Insurance's arguments in support of the Court granting Hartford Insurance's MTD were inappropriate because, Hartford Insurance relied on a summary judgment standard of review, as opposed to a motion to dismiss standard of review.  See Tr. at 8:6-9 (Zamora).  Specifically, the Youngs' ability to prevail under the factual circumstances, as the Youngs explained, is an inappropriate question to ask at the motion to dismiss stage based on the pleadings, and would, rather, be more appropriate as a basis for dismissal at summary judgment.  See Tr. at 8:6-11 (Zamora).  Furthermore, because the Court is only evaluating the "four corners" of the Youngs' complaint, Tr. at 8:13 (Zamora), it should find that all of the appropriate information to support their allegations is there.  See Tr. at 8:13-14 (Zamora).  The Youngs then referenced the sufficient information found in their Complaint, which included "inform[ing] the defendants of the facts of the case involving the date, location, time of the loss, the facts surrounding the loss, and why it falls under those portions of the policy."  Tr. at 8:14-16

(Zamora).  The Youngs also referenced the facts they included regarding the amounts claimed related to the March 30, 2016, theft.  See Tr. at 8:16-18 (Zamora).

Accordingly, as the Youngs argued, because these facts have been sufficiently alleged, they found it "interesting" that "defendants continue to argue that they are not aware of the amounts claimed when they've been provided a detailed list prior to the lawsuit of all of the information that my clients believe they are entitled to under the policies," Tr. at 8: 20-25 (Zamora), and the amounts are "identified in the complaint as well as the amount [the Youngs] claim is being requested here."  Tr. at 9:1-2 (Zamora).

The Youngs also contended that they had advanced "plausible allegations" to support their breach-of-contract claim," Tr. at 9:4-5 (Zamora):

> There's no dispute that there is a contract in this case or contracts in this case because we have the two Hartford certified policies attached to the complaint. There is no doubt that there is an insurance contract. Plaintiffs made the allegation that they complied with their duty of paying the premiums they are insured.  They presented their claims to the insurance company, and that the insurance company breached those claims by offering and paying significant less than what they're entitled to by -- by not opening up certain portions of the policy that they're entitled to, and so there's a breach of contract case there.

Tr. at 9:5-17 (Court).

Turning next to the question of punitive damages, the Youngs argued that punitive damages are available under the Youngs' breach-of-contract claim under UJI 13-861 NMRA, Paiz v. State Farm Fire and Ins. Co., 1994-NMSC-079, ¶¶ 26-27, 880 P.2d 300, and Sloan v. State Farm Mut. Auto Ins. Co., 2004-NMSC-004, ¶ 23, 85 P.3d 230, 238.   See Tr. at 9:19-22 (Zamora). Referencing the requisite culpable mental state required of punitive damages allegations, the Youngs conceded that while Hartford Insurance's:

> Culpable mental states were alleged in the complaint . . . we cannot, you know, figure out what the culpable mental state is at this point in the case because we haven't been able to do any type of discovery.  So, discovery is necessary to flesh

those out, but the allegations are there, and they're sufficient to show there is a plausible likelihood of being able to pursue those claims.

Tr. at 9:23-25 (Zamora);); id. at 10:1-6 (Zamora).

In addition, as the Youngs continued to argue, under the UCPA, "there is no doubt that both the defendants are insuring in this case, and they have an obligation to comply with that act." Tr. at 10:10-11 (Zamora).  The Youngs argued that they have "highlighted" the relevant "list of unfair insurance claim practices" and show "that there was a significant underpayment of the claim," which represented Hartford Insurance "not attempting in good faith to effectuate complete and fair, equitable settlements."  Tr. at 10:11-18 (Zamora).  In addition, the Youngs contended that Hartford Insurance is "offering . . . substantially less" in the recovery amount without any reasonable explanations found in the policies.   Tr. at 10:20 (Zamora).  See id. at 10:22-24 (Zamora).

In addition, the Youngs argued that they have advanced sufficient allegations in their claims to prove that Hartford Insurance has committed an UPA violation, see Tr. at 11:10-18 (Zamora),  because "there does not need to be any detrimental reliance, [or] any written misrepresentations," Tr. at 11:2-3 (Zamora).  The Youngs contend, therefore, that they have advanced sufficiently that they "believed that they were protected by both insurance companies for this loss," and by not compensating them fully, Hartford Insurance has engaged in "misrepresentations" based on the "dec page, policies, letters and communications of the claims, the sale of insurance and advertising,"  Tr. at 11:7-9 (Zamora) -- all of which, the Youngs state, they have "set forth in the complaint."  Tr. at 11:9-10 (Zamora).

The Youngs next argued that they have advanced sufficient facts in the pleadings to prove that Hartford Insurance has breached its implied covenant of good faith and fair dealing with them, because "it is undisputed" that  (i) "there is a contract in this case,", and (ii) "we know that that's

[sic] implied covenant of good faith and fair dealing is inherent in the contract," Tr. at 11:12-17 (Zamora).

Finally, the Youngs turned to their claims under the UMA and the question of punitive damages under the UMA. See Tr. at 11:9-10 (Zamora). Here, the Youngs conceded that the Court is correct in that "there is a legal issue involving the uninsured motorist portion of the case as well as the punitive damages under the UM portion of the case." Tr. at 11:18-21 (Zamora). According to the Youngs, however, New Mexico law is clear in answering the Court's questions, and relatedly, they do not think that Hartford Insurance has met the standard under New Mexico state law, because the defendants have "simply relied on two [non]-binding federal district court cases without really unfolding the New Mexico law on this issue." Tr. at 11:24-25 (Zamora). See id. at 12:1-2 (Zamora). Rather, as the Youngs explained:

> what we have here is . . . the facts to show that this was an uninsured motorist, it was a thief who stole the vehicle without permission for the insured, by that [sic] under the terms of the policy and the New Mexico Administrative Code, that makes the thief an uninsured motorist, and so the UM policy is open in this case.

Tr. at 12:2-9 (Zamora). Furthermore, "the incident itself constitutes an accident for purposes of the UM Act," as the Youngs explained, because under Britt v. Phoenix Indemnity Insurance Company, 1995-NMSC-075, 1995-NMSC-075, 907 P.2d 994, "an accident does not need to be a vehicle-on-vehicle accident." Rather, the case states that the definition of an accident is "far more broad," and "provided UM coverage for an internal stabbing of the claimant's father." Tr. at 12:2-9 (Zamora). Under Britt v. Phoenix Indemnity Insurance Company, 1995-NMSC-075, 1995-NMSC-075, 907 P.2d 994, the Youngs contended, their accident is covered under the UMA. See Tr. at 12:17-18 (Zamora). Moreover, as the Youngs continued, there does not need to be a "known tortfeasor" under Barncastle v. Am. Nat. Prop. and Cas. Companies, 2000-NMCA-095, ¶¶ 9-12, 11 P.2d at 1235-36, because, in that case, "UM Coverage was afforded in a situation involving an

unidentified passenger in an unidentified vehicle." Tr. at 12:21-22 (Zamora). Barncastle v. Am. Nat. Prop. and Cas. Companies, 2000-NMCA-095, ¶ ¶ 10, 11 P.2d at 1235, according to the Youngs, means that all they have to show is a "causal [chain] between the injury and the vehicle," Tr. at 12:23-24 (Zamora), which they claim is shown here. The Youngs then argued that courts allow "any type of property damage to be covered" under the UMA, because in Richards v. Mountain States Mut. Cas. Co., 1986-NMSC-021, ¶ 13, 716 P.3d 238, 241, " a house was covered under UM because a vehicle crashed into the house." Tr. at 8:14-18 (Zamora). Similarly, in this case, "the vehicle . . . took off with all of the Youngs' property," meaning, as the Youngs concluded, "this is a compensable claim." Tr. at 13:12 (Zamora). Furthermore, the Youngs rebutted Hartford Insurance's arguments that punitive damages are not available on their UM claim, citing the "policy behind the UM statute," which is "to put the plaintiffs into the same position they would have been had the tortfeasor possessed liability insurance." Tr. at 13:14-18 (Zamora).

> New Mexico law is clear that the UM act is interpreted liberally and -- to implement a remedial purpose. Uninsured motorist coverage is strictly pursued to protect the insured. Uninsured motorist coverage is in place to act in the tortfeasors' liability policy putting them in the same position as if the tortfeasor had coverage. The policy is not to protect the insurer who has the ability to use its resources to try to locate an unknown truck user.

Tr. at 13:18-25 (Zamora). See id. at 14:1-3 (Zamora).

Equally, as the Youngs argued, "[t]here is no case law" that supports that the UMA "is dependent on the insurance company being able to subrogate against the tortfeasor . . . New Mexico law is actually clear that punitive damages . . . are covered under the UM portion of the policy. Stinbrink is very clear that the purpose of the UM act is to protect the insured against the financially irresponsible motorist, not the insurance company." Tr. at 14:3-11 (Court). See

<u>Stinbrink v. Farmers Insurance Company of Arizona</u>, 1990-NMSC-108, ¶¶ 1-2, 803 P.2d at 664-65.

Upon completion of their arguments regarding the applicability of the UMA to their claims, the Youngs made a special point to clarify to the Court that they seek not only punitive damages, but, rather "all damages that they presented to their insurance companies prior the lawsuit." Tr. at 16:5-8 (Zamora).   In addition, the Youngs requested that the Court grant them "discovery . . . regarding the actual basis for the defendant's significant under payment of the claims" pursuant to the Homeowners Policy and the Automobile Policy, of which the Youngs are prepared to "present . . . the whole doctrine on those issues," Tr. at 16:11-13 (Zamora).   In this regard, the Youngs contended that there are "absolutely no defenses that did not apply at the time" of Hartford Insurance's denial of their claims, and they are "entitled to know what the actual denial was in Hartford Insurance's new defenses." Tr. at 16:13-16 (Zamora).

The Court interjected, expressing its concerns to the Youngs that they had yet to advance "any factual allegations in the complaint that support" a punitive damages award, and, therefore, the Youngs would "have to rely on discovery," Tr. at 16: 19-22 (Court).   The Court then explained that, in similar situations in the past where plaintiffs have lacked "any sort of facts to support the punitive damages," Tr. at 16:24-25 (Court), it has "dismissed the punitive damages" requests in their entirety, Tr. at 17:1-2 (Court).   The Court then told the Youngs that, if during discovery, they "discovered something that supports the punitive damages claim, we can come back and take a look at it." Tr. at 17: 2-3 (Court).   At the moment, however, according to the Court, it appears that the language of the Youngs' pleadings tracks the statutory language, the uniform jury instructions ("UJIs"), or the case law, "but it doesn't give . . . any facts that say in this case that either one of the defendants have acted the way that the case law requires to get punitive damages." Tr. at 17:6-

9 (Court).  Before responding to the Court's statements, the Youngs clarified that, in bringing their claims, they were seeking two sets of punitive damages.  See Tr. at 18: 3-4 (Zamora).  One set of punitive damages is based on Hartford Insurance's wrongful conduct in relation to not compensating the Youngs fully pursuant to the Youngs' insurance policies, which the Youngs allege represents "willful, wanton, and fraudulent conduct."  Tr. at 18:3-4 (Zamora).  The second set of punitive damages stems from the unknown tortfeasor's wrongful conduct in stealing the Youngs' property, which the Youngs also contend was "willful, wanton, and fraudulent conduct," Tr. at 18:3-4 (Zamora).  The Youngs, therefore, requested discovery on both sets of damages.  See Tr. at 18:8-9 (Zamora).  The Youngs told the Court that they are entitled to discovery on both punitive damages issues, because, if the Court were to dismiss the punitive damages requests, but allow their other claims to survive Hartford Insurance's MTD, the Youngs anticipate that once they attempt to get discovery on the substantive issues underlying their claims and take rule 30(b)(6) depositions, they will "run into a bar to ask the questions to get the information to amend the complaint."  Tr. at 18:14-15 (Zamora).  See id. at 18:9-13 (Zamora).  The Youngs contend, ultimately then, that "it makes sense" for the Court to allow them "to continue to move forward" on their punitive damage claims and "be able to do discovery," Tr. at 18:15-18 (Zamora), and only then, would Hartford Insurance be entitled "to file a motion for judgment" on the Youngs' punitive damage requests, Tr. at 18:19-20 (Zamora).  The Youngs described in greater detail to the Court why their punitive damages allegations should survive Hartford Insurance's MTD:

> [T]he first amended complaint has the allegations, at least enough there to be able to get us there, especially because we do have insur[eds] who presented their claims timely, and . . . complied with all of their obligations, and in the end . . . got significant underpaid.

Furthermore, according to the Youngs, the fact that Hartford Insurance "so underpaid" the Youngs pursuant to their Automobile Policy and Homeowners Policy demonstrates Hartford Insurance's "culpable mental state." Tr. at 19:1-2 (Zamora).

The Court responded to the Youngs' statements with continued misgivings whether the Youngs' allegations could satisfy the Ashcroft v. Iqbal, 556 U.S at 663, and Bell Atlantic Corp. v. Twombly, 550 U.S. at 556, pleading standards, see Tr. at 19:3-17 (Court), stating, instead, that the issue "can go either way," Tr. at 19:3 (Court). The Court described how judging the intent behind Hartford Insurance's alleged underpayment of the Youngs was difficult, because the underpayment could be "perfectly innocent conduct by the insurance company or culpable conduct," Tr. at 19:6-7 (Court). Accordingly, for the Court, the "issue to be decided" is whether Hartford Insurance underpaid the Youngs or paid them the required amount pursuant to the policies' provisions. Tr. at 19:8-9 (Court). Yet, as the Court continued, even if Hartford Insurance's actions constitutes "an underpayment or not," Tr. at 19:10, it still is unclear whether the Youngs' allegations related to the punitive damage requests contain a "factual basis" that push the claims "over from the possibility to plausibility" standard under Ashcroft v. Iqbal, 556 U.S at 663, and Bell Atlantic Corp. v. Twombly, 550 U.S. at 556, "as federal court[s] require," Tr. at 19:13-17 (Court). The Youngs pushed back against the Court's misgivings, see Tr. at 19:18-25 (Zamora), arguing that, in the absence of any explicit writing indicating what Hartford Insurance's mental state was at the time of the alleged underpayment, see Tr. at 19:21-25 (Zamora), discovery is necessary to determine whether Hartford Insurance acted with "willful, wanton, and fraudulent" intent, Tr. at 18:3-4 (Zamora). See id. at 20:1-2 (Zamora)

Upon the conclusion of the Youngs' arguments related to their punitive damages requests, the Court invited Hartford Insurance to respond. See Tr. at 20:6-7 (Court). Hartford Insurance

accepted the invitation "to address some issues that were raised" by the Youngs.  Tr. at 20:9-10 (Wilson).  First, Hartford Insurance responded to the Youngs' contentions that the Court was applying the wrong standard of review at the motion-to-dismiss stage.  See Tr. at 20:11-22 (Wilson).  According to Hartford Insurance, the Court is correct in requiring that the Youngs show factual allegations that are plausible -- not simply possible -- because, pursuant to Ashcroft v. Iqbal, 556 U.S at 663, and Bell Atlantic Corp. v. Twombly, 550 U.S. at 556, "the pleading standard in federal court is not whether or not" the plaintiffs "should be allowed to do discovery on something," but, rather, "whether or not they have employed it in their first amended complaint." Tr. at 20:13-16 (Wilson).  Under this standard, as Hartford Insurance argued, the Court is correct in "rais[ing] the issue" that in relation to the question of punitive damages, the Youngs' complaint "does not appear to contain the factual allegations beyond just the conclusory statements," Tr. at 20:18-20 (Wilson).  See id. at 20:20-22 (Wilson).

Similarly, Hartford Insurance continued, the Court is correct in demanding that the Youngs' factual allegations underlying Counts I through IV be plausible, as opposed to merely possible.  See Tr. at 20:23-25 – 21:1 (Wilson).  Most problematically, as Hartford Insurance explained, the Youngs have not met the standard, because in their Complaint, they merely "give[] a laundry list of what claims practices might be a violation, but yet there are not facts that were employed and certainly the issue has been raised numerous times in this case that there should be facts that are raised that show how plaintiffs' factual information gives rise to those allegations." Tr. at 21:1-7 (Wilson).  Hartford Insurance, therefore, requested that the Court dismiss all of the counts in the Youngs' Complaint.  See Tr. at 21:8-11 (Wilson).

Hartford Insurance responded next to the Youngs' argument that a 12(b)(6) motion was inappropriate at this stage of the case.  See Tr. at 21:8-11 (Wilson).  Here, Hartford Insurance

referenced <u>Mortensen v. Liberty Mutual Insurance,</u> 2019 WL 1571730, at *1-2, as support for

Hartford Insurance's Motion to Dismiss, because <u>Mortensen v. Liberty Mutual Insurance</u>, 2019

WL 1571730, at *1-2,  "clearly indicated that these are the types of issues that are able -- can be

raised at this stage" in the absence of the Youngs' ability to advance a "plausible cause of action."

Tr. at 21:13-15 (Wilson).  Accordingly, as Hartford Insurance continued, the Court should dismiss

the Youngs' claims, as opposed to allowing discovery and proceeding to the summary judgment

stage.  <u>See</u> Tr. at 21:15-17 (Wilson).  Hartford Insurance  then clarified to the Court the exact

position it was taking in its MTD, pursuant to rule 12(b)(6):

> Certainly there are no arguments that are made in either motion that suggest
> that the facts that are employed by the Plaintiffs in their -- Plaintiffs in their first
> amended complaint are somehow not true or not taken as true for this particular
> purpose, but rather that when you take those facts and you apply them to the policy,
> the plaintiffs haven't employed a breach of contract because they have employed
> that they are due coverage under the policy, and from that standpoint, the -- even
> the breach-of-contract claims should be dismissed, because the pleadings would not
> allow them to recover under the law even if you take the claims -- or the factual
> allegations as true.

Tr. at 21:17-25 - 22:1-6 (Wilson).

Hartford Insurance subsequently addressed the Youngs' request for punitive damages with

respect to the Youngs' Hartford Insurance automobile policy.  <u>See</u> Tr. at 22:7-25 (Wilson).

Although Hartford Insurance maintained that the Court should dismiss or strike the Youngs'

requests for punitive damages with respect to all of the claims against Hartford Insurance and also

the Youngs' request for punitive damages against the tortfeasor, it clarified to the Court that it "is

not making the argument that punitive damages are not sometimes recoverable under the uninsured

motorist statute . . . ."."  Tr. at 22:14-16 (Wilson).  Rather,  Hartford Insurance recognized that

punitive damages can be recovered under New Mexico's UMA, because, in fact, "there's

numerous cases in New Mexico" that govern the issue of punitive damages awarded under the

UMA, see Tr. at 22:17-18 (Wilson).  The factual scenario presented by the Youngs, however, as Hartford Insurance argued, is different, in that the Youngs suggest that "punitive damages can be awarded against an unknown tortfeasor under the uninsured motorist statute."  Tr. at 23:1-2 (Wilson).  There are no cases that govern this particular claim, as Hartford Insurance argued, and the "only law and the guidance . . . currently is that that is not something that is anticipated that New Mexico will adopt."  Tr. at 23:3-5 (Wilson).  Hartford Insurance then elaborated on its reasoning regarding why New Mexico would likely never allow for the awarding of punitive damages against an unknown tortfeasor.  See Tr. at 23:3-5 (Wilson).

> Although it is true that the uninsured motorist statute does get interpreted broadly, it does -- the -- the different ways that those cases talk about that is not excluding certain categories, for example, I think pone was whether or not a government vehicle could be excluded, and they determined that they could not. So, I think that the way that the law is developing in this realm would show that punitive damages are probably -- against an unknown tortfeasor are not anticipated by that statute.

Tr. at 23:5-15 (Wilson).

Furthermore, as Hartford Insurance continued, the deterrence policy rationale of awarding punitive damages under the UIM statutes, which the Youngs referenced in their arguments, is not applicable in relation to the Hartford Insurance Automobile Policy, because "making an auto insurer pay for the punitive damages related to somebody stealing a car doesn't deter the person from stealing the car at all.  So, the purpose of punitive damages is not fulfilled if you take [the Youngs'] interpretation of what the contract would require." Tr. at 23:20-25 (Wilson).

Hartford Insurance closed its arguments by reminding the Court that the Court must simply focus on the Youngs':

> Factual pleadings that exist in the first amended complaint and the policies that have been attached and at the end of the day, even if what they say about their pleadings is true, [the Youngs] still have not employed enough to show that there

was a covered damage that wasn't paid for from the auto policy or the homeowner's policy.

Tr. at 24:1-8 (Wilson).

After Hartford Insurance closed its arguments, the Court noted how many legal issues were "buried" in the case. Tr. at 24:10 (Court). The Court then invited the parties to make any final points that they wished the Court to consider. See Tr. at 24:10 (Court). The Youngs took advantage of the Court's invitation, requesting that, if the Court determined it appropriate, the Court should direct for any relevant issues in the case to the Supreme Court of New Mexico for certification. See Tr. at 24:15-21 (Zamora). Responding to the request, the Court indicated that it was doubtful it would pursue that direction, given the difficulty of "picking and choosing which insurance questions" to give to the Supreme Court of New Mexico. Tr. at 25:2-4 (Court). If anything, the Court stated, it would be more appropriate for it to address the issues itself, and then, if there is a split amongst the Court's fellow judges, in the case of an appeal, the United States Court of Appeals for the Tenth Circuit could possibly send the issues for certification back to the Supreme Court of New Mexico. See Tr. at 25:10-18 (Court).

Finally, the Court indicated it would take parties' arguments related to Hartford Insurance's Motion to Dismiss and Motion to Strike under advisement, to which both counsels responded that they had nothing further. See Tr. at 26:15-21 (Court).

## LAW REGARDING MOTIONS TO DISMISS UNDER RULE 12(B)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994)(citing Williams v.

Meese, 926 F.2d 994, 997 (10th Cir. 1991)).  The complaint's sufficiency is a question of law, and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the nonmoving party, and draw all reasonable inferences in the plaintiff's favor.  See Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atlantic Corp. v. Twombly, 550 U.S. at 555. "'At the motion-to-dismiss stage, the court does not weigh the evidence,' and 'is interested only in whether it has jurisdiction and whether the [p]laintiffs plead a claim to relief that is plausible on its face.'" Rivero v. Bd. of Regents of Univ. of New Mexico, No. CIV 16-0318 JB\SCY, 2019 WL 1085179, at *47 (D.N.M. March 7, 2019)(Browning, J.)(quoting Begay v. Pub. Serv. Co. of N.M., 710 F. Supp. 2d 1161, 1199 (D.N.M. 2010)(Browning, J.)).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atlantic Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atlantic Corp. v. Twombly, 550 U.S. at 556). This standard requires "'more than a sheer possibility that a defendant has acted unlawfully.'" Nowell v. Medtronic Inc., 372 F.Supp.3d 1166, 1245 (D.N.M. 2019)(Browning, J.)(quoting Ashcroft v. Iqbal, 556 U.S. at 678). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted). "A court will not construe a plaintiff's pleadings 'so liberally that it becomes his advocate.'" Rivero v. Bd. of Regents of Univ. of New Mexico, 2019 WL 1085179, at *48 (quoting Bragg v. Chavez, No. CIV 07-0343 JB/WDS, 2007 WL 5232464, at *25 (D.N.M. Aug. 2, 2007)(Browning, J.)). The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(citations omitted)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570). See Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, 278 F. Supp. 3d 1245, 1259 (D.N.M. 2017)(Browning, J.).

"When a party presents matters outside of the pleadings for consideration, as a general rule 'the court must either exclude the material or treat the motion as one for summary judgment.'" Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d 1081, 1103 (10th Cir. 2017)(quoting Alexander v. Okla., 382 F.3d 1206, 1214 (10th Cir. 2004)). There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, see Tellabs, Inc.

v. Makor Issues & Rights, Ltd., 551 U.S. at 322; (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.  See Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d at 1103-04 (holding that the district court did not err by reviewing a seminar recording and a television episode on a rule 12(b)(6) motion, which were "attached to or referenced in the amended complaint," central to the plaintiff's claim, and "undisputed as to their accuracy and authenticity").  "[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record."  Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).

In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the motion."  627 F.3d at 1186.  The United States Court of Appeals for the Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment."  627 F.3d at 1186-87.  In other cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint . . . it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)."  Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005)(unpublished).[6]  In Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006)(unpublished), the

---

[6]Nard v. City of Okla. City is an unpublished opinion, but the Court can rely on a Tenth Circuit unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.

Tenth Circuit addressed an untimely filed charge with the Equal Employment Opportunity Commission -- which missed deadline the Tenth Circuit analogized to a statute of limitations -- and concluded that, because the requirement is not jurisdictional, the district court should have analyzed the question under rule 12(b)(6), and "because the district court considered evidentiary materials outside of Douglas' complaint, it should have treated Norton's motion as a motion for summary judgment." Douglas v. Norton, 167 F. App'x at 704-05.

The Court has previously ruled that, when a plaintiff references and summarizes defendants' statements in a complaint, the Court cannot rely on documents containing those statements that the defendants attach in their briefing. See Mocek v. City of Albuquerque, No. CIV 11-1009 JB/KBM, 2013 WL 312881, at *50-51 (D.N.M. Jan. 14, 2013)(Browning, J.). The Court reasoned that the complaint did not incorporate the documents by reference, nor were the documents central to the plaintiff's allegations in the complaint, because the plaintiff cited the statements only to attack the defendant's reliability and truthfulness. See 2013 WL 312881, at *50-51. The Court also previously has ruled that, when determining whether to toll a statute of limitations in an action alleging fraud and seeking subrogation from a defendant, the Court may not use interviews and letters attached to a motion to dismiss, which show that a plaintiff was

---

See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . [a]nd we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that Nard v. City of Okla. City, 153 F. App'x at 534 n.4, and Douglas v. Norton, 167 F. App'x at 704-05, assist the Court in the writing of this Memorandum Opinion and Order.

aware of the defendant's alleged fraud before the statutory period expired. See Great Am. Co. v. Crabtree, No. CIV 11-112 9 JB/KBM, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23, 2012)(Browning, J.)("Crabtree").  The Court in Crabtree determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the sufficiency of its contents alone, as the complaint did not incorporate the documents by reference or refer to the documents.  See 2012 WL 3656500, at *22-23.

On the other hand, in a securities class action, the Court has ruled that a defendant's operating certification, to which the plaintiffs refer in their complaint, and which was central to whether the plaintiffs adequately alleged a loss, falls within an exception to the general rule, so the Court may consider the operating certification when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment. See Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg. Secs. Tr. 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.). See, e.g., S.E.C. v. Goldstone, 952 F. Supp. 2d 1060, 1217-18 (D.N.M. 2013)(Browning, J.)(considering, on a motion to dismiss, electronic mail transmissions referenced in the complaint as "documents referred to in the complaint," which are "central to the plaintiff's claim" and whose authenticity the plaintiff did not challenge); Mata v. Anderson, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the complaint because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute").

## LAW REGARDING MOTIONS TO STRIKE

Rule 12(f) of the Federal Rules of Civil Procedures provides:

**(f) Motion to Strike.** The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.  The court may act:

    (1) on its own; or

> (2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading.

Fed. R. Civ. P. 12(f).   Professors Charles Alan Wright and Arthur Miller have recognized, however, that such motions are not favored and, generally, the court should deny them:

> The district court possesses considerable discretion in disposing of a Rule 12(f) motion to strike redundant, impertinent, immaterial, or scandalous matter. However, because federal judges have made it clear, in numerous opinions they have rendered in many substantive contexts, that Rule 12(f) motions to strike on any of these grounds are not favored, often being considered purely cosmetic or "time wasters," there appears to be general judicial agreement, as reflected in the extensive case law on the subject, that they should be denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy . . .

5C C. Wright & A. Miller, Federal Practice & Procedure § 1382, at 433-36 (3d. ed. 2004)(footnotes omitted).   Accord Budget v. Capital W. Sec., Inc., 2009 WL 4807619, at *1 (citing Scherer v. U.S. Dep't of Educ., 78 F. App'x 687, 689 (10th Cir. 2003)(unpublished)) ("While motions to strike are generally disfavored, the decision to grant a motion to strike is within the discretion of the court.")) [7].

---

[7]Scherer v. United States Department of Education is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.   See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").   The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . . And we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).   The Court concludes that Scherer v. United States Department of Education, Searcy v. Social Security Administration., 956 F.2d 278, 1992 WL 43490 (10th Cir. 1992), and In re Hopkins, 162 F.3d 1173, 1998 WL 704710 (10th Cir. 1998) have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

"Allegations will not be stricken as immaterial under this rule unless they have no possible bearing on the controversy." Estate of Gonzales v. AAA Life Ins. Co., No. CIV 11–0486 JB/WDS, 2012 WL 1684599, at *5 (D.N.M. May 8, 2012)(Browning, J.)(internal quotation marks omitted)(quoting Sai Broken Arrow C, LLC v. Guardian Emergency Vehicles, Inc., 2010 WL 132414, at *5).   Professors Wright and Miller have also commented on what constitutes "immaterial" matter in the context of a motion to strike. 5C Wright & Miller, supra, § 1382, at 458-60 (footnotes omitted).   "'Immaterial' matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded, or a statement of unnecessary particulars in connection with and descriptive of that which is material." 5C Wright & Miller, supra, § 1382, at 458-60 (footnotes omitted).

Moreover, "[o]nly material included in a 'pleading' may be the subject of a motion to strike, and courts have been unwilling to construe the term broadly.   Motions, briefs, . . . memoranda, objections, or affidavits may not be attacked by the motion to strike." Dubrovin v. Ball Corp. Consol. Welfare Ben. Plan for Emps., Civil Action No. 08–cv–00563–WYD–KMT, 2009 WL 5210498, at *1 (D. Colo. Dec. 23, 2009)(Wiley, J.).   Accord Ysais v. N.M. Judicial Standard Comm'n, 616 F. Supp. 2d 1176, 1184 (D.N.M. 2009)(Browning, J.)("Ysais")(citing Searcy v. Soc. Sec. Admin., 956 F.2d 278, 1992 WL 43490 at *1, *4(10th Cir. 1992))("Generally . . . motions, briefs, and memoranda may not be attacked by a motion to strike.").   "The Federal Rules of Civil Procedure define 'pleadings' as a complaint or third-party complaint; an answer to a complaint, a third-party complaint, a counterclaim, or a crossclaim; and, 'if the court orders one, a reply to an answer.'" Ysais, 616 F. Supp. 2d at 1184 (quoting Fed. R. Civ. P. 7(a)).

"Striking a pleading or part of a pleading is a drastic remedy and because a motion to strike may often be made as a dilatory tactic, motions to strike under Rule 12(f) generally are disfavored." Estate of Gonzales v. AAA Life Ins. Co., 2012 WL 1684599, at *5 (quoting Sai Broken Arrow C, LLC v. Guardian Emergency Vehicles, Inc., 2010 WL 132414, at *5)(internal quotation marks omitted)). "The exception to this principle is that a Court may 'choose to strike a filing that is not allowed by local rule, such as a reply filed without leave of court.'" Ysais, 616 F. Supp. 2d at 1184 (citing In re Hopkins, 162 F.3d 1173, 1998 WL 704710 at *3 (10th Cir. 1998)).

For example, in Skyline Potato Co., Inc. v. Hi–Land Potato Co., Inc., No. CIV 10–0698 JB/RHS, 2012 WL 6846386 (D.N.M. Dec. 31, 2012)(Browning, J.), the Court denied a motion to strike a letter filed with the Court, because the letter was not a pleading, and did not pertain to either party's legal defenses or arguments; the letter expressed one party's position regarding whether the Court should rule on summary judgment motions pending at the close of a bench trial. See 2012 WL 6846386, at *6. Similarly, in Great American Insurance v. Crabtree, No. CIV 11-1129, 2012 WL 3656500 (D.N.M. Aug. 23, 2012)(Browning, J.), the Court denied a plaintiff's motion to strike exhibits attached to the defendant's motion to dismiss, because they were neither pleadings nor irrelevant. See 2012 WL 3656500, at *18. In Applied Capital, Inc. v. Gibson, No. CIV 05-0098, 2007 WL 5685131 (D.N.M. 2007)(Browning, J.), the Court refused the plaintiff's request to strike a motion to dismiss, because rule 12(f) applies only to pleadings and not to a motion to dismiss. See 2007 WL 5685131, at *18. In Estate of Anderson v. Denny's, Inc., 291 F.R.D. 622, 635 (D.N.M. 2013)(Browning, J.), the Court denied the plaintiff's request to strike a notice of completion of briefing for similar reasons. See 291 F.R.D. at 635.

In Lane v. Page, the plaintiff filed a motion to strike parts of the defendants' answer, because it was "devoid of factual allegations and assert[ed] improper defenses." 272 F.R.D. at

588.  Specifically, the plaintiff argued that the defendants' affirmative defenses should "put the plaintiff on notice of how the defense applies."  272 F.R.D. at 588.  The plaintiff therefore asked the Court not only to strike some of the defendants' answers, but also to "require the Defendants to amend their answers."  272 F.R.D. at 588.  The defendants argued that rule 8 does "not require them to provide factual support for their affirmative defenses" and contended that their answers adequately responded to the plaintiff's complaint.  272 F.R.D. at 588.  The Court "decline[d] to extend the heightened pleading standard the Supreme Court established in Bell Atlantic Corp. v. Twombly and Ashcroft v. Iqbal to affirmative defenses pled in answers, because the text of the rules, and the functional demands of claims and defenses, militate against requiring factual specificity in affirmative defenses."  272 F.R.D. at 588.  The Court struck two improperly labeled affirmative defenses that stated the defendants "reserve the right to assert additional affirmative defenses."  272 F.R.D. at 601.  The Court concluded the statement was not a defense, explaining:

> "[a]n affirmative defense, under the meaning of Fed. R. Civ. P. 8(c), is a defense that does not negate the elements of the plaintiff's claim, but instead precludes liability even if all of the elements of the plaintiff's claim are proven."  Roberge v. Hannah Marine Corp., [No. 96–1691,] 1997 WL 468330, at *3 [(6th Cir. 1997)].  "A reservation of unpled defenses is not a defense of any kind, much less an affirmative one."  Mission Bay Ski & Bike, 2009 WL 2913438, 2009 WL 2913438 at *5 [(N.D. Ill. Jan. 9, 2009)(Goldgar, J.)].

In Tavasci v. Cambron, No. CIV 16-0461 JB/LF, 2016 WL 6405896 (D.N.M. Oct. 25, 2016)(Browning, J.), the Court retreated some from that holding, however, because it did not want to encourage such motions, which do not advance the ball in a case.  The Court refused to strike a reservation of defenses, "[w]here a defendant reserves unpled defenses yet also agrees to comply with rule 15," because "the Court cannot conclude that 'under no set of circumstances' would the reservation of unpled defenses prevail."  2016 WL 6405896, at *18 (quoting Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. 1333, 1343 (D.N.M. 1995)(Hansen, J.)(citations omitted)).

## LAW REGARDING DIVERSITY JURISDICTION

Subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) requires: (i) complete diversity among the parties; and (ii) that "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs."  28 U.S.C. § 1332(a).  As the Court has previously explained, "[t]he Supreme Court of the United States has described [the] statutory diversity requirement [in 28 U.S.C. § 1332(a)] as 'complete diversity,' and it is present only when no party on one side of a dispute shares citizenship with any party on the other side of a dispute."  McEntire v. Kmart Corp., No. CIV 09-0567 JB/LAM, 2010 WL 553443, at *3 (D.N.M. 2010)(Browning, J.)(citing Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267, 267-68 (1806), overruled in part by Louisville & N. R. Co. v. Mottley, 211 U.S. 149 (1908); McPhail v. Deere & Co., 529 F.3d 947, 951 (10th Cir. 2008)).  The amount-in-controversy requirement is an "estimate of the amount that will be put at issue in the course of the litigation."  Valdez v. Metro. Prop. & Cas. Ins. Co., 867 F. Supp. 2d 1143, 1163 (D.N.M. 2012)(Browning, J.)(citing McPhail v. Deere & Co., 529 F.3d at 956).  The Court will discuss the two requirements in turn.

1.       **Diversity of Citizenship.**

For diversity jurisdiction purposes, a person's domicile determines citizenship.  See Crowley v. Glaze, 710 F.2d 676, 678 (10th Cir. 1983).  "A person's domicile is defined as the place in which the party has a residence in fact and an intent to remain indefinitely, as of the time of the filing of the lawsuit."  McEntire v. Kmart Corp., No. CIV 09-0567 JB/LAM, 2010 WL 553443, at *3 (citing Crowley v. Glaze, 710 F.2d at 678).  See Freeport-McMoRan, Inc. v. KN Energy, Inc., 498 U.S. 426, 428 (1991)("We have consistently held that if jurisdiction exists at the time an action is commenced, such jurisdiction may not be divested by subsequent events.").  If neither a person's residence nor the location where the person has an intent to remain can be

established, the person's domicile is that of his or her parents at the time of the person's birth.  See Gates v. Comm'r of Internal Revenue, 199 F.2d 291, 294 (10th Cir. 1952)("[T]he law assigns to every child at its birth a domicile of origin.  The domicile of origin which the law attributes to an individual is the domicile of his parents.  It continues until another domicile is lawfully acquired.").  Additionally, "while residence and citizenship are not the same, a person's place of residence is prima facie evidence of his or her citizenship."  McEntire v. Kmart Corp., No. CIV 09-0567 JB/LAM, 2010 WL 553443, at *3 (citing State Farm Mut. Auto. Ins. Co. v. Dyer, 19 F.3d 514, 520 (10th Cir. 1994)).  A corporation, on the other hand, is "'deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business.'"  Gadlin v. Sybron Int'l Corp., 222 F.3d 797, 799 (10th Cir. 2000)(quoting 28 U.S.C. § 1332(c)(1)).

**2.     Amount in Controversy.**

The statutory amount-in-controversy requirement, which presently stands at $75,000.00, must be satisfied as between a single plaintiff and a single defendant for a federal district court to have original jurisdiction over the dispute; "a plaintiff cannot aggregate independent claims against multiple defendants to satisfy the amount-in-controversy requirement," nor can multiple plaintiffs aggregate their claims against a single defendant to exceed the threshold.  Martinez v. Martinez, No. CIV 09-0281 JB/KBM, 2010 WL 1608884, at *18 (D.N.M. 2010)(Browning, J.).  If multiple defendants are jointly liable, or jointly and severally liable, on some of the claims, however, the amounts of those claims may be aggregated to satisfy the amount-in-controversy requirement as to all defendants jointly liable for the claims.  See Alberty v. W. Sur. Co., 249 F.2d 537, 538 (10th Cir. 1957); Martinez v. Martinez, No. CIV 09-0281 JB/KBM, 2010 WL 1608884, at *18.  Similarly, multiple plaintiffs may aggregate the amounts of their claims against a single defendant if the claims are not "separate and distinct."  Martin v. Franklin Capital Corp., 251 F.3d 1284,

1292 (10th Cir. 2001)(Seymour, C.J.), abrogated on other grounds by Dart Cherokee Basin Operating Co. v. Owens, 135 S. Ct. 547 (2014).  Multiple claims by the same plaintiff against the same defendant may be aggregated, even if the claims are entirely unrelated.  See 14AA Charles A. Wright, Arthur R. Miller, Edward H. Cooper, Vikram D. Amar, Richard D. Freer, Helen Hershkoff, Joan E. Steinman, & Catherine T. Struve, Federal Practice and Procedure, Jurisdiction § 3704, at 566-95 (4th ed. 2011).  While the rules on aggregation sound complicated, they are not in practice: if a single plaintiff -- regardless whether he or she is the only plaintiff who will share in the recovery -- can recover over $75,000.00 from a single defendant -- regardless whether the defendant has jointly liable co-defendants -- then the court has original jurisdiction over the dispute between that plaintiff and that defendant.  The court can then exercise supplemental jurisdiction over other claims and parties that "form part of the same case or controversy under Article III," 28 U.S.C. § 1367(a), meaning that they "derive from a common nucleus or operative fact," United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966).

Satisfaction of the amount-in-controversy requirement must be established by a preponderance of the evidence.  See McPhail v. Deere & Co., 529 F.3d at 953.  In the context of establishing an amount-in-controversy, the defendant seeking removal could appear to be bound by the plaintiff's chosen amount of damages in the complaint, which would seem to allow a plaintiff to avoid federal jurisdiction "merely by declining to allege the jurisdictional amount [in controversy]." McPhail v. Deere & Co., 529 F.3d at 955.  The Tenth Circuit's decision in McPhail v. Deere & Co. has foreclosed such an option from a plaintiff who wishes to remain in state court. McPhail v. Deere & Co. holds that a defendant's burden in establishing jurisdictional facts is met if the defendant proves "jurisdictional facts that make it possible that $75,000 is in play."  529 F.3d at 955.

The Supreme Court recently clarified that a defendant seeking removal to federal court need only include in the notice of removal a plausible allegation that the amount in controversy exceeds the jurisdictional threshold.  See Dart Cherokee Basin Operating Co., LLC v. Owens, 135 S. Ct. at 554.  The district court should consider outside evidence and find by a preponderance of the evidence whether the amount in controversy is satisfied "only when the plaintiff contests, or the court questions, the defendant's allegation."  Dart Cherokee Basin Operating Co., LLP v. Owens, 135 S. Ct. at 554.

## LAW REGARDING DIVERSITY JURISDICTION AND CHOICE OF LAW

When a court's jurisdiction rests on diversity of citizenship under 28 U.S.C. § 1332, the court should look to the forum state's choice-of-law rules to determine which state's substantive law to apply.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941); Pepsi-Cola Bottling Co. v. PepsiCo., Inc., 431 F.3d 1241, 1255 (10th Cir. 2005).  In New Mexico, choice-of-law analysis is a two-step process.  See Mosely v. Titus, 762 F. Supp. 2d 1298, 1314 (D.N.M. 2010)(Browning, J.)(citing Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶ 14, 142 P.3d 374, 377).  "First, the Court must characterize the 'area of substantive law -- e.g., torts, contracts, domestic relations -- to which the law of the forum assigns a particular claim or issue.'"  Mosely v. Titus, 762 F. Supp. 2d at 1314 (quoting Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶ 11, 142 P.3d at 377).  The next step is to apply New Mexico's choice-of-law rule.  See Mosely v. Titus, 762 F. Supp. 2d at 1314 (citing Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶ 15, 142 P.3d at 377).

"In tort actions, New Mexico courts follow the doctrine of lex loci delicti commissi and apply the law of the place where the wrong took place."  Mosely v. Titus, 762 F. Supp. 2d at 1314 (citing Torres v. State, 1995-NMSC-025, ¶ 13, 894 P.2d 386, 390).  The place of the wrong is the

location of the last act necessary to complete the injury.  See Mosely v. Titus, 762 F. Supp. 2d at 1314 (citing Torres v. State, 1995-NMSC-025, ¶ 13, 894 P.2d at 390).  "Where the elements of the underlying claim include harm, the place of the wrong is the place where the harm occurred." Mosely v. Titus, 762 F. Supp. 2d at 1314 (citing First Nat'l Bank v. Benson, 1976-NMCA-072, ¶ 6, 553 P.2d 1288, 1289).

Under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1983)("Erie"), a federal district court sitting in diversity applies "state law with the objective of obtaining the result that would be reached in state court."  Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007).  Accord Mem. Hosp. v. Healthcare Realty Trust Inc., 509 F.3d 1225, 1229 (10th Cir. 2007).  The Court has held that if a district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico "opinion that [governs] a particular area of substantive law . . . [the district court] must . . . predict how the Supreme Court of New Mexico would [rule]."  Guidance Endodontics, LLC v. Dentsply Intern., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.).  "Just as a court engaging in statutory interpretation must always begin with the statute's text, a court formulating an Erie prediction should look first to the words of the state supreme court."  Peña v. Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.).[8]  If the Court finds only an

_____

[8]In performing its Erie-mandated duty to predict what a state supreme court would do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may sometimes contradict the state supreme court's own precedent if the federal court concludes that the state supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (D.N.M. 2014)(Browning, J.).  Courts should be reticent to formulate an Erie prediction that conflicts with state court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in state and federal courts, as the old state supreme court precedent usually binds state trial and appellate courts.  The factors to which a federal court should look before making an Erie prediction that a state supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the state supreme court decision from which the federal court is considering departing -- the younger the state case is, the less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the state

opinion from the Court of Appeals of New Mexico, while "certainly [the Court] may and will consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision." Mosley v. Titus, 762 F. Supp. 2d at 1332 (noting that, where the only opinion on point is "from the Court of Appeals, . . . the Court's task, as a federal district court sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case were presented to it")(citing Wade v. EMCASCO Ins. Co., 483 F.3d 657, 666 (10th Cir. 2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do," and that, "[i]n doing so, it may seek guidance from decisions rendered by lower courts in the relevant state")).[9]   The Court may also rely on decisions by the

_____

courts -- especially the state supreme court -- have placed on the state decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the state decision articulates, especially if the state supreme court has explicitly called an older case's holding into question; (iv) changes in the composition of the state supreme court, especially if mostly dissenting justices from the earlier state decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times. See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17.  In short, a state supreme court case that a federal court Erie predicts will be overruled is likely to be very old, neglected by subsequent state-court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

[9]The Supreme Court has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in *West v. American Telephone and Telegraph Co.*, 311 U.S. 223 (1940), decided this day.  It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle

Tenth Circuit interpreting New Mexico law.  See Anderson Living Trust v. WPX Energy Prod.,

LLC, 27 F. Supp. 3d at 1243 & n.30.[10]  Ultimately, "the Court's task is to predict what the state

_____

as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.

. . . .

> We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.

. . . .

> The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Trust Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted).  The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at 465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Moore's")("Decisions of intermediate state appellate courts usually must be followed . . . [and] federal courts should give some weight to state trial courts decisions.")(emphasis and title case omitted).

  [10]In determining the proper weight to accord Tenth Circuit precedent interpreting New Mexico law, the Court must balance the need for uniformity between federal court and state court interpretations of state law with the need for uniformity among federal judges.  If the Court adheres too rigidly to Tenth Circuit case law, ignoring changes undergone by a state's law in the ensuing years, then parties litigating state law claims will be subject to a different body of substantive law, depending on whether they litigate in state court or federal court.  This result frustrates the purpose of Erie, which held that federal courts must apply state court interpretations of state law, rather than their own, in part so that parties achieve a consistent result regardless of the forum.  This consideration pulls the Court in the direction of according Tenth Circuit precedent less weight, and according state court decisions issued in the ensuing years more weight.  On the other hand, when

the state law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper interpretation.  Otherwise, different federal judges within the same circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a state's law.  This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects state law -- at least provides consistency at the federal level, so long federal district judges are required to follow it.

The Court must decide how to weigh Tenth Circuit case law against more-recent state court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening case law directly on point from the state's highest court, on one end; and independently interpreting the state law, regarding the Tenth Circuit precedent as persuasive authority, on the other.  In striking this balance, the Court notes that it is generally more concerned about systemic inconsistency between the federal courts and the state courts than it is about inconsistency among federal judges.  Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system.  More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the identity of the judge pre-filing or pre-removal.  All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would.  Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency.  When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law.  Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts' are.  More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do.  As such, Tenth Circuit precedent can lag behind developments in state law -- developments that the district courts may be nimble enough to perceive and adopt.  Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted.  Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look.  Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit.  Every federal judicial district in the nation, except the District of Wyoming, covers at most one state.  It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states.

Having outlined the relevant considerations, the Court thinks the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the Constitution of the United States of America possess.  A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based <u>only</u> on state court cases available to and considered by the Tenth Circuit, but it may come to such a conclusion based on intervening state court cases.

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that *x* is the law in New Mexico; it holds that the <u>proper interpretation</u> of New Mexico law, at the time the opinion is released, is *x*.  Its holdings are descriptive, not prescriptive -- interpretive, not normative.  Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court thinks the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law.  The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate.  The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms.  Giving such effect to the Tenth Circuit's interpretations of state law is at tension with <u>Erie</u>, giving independent substantive effect to federal judicial decisions -- <u>i.e.</u>, applying federal law -- in a case brought in diversity.

The purpose of <u>Erie</u> is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum.  For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue."  <u>Moore's</u> § 124.22[3] (citing <u>Comm'r v. Estate of Bosch</u>, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.")(citation and internal quotation marks omitted).  This may not be the most precise formulation if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, United States District Judge, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, see <u>Abbott Laboratories v. Granite State Ins. Co.</u>, 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus.  See <u>Allstate Ins. Co. v. Menards, Inc.</u>, 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to

ascertain the governing substantive law on the point in question."). This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions. To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play. The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The Erie doctrine results in federal cases that interpret state law withering with time. While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale. New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone. The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree. In Wankier v. Crown Equipment Corp., the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In performing this ventriloqual function, however, the federal court is bound by ordinary principles of *stare decisis*. Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp., 353 F.3d 862, 866 (10th Cir. 2003)(McConnell, J.). From this passage, it seems clear the Tenth Circuit only permits a district court to deviate from its view of state law on the basis of a subsequent case "of the state's highest court." See The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that"). A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue" -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation in order to be considered "intervening."

It is difficult to know whether Judge McConnell's limitation of "intervening decision" to cases from the highest state court was an oversight or intentional. Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts. Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th Cir. 2000), the primary

supreme court would do." Wade v. EMCASCO Ins. Co., 483 F.3d at 666.  Accord Mosley v.

Titus, 762 F. Supp. 2d at 1332 (citation omitted); Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d 1174,

1188-89 (D.N.M. 2008)(Browning, J.)(quoting Wade v. EMCASCO Ins. Co., 483 F.3d at 665-66).

### NEW MEXICO LAW REGARDING BREACH-OF-CONTRACT CLAIMS

A contract is a legally enforceable promise that must consist of an offer, an acceptance,

consideration, and mutual assent.  See UJI 13-801 NMRA.  A person may breach a contract by

failing to perform a contractual obligation when the performance is required, unless that

---

authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive
definition.  In fact, Wankier v. Crown Equipment Corp. quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not
> required to prove a safer, feasible alternative design, we are bound to follow the
> rule of Allen [v. Minnstar, Inc., 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case
> interpreting an issue of Utah law], as was the district court. "Following the doctrine
> of stare decisis, one panel of this court must follow a prior panel's interpretation of
> state law, absent a supervening declaration to the contrary by that state's courts or
> an intervening change in the state's law." Koch v. Koch Indus., Inc., 203 F.3d at
> 1231.

Wankier v. Crown Equip. Corp., 353 F.3d at 867.

Whether the decision to limit the intervening authority a district court can consider was
intentional or not, the Tenth Circuit has picked it up and run with it.  In Kokins v. Teleflex, Inc.,
the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion
from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit
interpretation of Colorado law.  See Kokins v. Teleflex, Inc., 621 F.3d 1290, 1297 (10th Cir.
2010)(Holmes, J.)("[T]he Colorado Court of Appeals decided Biosera[, Inc. v. Forma Scientific,
Inc., 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's highest
court.'")(emphasis in original)(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866).
The Tenth Circuit has set forth a stringent restriction on its district courts' ability to
independently administer the Erie doctrine.  More importantly, the Tenth Circuit's view may be at
tension with the above-quoted Supreme Court precedent, as well as its own prior case law.
Moore's lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior
federal appellate decision [interpreting state law] is persuasive." Moore's § 124.22[4] (citing State
Farm Mut. Auto. Ins. Co. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)).  Still, the
Court is bound to abide by the Tenth Circuit's interpretation of Erie.  This scheme may be
inefficient, because the plaintiffs may appeal, after trial, the Court's ruling on the marketable
condition rule.  The Tenth Circuit may certify the question to the Supreme Court of New Mexico,
and the Tenth Circuit may then have to reverse the Court after a full trial on the merits.

performance is otherwise excused.  See UJI 13-822 NMRA.  Incomplete performance is a breach

of contract.  See Cochrell v. Hiatt, 1981-NMCA-125, 638 P.2d 1101, 1103-04 (holding that, where

the contract called for the roof to be restored to a "healthy" state and guaranteed the work for

twenty-five years, because the roof leaked within the twenty-five-year period, the defendant's

performance was incomplete, and the defendant was in breach of the contract).  Under New

Mexico law, "[t]he elements of a breach-of-contract action are the existence of a contract, breach

of the contract, causation, and damages."  Abreu v. N.M. Children, Youth and Families Dep't, 797

F. Supp. 2d at 1247.

> [A] complaint on breach of contract must allege: (1) the existence of a valid and
> binding contract; (2) the plaintiff's compliance with the contract and his
> performance of the obligations under it; (3) a general averment of the performance
> of any condition precedent; and (4) damages suffered as a result of defendant's
> breach.

McCasland v. Prather, 1978-NMCA-098, 585 P.2d 336, 338 (citing (citing Wright and Miller,

Federal Practice and Procedure: Civil § 1235 (1969)).

Applying these principles in Armijo v. N.M. Dep't of Transp., No. CIV. 08-0336 JB/ACT,

2009 WL 1329192 (D.N.M. Apr. 6, 2009)(Browning, J.), the Court found that a plaintiff's

allegations failed to state a claim for breach of contract.  In support of the breach-of-contract claim,

the plaintiff asserted that "the Department would follow state employment policies and procedure,

and that the Department terminated him in breach of those policies without just cause."  2009 WL

1329192, at *7.  The Court noted that the plaintiff did not "indicate what contractual provisions or

employment policies the Department breached," and did not say "to what his employment contract

entitles him or of what the Department deprived him."  2009 WL 1329192, at *7.  The Court found

that there was "not enough . . . to determine whether, if taken as true, the Complaint's allegations

would support claims for breach of contract."  2009 WL 1329192, at *8.  On the other hand, the

Court has previously determined that a pro se plaintiff sufficiently alleged that his counsel breached a contract for legal representation by alleging that his former counsel promised to represent the plaintiff at forfeiture proceedings, that the plaintiff paid the counsel, and that the counsel failed to represent the plaintiff.  See Archuleta v. City of Roswell, No. CIV 10-1224 JB/RHS, 2012 WL 4950324, at **16-17 (D.N.M. Sept. 30, 2012)(Browning, J.).

   "Additionally, in spite of the general bar on punitive damages for breach-of-contract cases, the Supreme Court of New Mexico has recognized that punitive damages may be recoverable under some circumstances for a breach of contract."  Anderson Living Trust v. ConocoPhillips Co., LLC, No. CIV 12-0040 JB/LFG, 2013 WL 3456913, at *42 (June 28, 2013)(Browning, J.). As the Supreme Court of New Mexico stated in Romero v. Mervyn's, 1989-NMSC-081, 784 P.2d 991: "Our previous cases clearly establish that, in contract cases not involving insurance, punitive damages may be recovered for breach of contract when the defendant's conduct was malicious, fraudulent, oppressive, or committed recklessly with a wanton disregard for the plaintiff's rights." 784 P.2d at 998.  Punitive damages are not available when they are "predicated solely on gross negligence.  In addition to, or in lieu of, such negligence there must be evidence of an evil motive or a culpable mental state." Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, 880 P.2d 300, 308 (internal quotation marks omitted).  The Supreme Court of New Mexico has defined "reckless disregard" sufficient for an award of punitive damages as "when the defendant knows of potential harm to the interests of the plaintiff but nonetheless utterly fails to exercise care to avoid the harm." Paiz v. State Farm Fire & Cas. Co., 880 P.2d at 308 (citation and secondary quotations omitted). A defendant does not act with reckless disregard to a plaintiff's rights merely by failing "to exercise even slight care," absent the requisite "culpable or evil state of mind." Paiz v. State Farm Fire & Cas. Co., 880 P.2d at 308 (citation and secondary quotations omitted).  The New Mexico Civil

Jury Instructions define the elements necessary for an award of punitive damages for a breach of contract as follows:

> If you find that _____ (*name of party making claim for punitive damages*) should recover compensation for damages, and if you further find that the conduct of _____ (*name of party whose conduct gives rise to a claim for punitive damages*) was [malicious], [reckless], [wanton], [oppressive], or [fraudulent], then you may award punitive damages.

UJI 13-861 NMRA.

## NEW MEXICO LAW REGARDING CONTRACT INTERPRETATION

In contract cases, "the role of the court is to give effect to the intention of the contracting parties." Bogle Farms, Inc. v. Baca, 1996-NMSC-051, ¶ 22, 925 P.2d at 1184. "The primary objective in construing a contract is not to label it with specific definitions or to look at form above substance, but to ascertain and enforce the intent of the parties as shown by the contents of the instrument." Bogle Farms, Inc. v. Baca, 1996-NMSC-051, ¶ 22, 925 P.2d at 1184 (citing Shaeffer v. Kelton, 1980-NMSC-117, 619 P.2d 1226, 1229). "The parol evidence rule 'bars admission of evidence extrinsic to the contract to contradict and perhaps even supplement the writing.'" Memorial Med. Ctr., Inc. v. Tatsch Const., Inc., 2000-NMSC-030, ¶ 16, 12 P.3d at 431 (citation omitted). On the other hand, New Mexico has "adopted the contextual approach to contract interpretation, in recognition of the difficulty of ascribing meaning and content to terms and expressions in the absence of contextual understanding." Mark V, Inc. v. Mellekas, 1993-NMSC-001, 845 P.2d 1232, 1235 (citation and internal quotation marks omitted). See Pedroza v. Lomas Auto Mall, Inc., No. CIV 07-0594 JB/RHS, 2013 WL 4446770, at *18 (D.N.M. Aug. 2, 2013)(Browning, J.).

"The question whether an agreement contains an ambiguity is a matter of law." Hartnett v. Papa John's Pizza USA, Inc., 912 F. Supp. 2d 1066, 1092 (D.N.M. 2012)(Browning, J.). See

Mark V., Inc. v. Mellekas, 845 P.2d at 1235 (citing Levenson v. Mobley, 1987-NMSC-102, 744 P.2d 174, 176).  When the "evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law."  Mark V, Inc. v. Mellekas, 114 N.M. at 781, 845 P.2d at 1235.  A contract "is not rendered ambiguous merely because a term is not defined; rather, the term must be interpreted in its usual, ordinary, and popular sense . . . and may be ascertained from a dictionary."  Battishill v. Farmers Alliance Ins. Co., 2006-NMSC-004, ¶ 8, 127 P.3d at 1111 (internal quotation marks omitted)(applying principle to insurance policy).  "A contract is deemed ambiguous only if it is reasonably and fairly susceptible of different constructions.  The mere fact that the parties are in disagreement on the construction to be given does not necessarily establish ambiguity."  Vickers v. N. Am. Land Dev., Inc., 1980-NMSC-021, 607 P.2d 603, 606 (citation omitted).

"An ambiguity exists in an agreement when the parties' expressions of mutual assent lack clarity."  Mark V, Inc. v. Mellekas, 845 P.2d at 1235 (citation omitted).  If the court finds that the contract is "reasonably and fairly susceptible of different constructions, an ambiguity exists."  Mark V, Inc. v. Mellekas, 845 P.2d at 1235 (citing Vickers v. North Am. Land Dev., Inc., 94 N.M. at 68, 607 P.2d at 606 (1980)).

> [I]n determining whether a term or expression to which the parties have agreed is unclear, a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance. . . .  It is important to bear in mind that the meaning the court seeks to determine is the meaning one party (or both parties, as the circumstances may require) attached to a particular term or expression at the time the parties agreed to those provisions.
>
> . . . .
>
> It may be that the evidence presented is so clear that no reasonable person would determine the issue before the court in any way but one.  In that case, to the extent the court decides the issue, the question then may be described as one of law.

C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, 817 P.2d 238, 242-44 (affirming the trial court because it "considered all evidence adduced in response to the motion for summary judgment, including collateral or extrinsic evidence of the circumstances surrounding the execution of the lease amendment, and quite properly found no ambiguity")(citations and footnote omitted).  In addition, in determining whether an ambiguity exists,

> [a] court may employ the many rules of contract interpretation that do not depend on evidence extrinsic to the contract.  See, e.g., Smith v. Tinley, 100 N.M. 663, 665, 674 P.2d 1123, 1125 (1984) (reasonable interpretation of contract is favored); Schultz & Lindsay Constr. Co. v. State, 83 N.M. 534, 536, 494 P.2d 612, 614 (1972) (uncertainties construed strictly against drafter); Id. at 535, 494 P.2d at 613 (each part of contract is to be given significance according to its place in the contract so as to give effect to the intentions of the parties).

C.R. Anthony Co. v. Loretto Mall Partners, 817 P.2d at 244 n.5.  Once the Court finds that an ambiguity exists, the resolution of that ambiguity becomes a question of fact.  See Mark V, Inc. v. Mellekas, 845 P.2d at 1235.  To decide the meaning of any ambiguous terms, "the fact finder may consider extrinsic evidence of the language and conduct of the parties and the circumstances surrounding the agreement, as well as oral evidence of the parties' intent."  Mark V, Inc. v. Mellekas, 845 P.2d at 1236.  "[I]f the court finds ambiguity, the jury (or court as the fact finder in the absence of a jury) resolves the ambiguity as an issue of ultimate fact before deciding breach and damages."  C.R. Anthony Co. v. Loretto Mall Partners, 817 P.2d at 241.

## NEW MEXICO LAW REGARDING THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

"Whether express or not, every contract imposes upon the parties a duty of good faith and fair dealing in its performance and enforcement."  Watson Truck & Supply Co., Inc. v. Males, 1990-NMSC-105, 801 1 P.2d 639, 642 (1990)(citations omitted).  "Broadly stated, the covenant requires that neither party do anything which will deprive the other of the benefits of the agreement."  Watson Truck & Supply Co. v. Males, 1990-NMSC-105, 801 P.2d at 642 (internal

quotation marks omitted).  "The breach of this covenant requires a showing of bad faith or that

one party wrongfully and intentionally used the contract to the detriment of the other party."

Sanders v. FedEx Ground Package Sys., 2008-NMSC-040, ¶ 7, 114 N.M. 449, 188 P.2d 1200

(secondary quotations omitted).  The Supreme Court of New Mexico has expressed reluctance,

however, to use the covenant of good faith and fair dealing "under circumstances where . . . it may

be argued that from the covenant there is to be implied in fact a term or condition necessary to

effect the purpose of a contract."  Watson Truck & Supply Co. v. Males, 1990-NMSC-105, 801

P.2d at 642.

> "Generally, in the absence of an express provision on the subject, a contract
> contains an implied covenant of good faith and fair dealing between the parties.
> Under the implied covenant of good faith and fair dealing, courts can award
> damages against a party to a contract whose actions undercut another party's rights
> or benefits under the contract.  Our Supreme Court has nevertheless refused to
> apply this implied covenant to override an express at-will termination provision in
> an integrated, written contract."

Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co, 407 F.3d 1091, 1114-15 (10th Cir. 2005)(quoting

Kropinak v. ARA Health Servs., Inc., 2001-NMCA-081, ¶¶ 3-4,  33 P.3d 679)(secondary citations

omitted).

New Mexico has recognized that a cause of action for breach of the covenant of good faith

and fair dealing sounds in contract.  See Bourgeous v. Horizon Healthcare Corp., 1994-NMSC-

038, 872 P.2d 852, 857.  The Supreme Court of New Mexico has also explained that tort recovery

for breach of the covenant of good faith and fair dealing is permissible only where a special

relationship exists, such as between an insurer and its insured.  See Bourgeous v. Horizon

Healthcare Corp., 1994-NMSC-038, 872 P.2d at 857.  The "relationship of insurer and insured is

inherently unbalanced; the adhesive nature of insurance contracts places the insurer in a superior

bargaining position."  Bourgeous v. Horizon Healthcare Corp., 1994-NMSC-038, 872 P.2d at 857

(citations omitted)(internal quotation marks omitted).  Similarly, the Court of Appeals of New Mexico has held that "[t]he claim of breach of good faith and fair dealing sounds in contract, at least when no 'special relationship' such as that between an insured and insurer exists." Heimann v. Kinder-Morgan CO2 Co., 2006-NMCA-127, ¶ 18, 144 P.3d 111.

The Supreme Court of New Mexico has indicated that "the duty to not act in bad faith or deal unfairly," which an implied covenant of good faith and fear dealing within a contract imposes, "becomes part of the contract and the remedy for its breach is on the contract itself." Bourgeous v. Horizon Healthcare Corp., 1994-NMSC-038, 872 P.2d at 857 (discussing an Arizona case and distinguishing this measure of damages from tort damages that are available for breach of this covenant in the insurance context).  In the insurance context, however, a plaintiff can recover tort damages for breach of this implied covenant.  See Bourgeous v. Horizon Healthcare Corp., 1994-NMSC-038, 872 P.2d at 857.

The Supreme Court of New Mexico has noted that it does "not recognize a cause of action for breach of an implied covenant of good faith and fair dealing in an at-will employment relationship." Melnick v. State Farm Mut. Auto. Ins. Co., 1998-NMSC-012, 749 P.2d 1105, 1109.  This limitation is because "there is no contract of employment upon which the law can impose the stated duty to exercise good faith and fair dealing." Sanchez v. The New Mexican, 1987-NMSC-059, 738 P.2d 1321, 1324 (emphasis in original).

## LAW REGARDING NEW MEXICO'S UNFAIR PRACTICES ACT

The NMUPA provides private -- individual and class action -- remedies and civil penalties "for unfair, deceptive, or unconscionable trade practices." Valdez v. Metro. Prop. & Cas. Ins., No. CIV 11-0507 JB/KBM, 2012 WL 1132414, at *19 (D.N.M. March 31, 2012)(Browning, J.)(citing Quynh Truong v. Allstate Ins., 2010-NMSC-009, 227 P.3d 73, 80).  See NMSA 1978, §

57-12-3 ("Unfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful."); NMSA 1978, § 57-12-10 (authorizing private suits); NMSA 1978, § 57-12-11 (authorizing the Attorney General of New Mexico to seek civil penalties). In construing the NMUPA, "courts to the extent possible will be guided by the interpretations given by the federal trade commission and the federal courts." NMSA 1978, § 57-12-4.

> The term ""unfair or deceptive trade practice"":
>
> covers an act specifically declared unlawful pursuant to the NMUPA, NMSA 1978, § 57-12-2(D), a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services or in the extension of credit or in the collection of debts by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person.

NMSA 1978, § 57-12-2(D)(quotation for emphasis). To succeed on an NMUPA claim of an unfair or deceptive trade practice, the plaintiff most show four elements. Ashlock v. Sunwest Bank of Roswell, N.A., 1988-NMSC-026, 753 P.2d 346, 347.

First, the complaining party must show that the party charged made an "oral or written statement, visual description or other representation" that was either false or misleading. Ashlock v. Sunwest Bank of Roswell, N.A., 1988-NMSC-026, 753 P.2d at 347. Second, the false or misleading representation must have been "knowingly made in connection with the sale, lease, rental or loan of goods or services in the extension of credit or . . . collection of debts." Ashlock v. Sunwest Bank of Roswell, N.A., 1988-NMSC-026, 753 P.2d at 347. Third, the conduct complained of must have occurred in the regular course of the representer's trade or commerce. Ashlock v. Sunwest Bank of Roswell, N.A., 1988-NMSC-026, 753 P.2d at 347. Fourth, the representation must have been of the type that "may, tends to or does, deceive or mislead any person." Ashlock v. Sunwest Bank of Roswell, N.A., 1988-NMSC-026, 753 P.2d at 347. See

Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, 811 P.2d 1308, 1311.  "Generally speaking,

[this NMUPA provision] is designed to provide a remedy against misleading identification and

false or deceptive advertising."  Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 22, 166

P.3d 1091, 1096.  "The gravamen of an unfair trade practice is a misleading, false, or deceptive

statement made knowingly in connection with the sale of goods or services."  Diversey Corp. v.

Chem-Source Corp., 1998-NMCA-112, 965 P.2d 332, 338.  "The 'knowingly made' requirement

is met if a party was actually aware that the statement was false or misleading when made, or in

the exercise of reasonable diligence should have been aware that the statement was false or

misleading."  Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, 811 P.2d at 1311-12.  The

Court has noted that, "in the right circumstances, it could grant judgment as a matter of law on

whether a statement is deceptive or misleading," although "generally the question is a matter of

fact."  Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 728 F. Supp. 2d 1170, 1192-93 (D.N.M.

2010)(Browning, J.)(reasoning that the Supreme Court of New Mexico would reach this

conclusion).  The Court has also concluded that a communication can mislead even if the

representation is not false.  See Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 728 F. Supp.

2d at 1193-95 (concluding that the Supreme Court of New Mexico would reach this conclusion).

Unconscionable trade practices include:

E.     act[s] or practice[s] in connection with . . . the extension of credit in
the collection of debts that to a person's detriment:

(1)     take[ ] advantage of the lack of knowledge, ability, experience
or capacity of a person to a grossly unfair degree; or

(2)     result[ ] in a gross disparity between the value received by a
person     and the price paid.

NMSA 1978, § 57-12-2(E).  An unconscionable trade practice, accordingly, can be procedurally

unconscionable, per § 57-12-2(E)(1), or substantively unconscionable, per NMSA 1978, § 57-12-

2(E)(2).   See Cordova v. World Fin. Corp., 2009-NMSC-021, 208 P.3d 901, 907-908 ("The

doctrine of contractual unconscionability can be analyzed from both procedural and substantive

perspectives.").   The NMUPA's provisions regarding unconscionability "evince[ ] a legislative

recognition that, under certain conditions, the market is truly not free, leaving it for courts to

determine when the market is not free, and empowering courts to stop and preclude those who

prey on the desperation of others from being rewarded with windfall profits."  State ex rel. King

v. B & B Inv. Grp., Inc., 2014-NMSC-024, 329 P.3d 658, 671.  "Procedural unconscionability . .

. examines the particular factual circumstances surrounding the formation of [a] contract, including

the relative bargaining strength, sophistication of the parties, and the extent to which either party

felt free to accept or decline terms demanded by the other."  Cordova v. World Fin. Corp., 2009-

NMSC-021, 208 P.3d at 907-08.  Substantive unconscionability, on the other hand, "concerns the

legality and fairness of the contract terms themselves," and "focuses on such issues as whether the

contract terms are commercially reasonable and fair, the purpose and effect of the terms, the one-

sidedness of the terms, and other similar policy concerns."  Cordova v. World Fin. Corp., 2009-

NMSC-021, 208 P.3d at 907.  Substantive unconscionability arises where a contract is illegal, or

where it "is grossly unreasonable and against our public policy under the circumstances," Cordova

v. World Fin. Corp., 2009-NMSC-021, 208 P.3d at 909, even if "there is not a statute that

specifically limits contract terms," because "[r]uling on substantive unconscionability is an

inherent equitable power of the court, and does not require prior legislative action," State ex rel.

King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 33, 329 P.3d at 670.

        Under the NMUPA, the Attorney General of New Mexico is entitled to bring an action

in New Mexico's name for NMUPA violations.   See NMSA 1978, § 57-12-8(A).   In such an

action, the Attorney General may "petition the district court for temporary or permanent injunctive

relief and restitution." NMSA 1978, § 57-12-8(B).  Special penalties are available against persons who act willfully.  <u>See</u> NMSA 1978, § 57-12-11.

In any action brought under NMSA 1978, § 57-12-8, if the court finds that a person is willfully using or has willfully used a method, act, or practice the NMUPA declares unlawful, the Attorney General, upon petition to the court, may recover, on behalf of the State of New Mexico, a civil penalty of not exceeding $5,000 per violation.  NMSA 1978, § 57-12-11.  "Willful conduct is the intentional doing of an act with knowledge that harm may result."  N.M. Civ. UJI 13-1827.

## LAW REGARDING NEW MEXICO'S UNFAIR INSURANCE PRACTICES ACT

The Unfair Insurance Practices Act (UIPA) imposes liability for a laundry list of unfair insurance claims practices, including the following:

A.      misrepresenting to insureds pertinent facts or policy provisions relating to coverages at issue;

B.      failing to acknowledge and act reasonably promptly upon communications with respect to claims from insureds arising under policies;

failing to adopt and implement reasonable standards for the prompt investigation and processing of insureds' claims arising under policies;

D.      failing to affirm or deny coverage of claims of insureds within a reasonable time after proof of loss requirements under the policy have been completed and submitted by the insured;

E.      not attempting in good faith to effectuate prompt, fair and equitable settlements of an insured's claims in which liability has become reasonably clear;

F.      failing to settle all catastrophic claims within a ninety-day period after the assignment of a catastrophic claim number when a catastrophic loss has been declared;

G.      compelling insureds to institute litigation to recover amounts due under policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds when such insureds have made claims for amounts reasonably similar to amounts ultimately recovered;

H.      attempting to settle a claim by an insured for less than the amount to which a reasonable person would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application;

I.      attempting to settle claims on the basis of an application that was altered without notice to, or knowledge or consent of, the insured, his representative, agent or broker;

J.      failing, after payment of a claim, to inform insureds or beneficiaries, upon request by them, of the coverage under which payment has been made;

K.      making known to insureds or claimants a practice of insurer of appealing from arbitration awards in favor of insureds or claimants for the purpose of compelling them to accept settlements or compromises less than the amount awarded in arbitration;

L.      delaying the investigation or payment of claims by requiring an insured, claimant or the physician of either to submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information;

M.      failing to settle an insured's claims promptly where liability has become apparent under one portion of the policy coverage in order to influence settlement under other portions of the policy coverage;

N.      failing to promptly provide an insured a reasonable explanation of the basis relied on in the policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement; or
O. violating a provision of the Domestic Abuse Insurance Protection Act.

NMSA 1978, § 59A-16-20.

        The Honorable Bruce D. Black, United States District Judge for the District of New

Mexico, concluded that a plaintiff failed to plausibly plead a UIPA claim:

        Dr. Yumukoglu alleges generally that Provident's conduct "violates one or more of the provisions of Section 59A-16-20 NMSA 1978 (1984)," the section of the New Mexico Unfair Insurance Practices Act that prohibits unfair claims practices. Dr. Yumukoglu does not specify which of the fifteen provisions of this section he feels Provident has violated, and after a review of the statute, the Court cannot perceive which subsection could have been violated under the fact alleged. At the very least, Dr. Yumukoglu has failed to comply with the pleading requirements of Federal Rule of Civil Procedure 8(a)(2). Rule 8(a)(2) requires that a civil complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." Here, it is not clear either what Dr. Yumukoglu is

claiming or to what relief he is entitled under § 56A-16-20.  Dr. Yumukoglu's claim appears, like his claim for breach of the duty of good faith and fair dealing, to be based on Provident's alleged bad faith in terminating his disability benefits.  As discussed above, the Court finds that Provident's decision to terminate Dr. Yumukoglu's benefits did not amount to bad faith.  Provident's motion for summary judgment on Plaintiff's claim for statutory violation is granted.

Estate of Gonzales v. AAA Life Ins. Co., 2012 WL 1132332, at *18-19 (quoting

Yumukoglu v. Provident Life & Accident Ins. Co., 131 F.Supp.2d at 1227, (D.N.M.2001)(Black,

J.)(footnote omitted) (citations omitted). The Court has previously found that a plaintiff failed to

state a claim under rule 12(b)(6) when the complaint did not contain even "a formulaic recitation

of the elements of a cause of action" under the UIPA.  Estate of Gonzales v. AAA Life Ins. Co., No.

CIV 11–0486 JB/WDS, 2012 WL 1132332, at *7 (D.N.M. Mar. 28, 2012)(Browning,

J.)(citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555).The UIPA's  § 59A-5-26, titled

"Suspension, limitation or revocation of authority; discretionary and special grounds," is also

found within New Mexico's Insurance Code, and is listed within Article 16, which pertains to

"Trade Practices and Frauds."   See NMSA 1978,  § 59A-5-26.  Section 59A-5-26 outlines

specifically when a superintendent  "may, at his discretion, suspend limit or revoke an insurer's

certificate of authority."  See NMSA 1978,  § 59A-5-26. Sections 59A-5-26(C)(1) and § 59A-5-

26(C)(1), (2)(a) and (b), in turn, provide that:

> C.     The superintendent shall suspend or revoke an insurer's certificate of authority on any of the following grounds, if found after a hearing thereon that the insurer:
>
> (1)     is in unsound condition, or being fraudulently conducted, or in such condition or using such methods and practices in conduct of its business as to render its further transaction of insurance in this state currently or prospectively hazardous or injurious to policyholders or the public;
>
> (2)     with such frequency as to indicate its general business practice in this state:

(a)     has without just cause failed to pay, or delayed payment of, claims arising under its policies, whether the claim is in favor of an insured or in favor of a third person with respect to the liability of an insured to such third person; or

(b)     without just cause compels insureds or claimants to accept less than amount due them or to employ attorney or to bring suit against the insurer or such an insured to secure full payment or settlement of a claim;

NMSA 1978, § 59A-5-26(C)(1) and § 59A-5-26(C)(1), (2)(a) and (b).

## <u>NEW MEXICO LAW REGARDING UNINSURED MOTORIST COVERAGE</u>

NMSA 1978, § 66-5-301(A) and (C) in relevant part, state:

A. No motor vehicle or automobile liability policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person and for injury to or destruction of property of others arising out of the ownership, maintenance or use of a motor vehicle shall be delivered or issued for delivery in New Mexico with respect to any motor vehicle registered or principally garaged in New Mexico unless coverage is provided therein or supplemental thereto in minimum limits for bodily injury or death and for injury to or destruction of property as set forth in <u>Section 66–5–215 NMSA 1978</u> and such higher limits as may be desired by the insured, but up to the limits of liability specified in bodily injury and property damage liability provisions of the insured's policy, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness or disease, including death, and for injury to or destruction of property resulting therefrom, according to the rules and regulations promulgated by, and under provisions filed with and approved by, the superintendent of insurance.

. . .

C. . . . [T]he named insured shall have the right to reject uninsured motorist coverage as described in Subsections A and B of this section; provided that unless the named insured requests such coverage in writing, such coverage need not be provided in or supplemental to a renewal policy where the named insured has rejected the coverage in connection with a policy previously issued to him by the same insurer.

N.M. Stat. Ann. § 66–5–301(A) & (C). Regulation 13.12.3.9, which elaborates § 66–5–301, provides: "The rejection of the provisions covering damage caused by an uninsured or unknown motor vehicle as required in writing by the provisions of Section 66–5–301 NMSA 1978 must be endorsed, attached, stamped, or

otherwise made a part of the policy of bodily injury and property damage
insurance." N.M. Admin. Code § 13.12.3.9.

NMSA 1978, § 66-5-301(A) and (C).

The Supreme Court of New Mexico has recognized that § 66-5-301 "embodies a public
policy of New Mexico to make uninsured motorist c overage a part of every automobile liability
insurance policy issued in this state, with certain limited exceptions," and that the statute is
"intended to expand insurance coverage and to protect individual members of the public against
the hazard of culpable uninsured motorists." Romero v. Dairyland Ins. Co., 1990–NMSC–111, ¶
5, 803 P.2d 243, 245.   Based upon those observations, the Supreme Court of New Mexico
considers § 66–5–301 a remedial statute and, thus, maintains that it be liberally interpreted to
further its purpose, construing exceptions to uninsured motorist coverage strictly to protect the
insured.  See Romero v. Dairyland Ins. Co., 1990-NMSC-111, ¶ 5, 803 P.2d at 245.  The Supreme
Court of New Mexico has noted that an insured may reject uninsured motorist coverage, but that
such rejection must satisfy the applicable regulations.  See Romero v. Dairyland Ins. Co., 1990-
NMSC-111, ¶ 5, 803 P.2d at 245.  To be valid, a rejection of uninsured motorist coverage must be
made a part of the policy by endorsement on the declarations sheet, by attachment of the written
rejection to the policy, or by some other means that makes the rejection a part of the policy so as
to clearly and unambiguously call to the insured's attention that uninsured motorist coverage has
been waived.  See Romero v. Dairyland Ins. Co., 1990-NMSC-111, ¶ 5, 803 P.2d at 245.  With
respect to the regulation requiring that the rejection be made a part of the policy delivered to the
insured, the Supreme Court of New Mexico has stated:

> [Regulation 13.12.3.9] ensure[s] that the insured has affirmative evidence of the
> extent of coverage. Upon further reflection, consultation with other individuals, or
> after merely having an opportunity to review one's policy at home, an individual
> may well reconsider his or her rejection of uninsured motorist coverage. Providing
> affirmative evidence of the rejection of the coverage comports with a policy that

> any rejection of the coverage be knowingly and intelligently made. Any individual rejecting such coverage should remain well informed as to that decision. We find that the regulation of the superintendent of insurance furthers a legislative purpose to provide for the inclusion of uninsured motorist coverage in every automobile liability policy unless the insured has knowingly and intelligently waived such coverage.

Romero v. Dairyland Ins. Co., 1990-NMSC-111, ¶ 5, 803 P.2d at 245.  Based upon that assessment of NMSA 1978, § 66–5–301 and administrative regulation § 13.12.3.9 NMAC, the Supreme Court of New Mexico has held that, unless the named insured rejects uninsured motorist coverage in a manner consistent with statutory and administrative requirements, uninsured motorist coverage shall be read into an insured's policy regardless of the parties' intent or the fact that the insured has not paid a premium.  See Kaiser v. DeCarrera, 1996-NMSC-050, ¶ 1, 923 P.2d 588, 590 (internal quotations omitted). In Kaiser v. DeCarrera, the Supreme Court of New Mexico ruled that a valid rejection of uninsured motorist coverage did not take place and, therefore, read uninsured motorist coverage into the policy.  See 1996–NMSC–050, ¶ 17, 923 P.2d at 592.  The plaintiff had signed a rejection as part of the application for insurance, and the insurance company sent an amended policy reflecting the rejection to the address on the application that was returned to sender. See 1996–NMSC–050, ¶ 10, 923 P.2d at 590. The Supreme Court of New Mexico found that the plaintiff was never provided a policy with the rejection included and that, as a result, uninsured motorist coverage should be read into the policy.  See 1996–NMSC–050, ¶ 10, 923 P.2d at 590.

In Montano v. Allstate Indemnity Co., 2004–NMSC–020, ¶ 1, 92 P.3d 1255, the Supreme Court of New Mexico addressed the stacking of insurance coverage, noting that its cases had "expressed a public policy in favor of stacking," and that "it is unfair not to allow stacking *when multiple premiums are paid* or when the policy is otherwise ambiguous." 2004–NMSC–020, ¶ 15, 92 P.3d at 1259 (emphasis in original).  The Supreme Court of New Mexico indicated that it would

take the opportunity to "chart a new course." Montano v. Allstate Indem. Co., 2004–NMSC–020, ¶ 17, 92 P.3d at 1260.  Interpreting § 66–5–301(A) and (C), the Supreme Court of New Mexico held that "an insurance company should obtain written rejections of stacking in order to limit its liability based on an anti-stacking provision," and that, with "written waivers, insureds will know exactly what coverage they are receiving and for what cost."  Montano v. Allstate Indem. Co., 2004–NMSC–020, ¶¶ 21, 92 P.3d at 1260-61.   The Supreme Court of New Mexico also illustrated its holding:

> [I]n a multiple-vehicle policy insuring three cars, the insurer shall declare the premium charge for each of the three [uninsured or underinsured motorist] coverages and allow the insured to reject, in writing, all or some of the offered coverages. Thus, hypothetically, in the case of a $25,000 policy, if the premium for one [uninsured or underinsured motorist] coverage is $65, two coverages is an additional $60, and three coverages $57, the insured who paid all three (for a total premium of $182) would be covered up to $75,000 in [uninsured or underinsured motorist] bodily injury coverage. However, the insured may reject, in writing, the third available coverage and pay $125 for $50,000 of uninsured motorist coverage; or the insured may reject, in writing, the third available coverage and pay $65 for $25,000 of [uninsured or underinsured motorist] coverage; or the insured may reject all three [uninsured or underinsured motorist] coverages. In any event, the coverage would not depend on which vehicle, if any, was occupied at the time of the injury. Thus, the insured's expectations will be clear, and an insured will only receive what he or she paid for.

Montano v. Allstate Indem. Co., 2004–NMSC–020,  ¶¶ 21, 92 P.3d at 1261.

In Marckstadt v. Lockheed Martin Corp., 2010–NMSC–001, ¶ 1, 229 P.3d 462, the Supreme Court of New Mexico consolidated cases before it, including a case that the Tenth Circuit certified to it, to answer the question of what is required under § 66-5-301 and § 13.12.3.9 NMAC to effectively reject uninsured motorist coverage. See 2010–NMSC–001, ¶ 13, 229 P.3D 467.  The Supreme Court of New Mexico held that, "in order for the offer and rejection requirements of Section 66-5-301 to effectuate the policy of expanding [uninsured or underinsured motorist] coverage, the insurer is required to *meaningfully offer* such coverage and the insured

must *knowingly and intelligently act* to reject it before it can be excluded from a policy." Marckstadt v. Lockheed Martin Corp., 2010–NMSC–001, ¶ 16, 229 P.3d at 468. It found that "the rejection which the regulation requires to be in writing must be the *act* of rejection described in the statute" and held that an insured must reject uninsured motorist coverage in writing.    Marckstadt v. Lockheed Martin Corp., 2010–NMSC–001, ¶ 122, 229 P.3d at 470. In Progressive Northwestern Insurance Co. v. Weed Warrior Services, 2010–NMSC–050, ¶ 1, 245 P.3d 1209, the Supreme Court of New Mexico answered in the affirmative the question, certified to us by the United States Court of Appeals for the Tenth Circuit, of whether election by an insured to purchase [uninsured or underinsured motorist] coverage in an amount less than the policy limits constitutes a rejection of the maximum amount of [uninsured or underinsured motorist] coverage permitted under § 66-5-301, 2010–NMSC–050, ¶ 1, 245 P.3d at 1212. It found that § 66-5-301 provides that insurers must offer uninsured motorist coverage, or underinsured motorist coverage, in an amount greater than the minimums required.  See Progressive N.W. Ins. Co. v. Weed Warrior Servs., 2010–NMSC–050, ¶ 10, 245 P.3d at 1212. The Supreme Court of New Mexico held that the "Legislature intended for drivers to have the option of carrying [uninsured or underinsured motorist] coverage equal to their policy limits," and rejected "any suggestion that Section 66–5–301 places a burden on the insured to request [uninsured or underinsured motorist] coverage."  .  See Progressive N.W. Ins. Co. v. Weed Warrior Servs., 2010–NMSC–050, ¶¶ 12-13, 245 P.3d at 1213. It noted that the right to reject coverage cannot be meaningfully exercised without an offer of coverage equal to policy limits, and that it would not "impose on the consumer an expectation that she or he will be able to make an informed decision as to the amount of [uninsured or underinsured motorist] coverage desired or required without first receiving

information from the insurance company." See Progressive N.W. Ins. Co. v. Weed Warrior Servs., 2010-NMSC-050, ¶ 13, 245 P.3d at 1213.

In Jordan v. Allstate Ins. Co., 2010–NMSC–051, ¶ 1,  254 P.3d 1214, the Supreme Court of New Mexico granted certiorari in three cases and consolidated them for review.  In all three cases, the insured was injured in an accident involving an uninsured motorist.  Jordan v. Allstate Ins. Co., 2010–NMSC–051, ¶ 5-10, 254 P.3d 1217-19.

The Supreme Court of New Mexico held that "a rejection of [uninsured or underinsured motorist] coverage equal to the liability limits in an automobile insurance policy must be made in writing and must be made a part of the insurance policy delivered to the insured."  2010–NMSC–051, ¶ 2, 254 P.3d 1217.  It then further found that:

> In order to honor these requirements effectively, insurers must provide the insured with the premium charges corresponding to each available option for [uninsured or underinsured motorist coverage] so that the insured can make a knowing and intelligent decision to receive or reject the full amount of coverage to which the insured is statutorily entitled. If an insurer fails to obtain a valid rejection, the policy will be reformed to providing [uninsured or underinsured motorist] coverage equal to the limits of liability.

2010–NMSC–051, ¶ 2, 254 P.3d 1217.  It noted that "insurers continue to offer [uninsured or underinsured motorist] coverage in ways that are not conducive to allowing the insured to make a realistically informed choice," and found it "necessary to prescribe workable requirements for a valid and meaningful rejection of [uninsured or underinsured motorist] coverage in amounts authorized by statute."  Jordan v. Allstate Ins. Co., 2010–NMSC–051, ¶ 20, 254 P.3d at 1220.

The Supreme Court of New Mexico then provided:

> When issuing an insurance policy, an insurer must inform the insured that he or she is entitled to purchase [uninsured or underinsured motorist] coverage in an amount equal to the policy's liability limits and must also provide the corresponding premium charge for that maximum amount of [uninsured or underinsured motorist] coverage. The premium cost for the minimum amount of [uninsured or underinsured motorist] coverage allowed by Section 66–5–301(A) must also be provided, as well as the relative costs for any other levels of [uninsured or

> underinsured motorist] coverage offered to the insured. The insured must be
> informed that he or she has a right to reject [uninsured or underinsured motorist]
> coverage altogether. Providing the insured with a menu of coverage options and
> corresponding premium costs will enable the insured to make an informed decision.
> . . .

Jordan v. Allstate Ins. Co., 2010–NMSC–051, ¶ 20, 254 P.3d at 1220.  It held that, unless these

requirements are met, the "policy will be reformed to provide [uninsured or underinsured motorist]

coverage equal to the liability limits."  Jordan v. Allstate Ins. Co., 2010–NMSC–051, ¶ 22, 254

P.3d at 1221.  The Supreme Court of New Mexico also found that the rules that it announced

should be applied retroactive, because, on balance, "we deem it more equitable to let the financial

detriments be borne by insurers, who were in a better position to ensure meaningful compliance

with the law" and retroactive application "will ensure that all insureds will be treated

equally." Jordan v. Allstate Ins. Co., 2010–NMSC–051, ¶ 29, 254 P.3d at 1223.

In State Farm Mutual Automobile Insurance Co. v. Safeco Insurance Co., 2013–NMSC–

006, 298 P.3d 452, the Court of Appeals of New Mexico certified to the Supreme Court of New

Mexico the question "whether the primary or the secondary underinsured motorist ("UIM")

insurer, if either, should be given the statutory offset for the tortfeasor's liability coverage." 2013–

NMSC–006, ¶ 1, 298 P.3d at 453.  The Supreme Court of New Mexico explained the problem

through a hypothetical:

> A was a passenger in a vehicle driven by B, which was struck by a vehicle
> negligently driven by C. A sustains $500,000 in damages. C has liability coverage
> of $100,000. B has $100,000 in UIM coverage with XYZ Insurance Co. Because
> A was a passenger in the vehicle insured by XYZ, A is a Class II insured under the
> XYZ policy, and XYZ is the primary insurer because it insured the vehicle involved
> in the collision—the car closest to the risk. A also has UIM coverage under three
> other policies, with policy limits of $100,000, $50,000, and $25,000, respectively.
> A is a Class I insured under the three policies because A is a named insured in each
> policy. Because these policies did not insure the vehicle involved in the collision,
> the insurers who issued the policies are considered to be secondary insurers.
> Therefore, A has $100,000 in primary UIM coverage, plus $175,000 in secondary
> UIM coverage, for a total of $275,000 in UIM coverage.

2013–NMSC–006, ¶ 2, 298 P.3d at 453.   In analyzing "whether XYZ Insurance Co. or the secondary insurers should receive an offset for the $100,000 of liability coverage available from C, the tortfeasor," the Supreme Court of New Mexico said "neither the primary nor the secondary insurers are directly awarded the offset because . . .  the offset is applied before any UIM insurer is required to pay UIM benefits." 2013–NMSC–006, ¶¶ 3-4, 298 P.3d at 453.  The Supreme Court of New Mexico explained that, first, "one must determine both the tortfeasor's liability limits and the insured's total UIM coverage, which may include multiple stacked policies."  2013–NMSC–006, ¶ 8, 298 P.3d at 454.  If the insured's damages exceeds the tortfeasor's liability coverage, the insured may pursue a claim against the UIM insurers to recover the difference between his or her UIM coverage and the tortfeasor's liability coverage, or the difference between his or her damages and the tortfeasor's liability coverage, whichever is less.  See 2013–NMSC–006, ¶¶ 9, 15, 298 P.3d at 454-55.  The primary insurer must pay its policy limits before the secondary insurers pay in proportion to their respective policy limits.  See 2013–NMSC–006, ¶¶ 4, 11, 298 P.3d at 453, 455.  Under the hypothetical, the difference between A's UIM coverage and C's liability coverage -- $175,000.00 -- is less than the difference between A's damages and C's liability coverage -- $400,000.00 -- and, thus, A may pursue from the UIM insurers $175,000.00.  See 2013-NMSC-006, ¶ 18, 298 P.3d at 457.

> The primary UIM insurer pays its entire $100,000, leaving the secondary UIM insurers obligated to pay a prorated portion of $75,000.  One secondary insurer pays $42,857.14, which is 4/7ths (100,000/175,000) of $75,000; one pays $21,428.57, which is 2/7ths (50,000/175,000) of $75,000; and the remaining secondary insurer pays $10,714.29, which is 1/7th (25,000/175,000) of $75,000.  In no case will the insured receive more than the limits of the insured's UIM coverage minus the tortfeasor's liability payment or more than the insured's damages minus the tortfeasor's liability payment, whichever is less.

2013-NMSC-006, ¶ 19, 298 P.3d at 457.

. . . Because the tortfeasor's liability limits are taken into consideration in what the UIM insurers must pay the injured insured, there is no "offset" to award: the injured insured will not receive more than he or she is permitted under the UIM.

2013-NMSC-006, ¶ 15, 298 P.3d at 456.

### LAW REGARDING WHETHER THEFT OR LOSS OF PROPERTY CONSTITUTES PROPERTY DAMAGE FOR THE PURPOSE OF EVALUATING THE UMA'S § 66-5-301'S COVERAGE FOR  "INJURY TO OR DESTRUCTION OF PROPERTY"

Several courts have held that theft or loss of property does not constitute property damage, as defined in the applicable insurance policy.  See Travelers Ins. Cos. v. P.C. Quote, Inc., 570 N.E.2d 614, 616-18 (Ill. App. Ct. 1991)(stating that the "loss of computers" is not property damage within meaning of general liability policy, and distinguishing "damage to property and loss of property"); General Ins. Co. of Am. v. Palmetto Bank, 233 S.E.2d 699, 701-02 (1977)(finding that the loss of use of the property was not "property damage" under the terms of the blanket liability insurance policy -- which defined property damage as "injury to or destruction of tangible property" -- because the only damage alleged was "wrongful deprivation of property, not physical injury to property").  In Harry Winston, Inc. v. Travelers Indem. Co., 366 F. Supp. 988 (E.D. Mo. 1973)(Harper, J.), the Honorable Roy Winifield Harper, United States District Judge for the Eastern District of Missouri, addressed whether the plaintiff could recover $18,200.00 from Travelers Indemnity Company under the insured's homeowners policy after the plaintiff never received the jewelry that the insured allegedly mailed to the plaintiff.  366 F. Supp. at 989.  The policy stated that the insurer would pay on the insured's behalf all sums the insured was legally obligated to pay as damages, because of property damage, and defined property damage as "injury to or destruction of property, including loss of use thereof."  See 366 F. Supp. at 989-90.  Judge Harper addressed whether the loss of jewelry in the mails was covered within the language of the policy's liability section -- in other words, whether the loss of jewelry was property damage as the

policy defines that term. /. See 366 F. Supp. at 990.  Judge Harper concluded that the jewelry loss is not a loss the policy's definition of property damage covers.  See 366 F. Supp. at 989-90.  Judge Harper found that, given the plain meaning of the policy's language, there was no injury to or destruction of the jewelry; therefore, there was no property damage within the meaning of the policy -- the jewelry was rather lost or stolen in some manner.  See 366 F. Supp. at 990.

In State v. Glens Falls Ins. Co., Inc., 315 A.2d 257 (1974), the Supreme Court of Vermont addressed whether an insurer had an obligation to defend the State in a lawsuit, brought by the owner of transparencies that he had sent to the State, but were never returned.  See 315 A.2d at 257.  The general liability policy stated that the insurer would pay on behalf of the insureds all sums which the insured was legally obligated to pay as damages "because of injury to or destruction of property, including the loss of use thereof."  315 A.2d at 259.  The State argued that the transparencies had, in effect, been destroyed, but the Supreme Court of Vermont found that, because there was no evidence of actual destruction, the destruction was conjectural.  See 315 A.2d at 259.  The Supreme Court of Vermont found that, in such circumstances, "the insurance company has no obligation to defend."  315 A.2d at 259.

Other courts have held that theft or loss of property constitutes property damage, as the applicable insurance policies define.  In U.S. Fidelity & Guaranty Co. v. Mayor's Jewelers of Pompano, Inc., 384 So.2d 256 (Fla. Dist. Ct. App. 1980), the District Court of Appeal of Florida found that the applicable insurance policy covered theft of jewelry.  See 384 So.2d at 257, 259.  The insurance policy provided coverage for bodily injury or property damage, and defined property damage as "injury to or destruction of tangible property."  384 So.2d at 257.  The insurer argued that theft of jewelry did not constitute "injury to or destruction of tangible property."  384 So.2d at 257.  The Florida Court of Appeal defined injury as "[a]ny wrong or damage done to

another, either in his person, rights, reputation, or property," and "an act which damages, harms or hurts[,]" and found that the jewelry store suffered "the ultimate injury to its property" when a thief stole the property. 384 So.2d at 258 (citation omitted). The Florida Court of Appeal stated that the property was damaged, because the market value of the property to the one who lawfully possessed it was "totally diminished." 384 So.2d at 258. The Florida Court of Appeal therefore found that theft of personal property is "property damage" unless a contrary intent is clearly expressed in the policy. 384 So.2d at 258.

In Hofing GMC Truck, Inc. v. Kay Wheel Sales Co., Inc., 543 F. Supp. 414 (E.D. Pa. 1982)(Bechtle, J.), the United States District Court for the Eastern District of Pennsylvania, addressed a general liability policy's coverage. See 543 F. Supp. at 416. The policy stated that the insurer would pay all sums that the insured became legally obligated to pay as damages because of bodily injury or property damage, and defined property damage as "physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or . . . loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period." 543 F. Supp. at 416-17. The insurance company argued that the policy did not provide coverage for theft of property, because theft of property was not property damage within the policy. 543 F. Supp. at 417. The Honorable Louis Charles Bechtle, United States District Judge of the United States District Court for the Eastern District of Pennsylvania, recognized that, arguably, theft of property is not a form of physical injury to or destruction of tangible property. See 543 F. Supp. at 418 (citing U.S. Fidelity & Guaranty Co. v. Mayor's Jewelers of Pompano, Inc., 384 So.2d 256, 258 (Fla. App. 1980)). Judge Bechtle stated, however:

> Nevertheless, if property is stolen, the rightful possessor is necessarily no longer able to use that property. Thus, he suffers a "loss of use" in the plain,

ordinary sense of those words. Midland's argument to the contrary is embodied in three conclusory sentences which fail to suggest any tenable ground for concluding that the phrase "loss of use" has some narrower meaning that would exclude loss of use caused by theft. Accordingly, the Court holds that the theft of Hofing's tractor from Kay's premises constituted "property damage" within the meaning of the Midland policy.

543 F. Supp. at 418.

In Collin v. American Empire Ins. Co., 26 Cal. Rptr .2d 391 (Cal. Ct. App. 1994), the Court

of Appeal of California addressed a liability policy practically identical to the policy at issue

in Hofing GMC Truck, Inc. v. Kay Wheel Sales Co., Inc. and found that the policy did not cover

loss of property.  See 26 Cal. Rptr. 2d at 408.

The insurer's policy defined property damage as physical injury to or destruction of tangible property which occurs during the policy period, including loss of use thereof at any time resulting therefrom, or . . . loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

26 Cal. Rptr. 2d at 408.  The Court of Appeal of California distinguished loss of use of property

from loss of property in reversing the trial court's holding that conversion fell within the policy's

definition of property damage because conversion constitutes loss of use of property.  See 26 Cal.

Rptr. 2d at 409.  The Court of Appeal of California held that conversion does not constitute loss

of use of property, finding instead that conversion constitutes loss of property.  See 26 Cal. Rptr.

2d at 409. The Court of Appeal illustrated its distinction between loss of property and loss of use

of property through an example, stating that the value of the loss of use of a stolen car is the rental

value of a substitute vehicle whereas the value of the loss of the car is its replacement cost.  See 26

Cal. Rptr. 2d at 409.

The Court is not aware of any New Mexico cases that discuss whether the theft of property

or the loss of property constitutes property damage.  In Lamb v. Randall, 1980-NMCA-144, 618

P.2d 379,  however, the Court of Appeals of New Mexico interpreted a parental liability statute to

determine the liability of parents of a child who burglarized the plaintiff's home and took the plaintiff's jewelry, which the plaintiff never recovered. See Lamb v. Randall, 1980-NMCA-144, ¶ 5, 618 P.2d at 380. The statute stated that a person "may recover damages . . . from the parent . . . of a child when the child has maliciously or willfully injured a person or damaged or destroyed property, real or personal, belonging to the person bringing the action." Lamb v. Randall, 1980-NMCA-144, ¶ 5, 618 P.2d at 380.   The Court of Appeals of New Mexico recognized that the plaintiff's property was pawned for money "but [was] not physically mutilated or destroyed." 1980-NMCA-144, ¶ 5, 618 P.2d at 381.   The Court of Appeals of New Mexico stated: "There being no evidence that the property was damaged or destroyed, the parents are not liable . . . for the value of the property." Lamb v. Randall, 1980-NMCA-144, ¶ 5, 618 P.2d at 381.


## LAW REGARDING EXERCISE OF DISCRETIONARY JURISDICTION OVER DECLARATORY JUDGMENT ACTIONS


In Brillhart v. Excess Insurance Co. of America, 316 U.S. 491 (1942), the Supreme Court explained that district courts are "under no compulsion to exercise . . . jurisdiction" under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 to 2202.   Brillhart v. Excess Insurance Co. of America, 316 U.S. at 494.   The Supreme Court explained:

> Ordinarily it would be uneconomical as well as vexatious for a federal court to proceed in a declaratory judgment suit where another suit is pending in a state court presenting the same issues, not governed by federal law, between the same parties. Gratuitous interference with the orderly and comprehensive disposition of a state court litigation should be avoided.

Brillhart v. Excess Insurance Co. of America, 316 U.S. at 495.   A court should determine whether the lawsuit "can be better settled in the proceeding pending in the state court."   Brillhart v. Excess Insurance Co. of America, 316 U.S. at 495.

The Tenth Circuit has adopted a five-factor test for evaluating whether a district court should exercise its discretionary jurisdiction over a declaratory judgment action.  See St. Paul Fire and Marine Ins. Co. v. Runyon, 53 F.3d 1167, 1169 (10th Cir. 1995).  These factors include:

> [i] whether a declaratory action would settle the controversy; [ii] whether it would serve a useful purpose in clarifying the legal relations at issue; [iii] whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race to res judicata"; [iv] whether use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and [v] whether there is an alternative remedy which is better or more effective.

St. Paul Fire and Marine Ins. Co. v. Runyon, 53 F.3d 1167, 1169 (alterations in original)(quoting State Farm Fire and Cas. Co. v. Mhoon, 31 F.3d 979, 983 (10th Cir. 1994)).  The Tenth Circuit has held that a district court's dismissal of a declaratory judgment action is an abuse of discretion when there is no pending state proceeding.  See United States v. City of Las Cruces, 289 F.3d 1170, 1183 (10th Cir. 2002)(citing ARW Exploration Corp. v. Aguirre, 947 F.2d 450, 454 (10th Cir. 1991.  In St. Paul Fire and Marine Ins. Co. v. Runyon, 53 F.3d at 1168,, the plaintiff, an insurance company, sought a declaratory judgment holding that it had no obligation to defend the defendant under the terms of a professional-liability insurance policy.  See St. Paul Fire and Marine Ins. Co. v. Runyon, 53 F.3d at 1168.  The defendant sought indemnification and argued that the plaintiff had a duty to defend him against claims brought by his coworkers.  See St. Paul Fire and Marine Ins. Co. v. Runyon, 53 F.3d at 1168.  The insurance-company plaintiff refused to provide a defense.  See St. Paul Fire and Marine Ins. Co. v. Runyon, 53 F.3d at 1168.  The district court in St. Paul Fire and Marine Ins. Co. v. Runyon, 53 F.3d at 1169, had abstained from exercising jurisdiction, "because the same issues were involved in the pending state proceeding, and therefore, there existed a more effective alternative remedy." St. Paul Fire and Marine Ins. Co. v. Runyon, 53 F.3d at 1169.

The Tenth Circuit in *St. Paul Fire and Marine Insurance Co. v. Runyon* explained: The parties have a pending state contract action, which incorporates the identical issue involved in the declaratory judgment action.  [The defendant's] state breach of contract complaint against [the insurance-company plaintiff] alleges the coworkers' lawsuit is a "covered claim" pursuant to the insurance policy.  In resolving the insurance contract, the state court will necessarily determine rights and obligations under the contract.  [The insurance-company plaintiff] is seeking a declaration by the federal court that the coworkers' lawsuit is not a covered claim. The issue in the federal declaratory judgment action is identical to what would be a defense to the state court contract action -- whether [the defendant]'s insurance contract with [the insurance-company plaintiff] protects him from the coworkers' lawsuit.  Because the state court will determine, under state contract law, whether the tort action is covered by the insurance contract, it is not necessary for the federal court to issue a declaration on the insurance contract.

St. Paul Fire and Marine Ins. Co. v. Runyon, 53 F.3d at 1169. A federal court is not required to refuse jurisdiction, but it "should not entertain a declaratory judgment action over which it has jurisdiction if the same fact-dependent issues are likely to be decided in another pending proceeding."  St. Paul Fire and Marine Ins. Co. v. Runyon, 53 F.3d at 1170.  See Schering Corp. v. Griffo, 872 F. Supp. 2d 1220, 1245-47 (D.N.M. 2012)(Browning, J.).

## LAW REGARDING CERTIFICATION TO THE SUPREME COURT OF NEW MEXICO

Rule 12-607 of the New Mexico Rules of Appellate Procedure, NMSA 1978, § 39-7-4, provides:

A.    Power to answer.

(1)    The Supreme Court may answer by formal written opinion questions of law certified to it by a court of the United States, an appellate court of another state, a tribe, Canada, a Canadian province or territory, Mexico or a Mexican state if the answer may be determinative of an issue in pending litigation in the certifying court and the question is one for which answer is not provided by a controlling:

(a)    appellate opinion of the New Mexico Supreme Court or the New Mexico Court of Appeals; or

(b)    constitutional provision or statute of this state.

NMSA 1978, § 39-7-4.  See NMRA 12-607(A).  See also Walker v. United States, 2007-NMSC-038, ¶ 1, P.3d 882, 884 (2007)(answering questions that the United States Court of Federal Claims certified); Campos v. Murray,  2006-NMSC-020, ¶ 2, 134 P.3d 741, 742 (answering questions that the Honorable Bruce D. Black, United States District Judge for the United States District Court for the District of New Mexico, certified).  Federal courts have the option of determining what a state court would do if confronted with the same issue, see Erie Railroad Co. v. Tompkins, 304 U.S. 64, 78 (1938), or of certifying the question to the state appellate court for review,  see Allstate v. Stone,  1993-NMSC-066, ¶ 1, 863 P.2d 1085, 1086 ("This matter comes before us by way of certification from the United States District Court for the District of New Mexico.").  See also Lehman Bros. v. Schein, 416 U.S. 386, 390-91 (1974)("The decision to certify a question to the state supreme court 'rests in the sound discretion of the federal court.").  Pursuant to NMSA 1978, § 39-7-4, the Supreme Court of New Mexico may answer questions that the federal district court certifies to it if they involve propositions of New Mexico law that may be determinative of the matter before the certifying court and there are no controlling precedents from the New Mexico appellate court.   See Swink v. Fingado,  1993-NMSC-013,  ¶  1,  850  P.2d  978,  979  n.  1 (1993); Schlieter v. Carlos, 1989-NMSC-037, ¶ 5, 775 P.2d 709, 710.

In New Mexico, the Supreme Court may answer questions that the federal district court certifies to it only "if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision or statute of this state."  NMSA 1978, § 39-7-4.  See NMRA 12-607(A).  In explaining when it will accept certification from a federal court, the Supreme Court of New Mexico has noted that:

> To date, we by and large have limited our acceptance of certifications prior to judgment to those cases in which there is no dispute over the factual predicates to the Court's determination of the questions certified, and our answer either disposes

of the entire case or controversy, or disposes of a pivotal issue that defines the future course of the case.

Schlieter v. Carlos, 1989-NMSC-037, ¶ 5, 775 P.2d 709, 710-11.  The Honorable Leslie Smith, United States Magistrate Judge for the District of New Mexico, has stated that litigation is not pending under this statute when the district court "has already ruled upon the issue for which [the party] seek[s] certification."  Hartford Ins. Co. of the Midwest v. Cline, 367 F. Supp. 2d 1342, 1344 (D.N.M. 2005)(Smith, M.J.).

In Stoner v. New York Life Ins. Co., 311 U.S. 464 (1940), the Supreme Court of the United States of America explained that, "in cases where jurisdiction rests on diversity of citizenship, federal courts, under the doctrine of Erie Railroad Co. v. Tompkins, 304 U.S. at 78 . . . must follow the decisions of intermediate state courts in the absence of convincing evidence that the highest court of the state would decide differently." 311 U.S. at 467.  "In particular, this is true where the intermediate state court has determined the precise question in issue in an earlier suit between the same parties, and the highest court of the state has refused review."  Stoner v. New York Life Insurance Co., 311 U.S. at 467.  See Adams-Arapahoe Joint School Dist. No. 28-J v. Cont'l Ins. Co., 891 F.2d 772, 774 (10th Cir. 1989)("With respect to issues which the Colorado Supreme Court has not addressed, we may consider all available resources, including Colorado appellate court decisions, other state and federal decisions, and the general trend of authority, to determine how the Colorado Supreme Court would construe the law in this case."). As the Tenth Circuit explained in Wade v. EMCASCO Ins. Co., 483 F.3d 657 (10th Cir. 2007):

> In cases arising under diversity jurisdiction, the federal court's task is not to reach its own judgment regarding the substance of the common law, but simply to ascertain and apply the state law. . . . The federal court must follow the most recent decisions of the state's highest court. . . .  Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do.... In doing so, it may seek guidance from decisions rendered by lower courts in the relevant state .... appellate decisions in other states with similar legal principles . . .

. district court decisions interpreting the law of the state in question, ... and the general weight and trend of authority in the relevant area of law. . . . Ultimately, however, the Court's task is to predict what the state supreme court would do. Our review of the district court's interpretation of state law is de novo.

483 F.3d at 665-66 (internal citations and quotation marks omitted).

The Tenth Circuit generally "will not certify questions to a state supreme court when the requesting party seeks certification only after having received an adverse decision from the district court." Massengale v. Okla. Bd. of Exam'rs in Optometry, 30 F.3d 1325, 1331 (10th Cir. 1994). See Arnold I, 827 F. Supp. 2d at 1297 (denying the Plaintiffs'' request for certification because the Plaintiffs requested the certification after the Court rendered judgment in favor of the Defendants, and Plaintiffs' request for certification was made in the alternative); XTO Energy, Inc. v. ATD, LLC, 189 F. Supp. 3d 1174, 1207 (D.N.M. 2016)(Browning, J.)(declining a Defendant Insurer's request for certification in its Motion for Reconsideration after the Court had already ruled against the Insurer under New Mexico's Oilfield Anti-Indemnity Statute, NMSA 1978, § 56-7-2); Martinez v. Martinez, 2013 WL 3270448, at *47(D.N.M. June 3, 2012)(declining to certify a question when the Court could interpret New Mexico precedent); Armijo v. Ex Cam, Inc., 843 F.2d 406, 407 (10th Cir. 1988)(noting that "[c]ertification is not to be routinely invoked whenever a federal court is presented with an unsettled question of state law" and that "the plaintiff did not request certification until after the district court made a decision unfavorable to her"); Boyd Rosene & Assoc., Inc. v. Kan. Mun. Gas Agency, 178 F.3d 1363, 1364 (10th Cir. 1999)("Late requests for certification are rarely granted . . . and are generally disapproved, particularly when the district court has already ruled."); Harvey E. Yates Co. v. Powell, 98 F.3d 1222, 1229 n.6 (10th Cir. 1996)(denying request for certification in removed case where the moving party had not moved for certification in the district court and had received an adverse ruling).

## ANALYSIS

The Court grants Hartford Insurance's MTD in part, and denies in part.  The Court denies Hartford Insurance's Motion to Dismiss Count I of the Youngs' Complaint, because the Court concludes that questions of fact exist as to: (i) whether Hartford Insurance breached its Automobile Policy with the Youngs by not paying the Youngs the full amount they argue they are entitled to related to their 2007 Case Tractor theft; and (ii) whether Hartford Insurance breached its Homeowners Policy with the Youngs by allegedly only paying the Youngs 12.48% of the amount the Youngs argue they are entitled to related to their March 30, 2016, theft and property damage. The Court, relatedly, denies Hartford Insurance's Motion to Dismiss Count IV of the Youngs' Complaint, because the Court concludes that questions of fact exist regarding whether Hartford Insurance breached its implied covenant of good faith and fair dealing with the Youngs when allegedly breaching the terms of the Youngs' Homeowners Policy and Automobile Policy.  The Court grants Hartford Insurance's Motion to Dismiss the Youngs' request for punitive damages, pursuant to the Youngs' breach-of-contract claim against Hartford Insurance, see Complaint ¶ 53, at 7, because the Youngs do not advance evidence showing that Hartford Insurance acted with "wanton disregard" for the Youngs' rights, Romero v. Mervyn's, 1989-NMSC-081, ¶ 23, 784 P.2d at 998, or with an "evil motive or a culpable mental state," Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 25, 880 P.2d at 308, when allegedly underpaying the Youngs under the Automobile Policy or the Homeowners Policy.  The Court denies Hartford Insurance's Motion to Dismiss Counts II and III of the Youngs' Complaint, because the Court concludes that the Youngs allege sufficient facts to support their claims that Hartford Insurance committed unfair trade practices in violation of New Mexico's UIPA, NMSA 1978, § 59A-16-1, and in violation of New Mexico's UPA, NMSA 1978, § 57-12-2(D).  The Court grants Hartford Insurance's Motion to Dismiss Count V of the Youngs' Complaint, because the Court concludes that the Uninsured

Motorist Act's ("UMA") § 66-5-301(A)  does not cover  "property theft" and "loss of use" damages, see NMSA 1978, § 66-5-301(A).  The Court, in turn, grants Hartford Insurance's Motion to Dismiss the Youngs' request for punitive damages pursuant to the UMA's § 66-5-301(A), because of the Court's conclusion that the  UMA's § 66-5-301(A) does not cover the Youngs' theft and property damage.  See NMSA 1978, § 66-5-301(A);  Mortensen v. Liberty Mut. Ins., 2019 WL 1571730, at *3; Arnold III, Memorandum Opinion and Order, at 2; Arnold II, 827 F. Supp. 2d at 1300-1301; Arnold I, 760 F. Supp. 2d at 1286.  In addition, the Court grants Hartford Insurance's Motion to Dismiss Count VI of the Youngs' Complaint -- the Youngs' request for a Declaratory Judgment on their rights, status, and liabilities related to their UM/UIM benefits under the Hartford Insurance Automobile Policy -- because of the Court's determination that the UMA's § 66-5-301(A) does not cover the Youngs' March 30, 2016, theft and related property damage. Finally, because the Court determines that New Mexico courts have charted a "reasonably clear and principled course" on the Youngs' state law questions, the Court concludes that there is no sound reason to certify the Youngs' state law issues to the Supreme Court of New Mexico.  Pino v. United States, 507 F.3d at 1236.

## I.   FACTUAL DISPUTES EXIST WHETHER HARTFORD INSURANCE BREACHED THE TERMS OF THE YOUNGS' AUTOMOBILE POLICY AND HOMEOWNERS POLICY.

The Court denies Hartford Insurance's Motion to Dismiss Count I -- the Youngs' breach-of-contract claim -- because factual disputes exist whether Hartford Insurance breached the terms of the Youngs' Automobile Policy and Homeowners Policy, based on its alleged underpayment of compensatory and punitive damages to the Youngs related to the March 30, 2016, theft.

A contract is a legally enforceable promise that must consist of an offer, an acceptance, consideration, and mutual assent.  See N.M.R.A., Civ. UJI 13-801.  A person may breach a contract

by failing to perform a contractual obligation when the performance is required, unless that performance is otherwise excused. See N.M.R.A., Civ. UJI 13-822. Incomplete performance is a breach of contract. See Cochrell v. Hiatt, 1981-NMCA-125, ¶ 10, 638 P.2d at 1103-04 (holding that, where the contract called for the roof to be restored to a "healthy" state and guaranteed the work for twenty-five years, because the roof leaked within the twenty-five-year period, the defendant's performance was incomplete, and the defendant was in breach of the contract). Under New Mexico law, "[t]he elements of a breach-of-contract action are the existence of a contract, breach of the contract, causation, and damages." Abreu v. N.M. Children, Youth and Families Dep't, 797 F. Supp. 2d 1199, 1247 (D.N.M. 2011)(Browning, J.).

> [A] complaint on breach of contract must allege: (1) the existence of a valid and binding contract; (2) the plaintiff's compliance with the contract and his performance of the obligations under it; (3) a general averment of the performance of any condition precedent; and (4) damages suffered as a result of defendant's breach.

McCasland v. Prather, 1978-NMCA-098, ¶ 7, 585 P.2d 336, 338 (citing Wright and Miller, Federal Practice and Procedure: Civil § 1235 (1969)).

Additionally, in contract cases, "the role of the court is to give effect to the intention of the contracting parties." Bogle Farms, Inc. v. Baca, 1996-NMSC-051, ¶ 22, 925 P.2d at 1184. "The primary objective in construing a contract is not to label it with specific definitions or to look at form above substance, but to ascertain and enforce the intent of the parties as shown by the contents of the instrument." Bogle Farms, Inc. v. Baca, 1996-NMSC-051, ¶ 22, 925 P.2d at 1184 (citing Shaeffer v. Kelton, 1980-NMSC-117, 619 P.2d at 1229). "The parole evidence rule 'bars admission of evidence extrinsic to the contract to contradict and perhaps even supplement the writing.'" Memorial Med. Ctr., Inc. v. Tatsch Const., Inc., 2000-NMSC-030, ¶ 16, 129 N.M. 677, 12 P.3d 431 (citation omitted). On the other hand, New Mexico has "adopted the contextual

approach to contract interpretation, in recognition of the difficulty of ascribing meaning and content to terms and expressions in the absence of contextual understanding." Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 845 P.2d at 1235. See Pedroza v. Lomas Auto Mall, Inc., 2013 WL 4446770, at *18.

1. **The Court Concludes That The Youngs Show The Existence Of A Contract With Hartford Insurance -- The Automobile And Homeowners Insurance Policies -- And Their Compliance With The Conditions Precedent Of The Contracts.**

First, the Court concludes that the Youngs show the first element of a breach-of-contract claim, because the Youngs show "the existence of a valid and binding contract" between themselves and Hartford Insurance, which comes in the form of the Automobile  Policy and Homeowners Policy, both of which were effective on March 30, 2016 -- the day that the Youngs filed the claims related to their property theft. McCasland v. Prather, 1978-NMCA-098, ¶ 7, 585 P.2d at  338. See Complaint ¶¶  19-20, at 3 (alleging the existence of Automobile Policy and Homeowners Insurance Policy effective on March 30, 2016). See also Homeowners Insurance Policy at 3; Automobile Insurance at 1. The Youngs allege facts showing that the Homeowners Insurance Policy provides to the Youngs "coverage for personal property at an amount of $140,250," and the insured location includes the grounds of the Youngs' residence. Complaint at ¶¶ 19-20, at 3. Homeowners Insurance Policy at 3. In addition to obtaining personal property insurance coverage through Hartford Insurance, as of March 30, 2016, the Youngs also show that they were insured under the Automobile Policy, which provides "comprehensive coverage as well as coverage for UM/UIM . . . in the amount of $50,000." Complaint ¶ 26, at 4. See Automobile Policy at 2. Based on these facts, the Court concludes that the Youngs have shown sufficiently the first element of a breach-of-contract claim.

Second, the Court concludes that the Youngs demonstrate the second and third elements of a breach-of-contract claim under New Mexico state law, because they demonstrate their "compliance" with the insurance policies and their "performance of the obligations under it," and relatedly, they show "a general averment of the performance of any condition precedent." McCasland v. Prather, 1978-NMCA-098, ¶ 7, 585 P.2d at 338.  See Abreu v. N.M. Children, Youth and Families Dep't, 797 F. Supp. 2d at 1247.  Here, the Court determines that the Youngs advance facts showing that the insurance claims the Youngs filed with Hartford Insurance on March 30, 2016, comply with the conditions precedent set forth in the Automobile Policy and the Homeowners Policy.  See Complaint ¶ 35-36, at 4.  Specifically, the Court accepts as true the Youngs' allegations that the property damage they suffered constitutes applicable "property damage as defined by the homeowner's policy," because "[t]he homeowner's policy covers the materials and supplies located on or next to the residence premises used to construct, alter or repair the dwelling or other structures on the residence premises."  Complaint ¶ 21, at 3.   In addition, the Court determines that the Youngs advance factual allegations statements showing that:

> The homeowner's policy covers personal property owned or used by an insured while it is anywhere in the world.  After a loss and at the insureds' request, the Homeowners Policy will cover personal property owned by others while the party is on the part of the residence premises occupied by the insured.

Complaint ¶ 23, at 3.  Ultimately, then, because the Youngs have suffered theft of "personal property owned or used" by the Youngs, Complaint ¶ 23, at 3 -- in the form of their "2004 Ford F-350, 2010 JB trailer, 2007 Case Tractor with attachments," as well as "other miscellaneous property," Complaint ¶ 7, at 2, "had been stolen during the night from the side of their residence," Complaint ¶ 7, at 2 -- the Court concludes that the Youngs have complied with the conditions precedent under their Hartford Insurance Homeowners Policy.  Equally, the Court concludes that the Youngs have complied with the conditions precedent under the Automobile Policy, because

they show facts demonstrating the theft of their two vehicles, which they allege, entitled them to "stacked property damage coverage totaling at least $200,000." Complaint ¶ 8 at 2. The Court also concludes that the Youngs allege sufficiently that they have complied with the proper procedures in filing their claims with Hartford Insurance, which included "tender[ing] an itemized list of stolen personal property, including the 2007 Case Tractor with attachments, totaling approximately $68,541.90 (not including the 2004 Ford F-350 vehicle) to enable the insurers to evaluate Plaintiffs' claims." Complaint ¶ 35, at 4. In addition, the Youngs allege that they also followed proper procedure, because they "purchased the property from a personal account, registered the property in their names, and/or leased the property in their names and have always maintained these items as mixed-use." Complaint ¶ 44, at 5. The Court concludes, therefore, that the Youngs satisfy the conditions precedent under their Homeowners Policy and Automobile Policy, thus showing elements two and three of a breach-of-contract claim under New Mexico state law.

2.      **The Youngs Allege Sufficient Facts In Their Complaint To Support Their Claim That Hartford Insurance Breached The Automobile Policy By Not Compensating the Youngs Fully For the Theft of Their 2007 Case Tractor And That Hartford Insurance Breached The Homeowners Policy By Only Compensating The Youngs for 12.48% Of Their Itemized Property Damage.**

The Court determines, however, that certain factual disputes exist regarding whether the Youngs can show the fourth element of a breach-of-contract claim -- that Hartford Insurance "fail[ed] to pay for the coverage" to which the Youngs state that they were entitled under the Automobile Policy and the Homeowners Policy. Complaint ¶ 46, at 5. The Youngs first allege that Hartford Insurance breached the Automobile Policy and Homeowners Policy contracts with the Youngs, in that Hartford Insurance failed to compensate the Youngs for the "injury and destruction to [their] property that is compensable pursuant to Part C and Part D of the automobile policy, including the New Mexico coverage endorsement," Complaint ¶ 34 at 4. The Youngs

contend, as well, that Hartford Insurance breached the Automobile Policy and the Homeowners Policy with the Youngs by not "compensate[ing] Plaintiffs for punitive damages stemming from loss of property."  Complaint at ¶ 34 at 4.  The Court will analyze initially Hartford Insurance's alleged compensatory damages underpayment to the Youngs under the Automobile Policy.  The Court will then analyze Hartford Insurance's alleged compensatory damages underpayment to the Youngs under the Homeowners Policy.[11]

First, under the Automobile Policy, Hartford Insurance provided to the Youngs: (i) a $12,120.61 check, which the Youngs received "[o]n or about July 1, 2016," and was intended to cover the "damage to the 2004 Ford F-350 only" that resulted from the theft,  Complaint ¶ 37, at 4; and (ii) a $250 check, which the Youngs received "[o]n October 31, 2016," which  was intended to cover the deductible under the automobile policy, Complaint ¶ 38, at 4.  See Automobile Policy at 1-13.  The Youngs, nonetheless, argue that they were not "made whole" under the Hartford Automobile Policy because they were not compensated properly for the theft of their 2007 Case Tractor.  See Complaint ¶ 43, at 5.   Hartford Insurance rebuts this claim, stating that it was not required to compensate the Youngs for the 2007 Case Tractor theft because "the 2007 Case Tractor with attachments was business property and therefore, subject to a cap of $2,500 on insurance payouts."  Complaint ¶ 44, at 5.   The Youngs respond by stating that Hartford's characterization of the 2007 Case Tractor as "business property" is incorrect, because they "purchased the property

_____

[11]The Court, however, will not analyze the Youngs' claim that Hartford Insurance breached the Youngs' Automobile Policy by allegedly underpaying the Youngs punitive damages related to their UM/UIM benefits in Part I.  Rather, the Court will analyze the UM/UIM benefits issue in Part III of the Analysis, because the question whether Hartford Insurance breached the Youngs' Automobile Policy by allegedly underpaying the Youngs' punitive damages related to their UM/UIM benefits is intertwined with the Court's analysis of the question whether the Youngs' are legally entitled to UM/UIM benefits based on their March 30, 2016, theft and related property damage.

from a personal account, registered the property in their names, and/or leased the property in their names and have always maintained these items as mixed-use."  Complaint ¶ 44, at 5.  The 2007 Case Tractor, therefore, as the Youngs explain, was "not subject" to the $2,500 cap.  Complaint ¶ 44, at 5.

The Court is not aware of any New Mexico state law that addresses whether a vehicle properly can be classified as "business property" under an automobile policy.  Rather, the question is one of fact, and, therefore, requires an analysis of the relevant provisions of the insurance policy at issue.  Accordingly, the Court evaluates the specific policy provisions within the Hartford Insurance Automobile Policy that govern exclusions of coverage under the policy.  <u>See</u> Automobile Policy at 13, § A.  Specifically, in the "Exclusions" Section of the Automobile Policy, under § A, Subsections (6)-(7), the Automobile Policy states:

> A.   We do not provide Liability Coverage for any **insured**:
>
> . . .
>
> > 6.   While employed or otherwise engaged in the **business** of:
> >
> > a.   Selling;
> > b.   Repairing;
> > c.   Servicing;
> > d.   Storing; or
> > e.   Parking
>
> vehicles designed for use mainly on public highways.  This includes road testing and delivery.  This Exclusion **(A.6.)** does not apply to the ownership, maintenance or use of **your covered auto** by:
>
> > **a.**   You;
> > **b.**   Any **family member**; or
> > **c.**   Any partner, agent or employee of you or any **family member**

Automobile Policy at 13, § A(6) (emphasis in original).  Comparably, within the Automobile Policy's same "Exclusions" Section, under § A, Subsection (7), Hartford Insurance states:

A.      We do not provide Liability Coverage for any **insured**:

. . .

7.      Maintaining or using any vehicle while that **insured** is employed or otherwise engaged in any business (other than farming or ranching) nor described in Exclusion **A.6.**  This Exclusion (A.8) does not apply to the maintenance or use of a:

**a.**   Private passenger auto;
**b.**   Pickup or van; or
**c.**   Trailer used with a vehicle described in a. or b. above.

Automobile Policy at 13, § A(7) (emphasis in original).

Upon evaluation of the Hartford Insurance Automobile Policy provisions that cover exclusions of coverage, the Court concludes that it cannot determine, as a matter of law for the Plaintiffs, whether the Youngs' 2007 Case Tractor should be classified properly as "business property," as to trigger an exclusion and a cap on compensatory payout by Hartford Insurance. Automobile Policy at 13.  Namely, it is unclear from the pleadings alone whether the exclusion is triggered based on the 2007 Case Tractor having been used by a driver "[w]hile employed or otherwise engaged in the business of . . . **a.** Selling, **b.** Repairing, **c.** Servicing, **d.** Storing; **e.** Parking," or, if the exclusion is otherwise triggered based on the 2007 Case Tractor being a "vehicle[] designed for use mainly on public highways . . . includ[ing] road testing and delivery." Automobile Policy at 13, § A(6) (emphasis in original) .  Even if the 2007 Case Tractor is used for a "business" purpose under Section A(6)'s first portion, however, the Court then questions whether the Automobile Policy's exception to the § A(6) exclusion covers in full the 2007 Case Tractor, in that the Youngs, a "family member," or a "partner, agent or employee of [the Youngs] or any family member" used the 2007 Case Tractor.   Automobile Policy at 13, § A(6).  Alternatively, under § A(7), the Court inquires whether the 2007 Case Tractor would be excluded from coverage as "business property" because the Youngs "maintained" or "used" the 2007 Case Tractor "while

that **insured** is employed or otherwise engaged in any business (other than farming or ranching) not described **Exclusion A.6**." Automobile Policy at 13, Section A(6) (emphasis in original) . Or, alternatively, is the 2007 Case Tractor exempt from the Section A(7) exclusionary provision because the Youngs maintain the automobile for use as a "Private passenger auto;" "Pickup or van," or as a "Trailer used with a [Private passenger auto] or [Pickup or van]." Automobile Policy at 13, Section A(6). Ultimately, then, because of these existing factual disputes regarding the nature of the 2007 Case Tractor as "business property" under the Hartford Insurance Automobile Provision, see Automobile Policy at 13, Sections A(6)-(7), the Court denies Hartford Insurance's Motion to Dismiss the Youngs breach-of-contract claim, as it relates to Hartford Insurance's alleged underpayment of compensation owed to the Youngs related to the 2007 Case Tractor.

Second, under the Homeowners Policy, Hartford Insurance provided to the Youngs: (i) a $7,490.96 check, which the Youngs received "[o]n or about September 3, 2016," Complaint ¶ 40, at 5; and (ii) an additional $1,063.13 check, which the Youngs received "[o]n October 27, 2016," and was intended to cover the deductible under the automobile policy, Complaint ¶ 41, at 4. See Homeowners Policy at 2-59. The Youngs, nonetheless, argue that they were similarly not "made whole" by Hartford Insurance's payments under the Homeowners Policy, because Hartford Insurance's collective payments to the Youngs "totaled only $8,554.09 or 12.48% of the total loss," which, the Youngs "maintain was covered by the policy in force." Complaint ¶ 42, at 6. Hartford Insurance rebuts the Youngs' claim, stating that "[n]othing" in the Youngs' Complaint or Response "pleads what specific amount is owed under the Policy." Reply at 2.

The issue related to Hartford Insurance's alleged underpayment of the Youngs' coverage under the Homeowners Policy is also one of fact, meaning that, outside of an analysis of the provisions at issue, there is no New Mexico state law that speaks to whether Hartford Insurance

legally breached its insurance contract with the Youngs.  At present, however, the Court, disagrees with Hartford Insurance's contention that the Youngs have not pleaded the specific amount that is owed to them under the Homeowners Policy, as the Youngs indicate that they received "only $8,554.09 or 12.48%" of the total property damage loss they claimed on March 30, 2016. Complaint ¶ 42, at 6.  The Youngs allege therefore that they are entitled to $68,542.39, which represents the full amount they are owed.  At the motion-to-dismiss stage, the Court does not weigh the evidence.  See Bell Atlantic Corp. v. Twombly, 550 U.S. at 555; Rivero v. Bd. of Regents of Univ. of New Mexico, 2019 WL 1085179, at *47.  Rather, the Court "is interested only in whether . . . the [p]laintiffs plead a claim to relief that is plausible on its face." Rivero v. Bd. of Regents of Univ. of New Mexico, 2019 WL 1085179, at *47.  "On the assumption that all of the allegations in the complaint are true (even if doubtful in fact)," the Court concludes that the Youngs advance sufficient factual allegations "to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. at 555.  The Court concludes that the Youngs have sufficiently pleaded the specific amount that is owed to them under the Homeowners Policy,.  The Court, therefore, denies Hartford Insurance's Motion to Dismiss the Youngs breach-of-contract claim, as it relates to Hartford Insurance's alleged underpayment of compensation owed to the Youngs related to their alleged property damages under the Youngs' Homeowners' Policy.

## II.    THE YOUNGS DO NOT SHOW THAT HARTFORD INSURANCE  BREACHED THEIR AUTOMOBILE POLICY AND HOMEOWNERS POLICY WITH "WANTON DISREGARD" FOR THEIR RIGHTS OR WITH AN "EVIL MOTIVE OR A CULPABLE MENTAL STATE."

The Youngs request punitive damages for two reasons.  See Complaint ¶¶ 48-80, at 10-11. The Youngs first request punitive damages because of the theft of their property at the unknown motorist's hands on March 30, 2016.  See Complaint ¶ 33, at 4.  See also Complaint ¶ 75, at 10; Tr. at 18: 3-4 (Zamora).  The Youngs request these punitive damages pursuant to the UMA's § 66-

5-301.  See Complaint ¶ 74, at 9; NMSA 1978, § 66-5-301.  The Youngs' second basis for punitive

damages stems from Hartford Insurance's alleged breach of the Youngs' Automobile Policy and

Homeowners Policy.  The Youngs aver that Hartford Insurance underpaid them  which the Youngs

allege, was "malicious, willful, reckless, wanton, oppressive, in bad faith and/or fraudulent."

Complaint ¶ 53, at 6.  See Tr. at 18: 3-4 (Zamora).  The Court will evaluate the Youngs' requested

punitive damages, stemming from Hartford Insurance's alleged breach of the Youngs' Automobile

Policy and Homeowners Policy.  In Part IV of the Analysis, the Court will evaluate subsequently

the Youngs' first set of requested punitive damages that relate to the theft of the Youngs property

at the unknown motorist's hands.  See Tr. at 18:3-4 (Zamora).

The Supreme Court of New Mexico has held that "an award of punitive damages in a

breach-of-contract case must be predicated on a showing of bad faith, or at least a showing that

the breaching party acted with reckless disregard for the interests of the nonbreaching party."  Paiz

v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 24, 880 P.2d at 307.   Punitive damages are

awarded on a showing of bad faith in the insurance contract context as long as a plaintiff shows

"evidence of bad faith or malice in the insurer's refusal to pay the claim."   United Nuclear Corp.

v. Allendale Mut. Ins. Co., 1985-NMSC-090, ¶ 16, 709 P.2d at 653.  When assessing an insurer's

bad faith for the awarding of punitive damages, New Mexico state courts assess whether the

plaintiff can show that "the conduct of the wrongdoer [is] 'maliciously intentional, fraudulent,

oppressive, or committed recklessly or with a wanton disregard to the plaintiffs' rights.'" Paiz v.

State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 24, 880 P.2d at 307 (quoting Loucks v.

Albuquerque Nat'l Bank, 1966-NMSC-176, ¶ 48, 418 P.2d 191, 199.  See also  Green Tree

Acceptance, Inc. v. Layton, 1989-NMSC-006, ¶ 9, 769 P.2d 84, 87.  The Supreme Court of New

Mexico requires that a plaintiff show a defendant's "wanton disregard" for her or his rights to

prove punitive damages, because of the important deterrence and punishment policy rationales underlying a punitive damages award.  Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 24, 880 P.2d at 307.  As the Supreme Court of New Mexico explained in Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 24, 880 P.2d at 307:

> "In New Mexico, it is well settled that because the limited purpose of punitive damages is to punish and deter persons from certain conduct, there must be some evidence of a culpable mental state.  Certainly the mere breach of a contract does not imply any basis for punitive damages without evidence of such a culpable mental state or other form of overreaching, malicious, or wanton conduct."

Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 24, 880 P.2d at 307 (quoting Construction Contracting & Management, Inc. v. McConnell, 1991-NMSC-066, ¶ 16, 815 P.2d 1161, 1165).

Nonetheless, the Supreme Court of New Mexico also outlines exceptions to its requirement that a plaintiff prove a defendant's "wanton disregard" to justify an awarding of punitive damages under an insurance contract.  Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 24, 880 P.2d at 307.  For example,  an insurance carrier can be liable for punitive damages "if it fails to exercise even slight care in discharging its contractual obligations to its insured."  1994-NMSC-079, ¶ 25, 880 P.2d at 307.  The Supreme Court of New Mexico made clear that this principle supersedes its previous holdings that punitive damages were only "exclusively" available for an insurer's "reckless or grossly negligent conduct"  Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 25, 880 P.2d at 307 (quoting Jessen v. National Excess Insurance Co., 1989-NMSC-040, ¶ 8, 776 P.2d 1244, 1246 (emphasis in original)).  Under New Mexico state law, therefore, punitive damages within the context of an insurance contract may be predicated on an insurer's "gross negligence" and "evidence of an 'evil motive' or a 'culpable mental state."  Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 26, 880 P.2d at 308.

The Supreme Court of New Mexico also clarifies the "culpable mental state" that is required to support an award of punitive damages to a plaintiff in the context of breach-of-contract cases and breach of insurance contract cases.  Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 27, 880 P.2d at 308.  Specifically, as the Supreme Court of New Mexico explains:

> A mental state sufficient to support an award of punitive damages will exist when the defendant acts with "reckless disregard" for the rights of the plaintiff -- i.e., when the defendant *knows* of potential harm to the interests of the plaintiff but nonetheless "utterly fail[s] to exercise care" to avoid the harm. By contrast, a defendant acting with gross negligence -- which UJI Civil 13–1827 defines as a failure to exercise even slight care -- cannot, solely because the defendant acted with such negligence, be regarded as having a culpable or "evil" state of mind.  *See* W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 34, at 212 (5th ed. 1984)("[M]ost courts consider that 'gross negligence' falls short of a reckless disregard of the consequences, and differs from ordinary negligence only in degree, and not in kind.").

Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 27, 880 P.2d at 308.

The Supreme Court of New Mexico explains that its requirement for the plaintiff to show a defendant's "culpable mental state" is based on the views "endorsed by the authorities we have encountered in the area of damages."  Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 27, 880 P.2d at 308.

> We note that the position we now reaffirm comports with the view endorsed by the authorities we have encountered in the area of damages. *See, e.g.*, Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 34, at 212 (5th ed. 1984) § 2, at 9-10 (for an award of punitive damages, "[t]here must be . . . such a *conscious* and *deliberate* disregard of the interests of others that the conduct may be called willful or wanton. There is general agreement that, because it lacks this element, *mere negligence is not enough, even though it is so extreme in degree as to be characterized as 'gross'* . . . .". . . ." (emphasis added; footnotes omitted)); 1 Dan B. Dobbs, *Dobbs' Law of Remedies* § 3.11(2), at 472 (2d ed. 1993)("[I]n spite of the 'gross negligence' terminology, the courts seem largely agreed in practice that bad conduct and bad states of mind are both required to justify punitive damages."); Restatement (Second) of Torts § 908 (1979)("Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others."); Charles T. McCormick, *Handbook of the Law of Damages* § 79, at 280–81 (1935):

Since [punitive] damages are assessed for punishment and not for reparation, *a positive element of conscious wrongdoing is always required.* It must be shown either that the defendant was actuated by ill will, malice, or evil motive . . . , or by fraudulent purposes, or that he was so wanton and reckless as to evince a *conscious disregard* of the rights of others. "Gross negligence" is a somewhat ambiguous expression. In the sense of extreme carelessness merely, it would probably not suffice, but only when it goes further and amounts to *conscious indifference to harmful consequences.* [Emphasis added; footnotes omitted.]

Our position also corresponds with the approach taken by most states. *See, e.g., Linthicum v. Nationwide Life Ins. Co.,* 150 Ariz. 326, 330, 723 P.2d 675, 679 (1986)(in banc)(stating, in insurance case where insured sued insurer for breach of contract: "In deciding whether punitive damages are awardable, the inquiry should be focused upon the wrongdoer's mental state. . . . The wrongdoer [insurer] must be *consciously aware* of the wrongfulness or harmfulness of his conduct and yet continue to act in the same manner in deliberate contravention to the rights of the victim [insured]." (emphasis added)); *Tuttle v. Raymond,* 494 A.2d 1353, 1360-61 (Me. 1985)("It is generally accepted that mere negligence cannot support an award of punitive damages. . . . Whatever qualitative difference exists between mere negligence and 'gross' negligence, it is insufficient to justify allowing punitive damages based upon the latter class of conduct.").

Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 27, 880 P.2d at 308. Finally, the Supreme

Court of New Mexico draws its theory for the awarding of punitive damages on a breach-of-

contract claim from the principle that contract law is "a law of strict liability, and the

accompanying system of remedies operates without regard to fault." Paiz v. State Farm Fire &

Cas. Co., 1994-NMSC-079, ¶ 30, 880 P.2d at 300 (citing  3 E. Allan Farnsworth, on Contract Law,

Farnsworth on Contracts § 12.8, at 190 (1990)). See Patton v. Mid–Continent Sys., Inc., 841 F.2d

742, 750 (7th Cir. 1988)("[L]iability for breach of contract is, prima facie, strict liability. That is,

if the promisor fails to perform as agreed, he has broken his contract even though the failure [was]

in no way blameworthy."). The Supreme Court of New Mexico explains its reliance on contract

law principles for the awarding of punitive damages in the following way:

As a general principle, the purpose of contract law is to compensate the nonbreaching party for the damages caused by the breaching party's nonperformance. Romero v. Mervyn's, 1989-NMSC-081, ¶ 30, 784 P.2d at 1000 (discussing "[t]he general rule limiting recovery in contract case[s] to

compensatory damages"). The amount of recovery should not depend on the manner in which the contract was breached, and the nonbreaching party should not be able to extract an extra bonus from a breach characterized by a high degree of fault or resulting from a low degree of care. "It is a fundamental tenet of the law of contract remedies that, regardless of the character of the breach, an injured party should not be put in a better position than had the contract been performed." Farnsworth, § 12.8, at 189-90; *see also* 3 Arthur L. Corbin, *Corbin on Contracts* § 606, at 647-48 (1960)("[O]ne is held responsible for harm to others if it is caused by his 'folly' or his negligent mistake, but his responsibility need not be carried so far as to permit others to profit by reason of his mistake.").

Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 30, 880 P.2d at 309.  Nonetheless, as the Supreme Court of New Mexico qualifies, there is a narrow exception to the principle that a "party should not be put in a better position than had the contract been performed."  Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 30, 880 P.2d at 309.  That exception is when state courts seek to penalize, with an award of punitive damages, a defendant's "conduct that constitutes a 'wanton disregard' for the nonbreaching party's rights, or 'bad faith.'"  Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 31, 880 P.2d at 309 (quoting Romero v. Mervyn's, 1989-NMSC-081, ¶ 26-37, 784 P.2d at 999-1002 (upholding the jury's award of punitive damages when an agent made a promise knowing that his employer would not be able to perform).

Importantly, as well, the Supreme Court of New Mexico's aims to prevent bad faith in contract dealing by "implying, in all contracts, a covenant of good faith and fair dealing."  Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 31, 880 P.2d at 309.  As the Supreme Court of New Mexico explained in Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 31, 880 P.2d at 309, "[t]he breach of this covenant requires a showing of bad faith or that one party wrongfully and intentionally used the contract to the detriment of the other party."  1994-NMSC-079, ¶ 31, 880 P.2d at 309 (citing Continental Potash, Inc. v. Freeport–McMoran, Inc., 1993-NMSC-039, ¶¶ 64-656, 858 P.2d 66, 82 (citation omitted), cert. denied, 510 U.S. 1116 (1994)).  Nonetheless, the implied covenant of good faith and fair dealing is limited, as the Supreme Court of New Mexico

clarifies, and "protects" a plaintiff "only against bad faith" of a defendant, which is characterized as a defendant's "wrongful and intentional affronts to the other party's rights, or at least affronts where the breaching party is consciously aware of, and proceeds with deliberate disregard for, the potential of harm to the other party." Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 31, 880 P.2d at 309. The Supreme Court of New Mexico, therefore, explains that the implied covenant of good faith and fair dealing, across the regular contract and insurance contract settings, "has never, to our knowledge, been extended to protect against [a defendant's] negligent conduct -- no matter how grossly so." Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 31, 880 P.2d at 309. Or, in other words, as the Supreme Court of New Mexico clarifies, "there is no implied covenant to exercise 'ordinary care,' or even 'slight care' and the fact that the breaching party may not have acted with ordinary or slight care is immaterial to the questions whether the contract has been breached and, if so, what damages should be awarded for the breach." Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 31, 880 P.2d at 310.

As discussed in the Court's analysis of the Youngs' breach-of-contract claim, the Court concludes that it cannot determine, as a matter of law: (i) whether the Youngs' 2007 Case Tractor should be classified properly as "business property," as to trigger an exclusion and a cap on Hartford Insurance's compensatory payout for the theft of the 2007 Case Tractor pursuant to the Youngs' under the Automobile Policy, see Complaint ¶ 44, at 5, and (ii) whether Hartford Insurance only compensated the Youngs for 12.48% of their personal property coverage pursuant to the Homeowners Policy, see Complaint ¶ 42, at 5. The Court, therefore, denies Hartford Insurance's Motion to Dismiss the Youngs' breach-of-contract claim. The Court, however, grants Hartford Insurance's Motion to Dismiss the Youngs' request for punitive damages in ¶ 53 of the Complaint, pursuant to their breach-of-contract claim against Hartford Insurance.

As an initial matter, the Court disagrees with Hartford Insurance's contention that punitive damages cannot be awarded on a plaintiff's breach-of-contract claim.  See MTD at 5; United Nuclear Corp. v. Allendale Mut. Ins. Co., 1985-NMSC-090, ¶ 16, 70 P.2d at 654.  Instead, the Court recognizes that, under New Mexico law, punitive damages can be awarded on a plaintiff's breach-of-contract claim, even in the context of an insurance contract, as long as the plaintiff can show "evidence of bad faith or malice in the insurer's refusal to pay the claim."  United Nuclear Corp. v. Allendale Mut. Ins. Co., 1985-NMSC-090, ¶ 16, 70 P.2d at 654.  To support a punitive damages award under New Mexico state law, a plaintiff must show an insurer's bad faith by advancing evidence that "the conduct of the wrongdoer [is] 'maliciously intentional, fraudulent, oppressive, or committed recklessly or with a wanton disregard to the plaintiffs' rights.'"  Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 24, 880 P.2d at 307 (quoting Loucks v. Albuquerque National Bank, 71966-NMSC-176, ¶ 48, 418 P.2d 191, 199.  See also Green Tree Acceptance, Inc. v. Layton, 1989-NMSC-006, ¶ 9, 769 P.2d 84, 87.

The Court concludes that the Youngs do not advance facts showing Hartford Insurance acted in "bad faith" or allegedly underpaid the Youngs on their insurance claims related to the March 30, 2016, theft with conduct that was "maliciously intentional, fraudulent, oppressive, or committed recklessly or with a wanton disregard to the plaintiffs' rights."  Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 24, 880 P.2d at 307 (quotations omitted).  Although the Youngs argue that the Court should defer to its allegations that Hartford Insurance's actions in underpaying the Youngs under the Automobile Policy and Insurance Policy were "malicious, willful, reckless, wanton, oppressive, in bad faith and/or fraudulent," Complaint ¶ 53, at 6, when assessing an insurer's "wanton disregard" for an insured's rights under an insurance contract, the Court requires that a plaintiff advance sufficient evidence of an insurer's "culpable mental state."   Paiz v. State

Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 27, 880 P.2d at 308.  The Court must ensure the Youngs

meet this standard, because the Supreme Court of New Mexico has clarified that, at the motion-

to-dismiss stage, even if a plaintiff can advance facts showing a defendant's breach-of-contract

under Twombly and Iqbal, this "does not imply any basis for punitive damages without evidence

of such a culpable mental state or other form of overreaching, malicious, or wanton conduct."  Paiz

v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 24, 880 P.2d at 307 (quoting Construction

Contracting & Management, Inc. v. McConnell, 112 N.M. 371, 375 (1991)).  See Bell Atlantic

Corp. v. Twombly, 550 U.S. at 555; Ashcroft v. Iqbal, 556 U.S. at 678.  Here, the Youngs do not

provide evidence of Hartford Insurance's culpable mental state, but offer merely a "formulaic

recitation" that Hartford Insurance's actions, in denying the full scope of their Automobile Policy

and Homeowners Policy claims, were "malicious, willful, reckless, wanton, oppressive, in bad

faith and/or fraudulent."  Complaint ¶ 53, at 6.  Without more evidence of Hartford Insurance's

alleged culpable mental state," Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 27, 880

P.2d at 308, the Youngs do not "raise a right to relief above the speculative level."  Bell Atlantic

Corp. v. Twombly, 550 U.S. at 555.

Furthermore, although the Youngs' allege that Hartford Insurance did not offer them a

"reasonable explanation" for its cap on the compensatory damages on their 2007 Case Tractor

under their Automobile Policy, and its alleged denial of the full coverage owed to them under the

Youngs' Homeowners Policy,  See Response at 6.  See also Complaint ¶ 15, at 3; id. ¶¶ 26-35, 37,

39, 45-47, at 4-6, the Court still concludes that the Youngs' allegations do not support the awarding

of punitive damages in this case.  The Court reaches this determination because the Court

concludes that the Youngs' alleged facts do not fall within the Supreme Court of New Mexico's

designated exception obviating the need for an insured plaintiff to prove the defendant's "wanton

disregard" for her or his rights, which, alternatively, allows the insured to show that the insurer "fail[ed] [to] exercise even slight care in discharging its contractual obligations to its insured." Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 25, 880 P.2d at 307.  For example, if the Youngs were to show that, Hartford Insurance, when allegedly underpaying the Youngs, (i) acted with "gross negligence" in the handling of the Youngs claims -- which the Supreme Court of New Mexico defines as failing to "exercise even slight care," -- and (ii) subsequently acted with "wanton disregard" for the Youngs rights when underpaying the Youngs, Romero v. Mervyn's, 1989-NMSC-081, ¶ 23, 784 P.2d at 998, or with an "evil motive or culpable mental state," Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 25, 880 P.2d at 308, then the Court could conclude that the Youngs have sufficiently alleged Hartford Insurance's "bad faith" to advance a claim for punitive damages pursuant to their breach-of-contract claim, Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 24, 880 P.2d at 307.  Yet, nowhere in the Youngs' Complaint do they describe Hartford Insurance's procedure or methods for handling their claim.  See Complaint ¶¶ 1-74, at 1-11  Moreover, the Youngs do not allege facts leading the Court to even infer that Hartford Insurance possessed a "wanton disregard" for the Youngs' rights.  Romero v. Mervyn's, 1989-NMSC-081, ¶ 23, 784 P.2d at 998.  See Complaint ¶¶ 1-74, at 1-11.  Ultimately then, because Court has no basis to determine that Hartford Insurance's alleged underpayment to the Youngs' was in "bad faith," the Court dismisses the Youngs' request for punitive damages pursuant to their breach-of-contract claim against Hartford Insurance.  Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 24, 880 P.2d at 307.

**III. THE UMA'S § 66-5-301(A) DOES NOT COVER LOSS-OF-USE DAMAGES ARISING FROM PERSONAL PROPERTY THEFT; THEREFORE, THE YOUNGS ARE NOT ENTITLED TO COVERAGE FOR THE MARCH 30, 2016, THEFT AND RELATED PROPERTY DAMAGE TO THEIR AUTOMOBILES.**

The Youngs allege that Hartford Insurance failed to provide them UMA coverage related to the March 30, 2016, theft of their automobiles.  See Complaint ¶ 70-74, at 9.  Pursuant to this claim, the Youngs argue that they are entitled to "recover the full extent of the uninsured/underinsured motorist benefits issued by Hartford Casualty Insurance Company and which might be otherwise available to Plaintiffs as a result of the damages sustained in the subject loss" because the loss of their property fulfilled the provisions under their Automobile Policy.  Complaint ¶ 70, at 9.  Specifically, the Youngs state that Hartford Insurance owes them UM/UIM reimbursement under their policies, because (i) "the theft of property was caused by one or more unknown motorist [sic]; no one walked away with the property," Complaint ¶ 71, at 9; (ii) "[a]t the time of the loss, [they] were insureds under one or more Hartford Casualty Insurance Company automobile policies providing uninsured/underinsured motorist coverage," Complaint ¶ 72, at 9; and (iii) they "have fully and completely complied with all applicable terms and conditions contained in the State Farm [sic] insurance policies at issue in this litigation," Complaint ¶ 73, at 9.  For the aforementioned reasons, as well, the Youngs contend that they are entitled "to all compensatory and punitive damages caused by the unknown motorist."  Complaint ¶ 74, at 9.

Hartford Insurance argues, however, that benefits are not available to the Youngs under the UM/UIM statutes, because the Youngs' March 30, 2016, theft of their automobiles "does not involve an uninsured vehicle driven by a third party, which is required by both the policy and New Mexico law to recover uninsured motorist benefits."  MTD at 11 (citing Automobile Policy at 40-45); Mortensen v. Liberty Mut. Ins., 2019 WL 1571730, at *9 (concluding that the loss of stolen cars is not covered under a different uninsured motorist statute); Mountain State Mur. Cas. Co. v. Martinez, 1993-NMSC-003, ¶¶ 4-9, 848 P.2d 527, 529 (assessing UM coverage for purpose of avoiding insurer paying out for unnecessary duplication of coverage))).  Hartford Insurance

explains further that the theft alleged by the Youngs is not covered by the Automobile Policy, because under the UM provisions at issue, "the policy excludes vehicles to which insurance applies." MTD at 12.   Hartford Insurance references the following provision that sets forth this exclusion: "[u]ninsured motor vehicle means a land motor vehicles of any type: (1) To which no liability bond or policy applies at the time of the accident . . . ."   MTD at 12-13 (quoting Automobile Policy at 41). See also id. at 13 (citing Dockery v. Allstate Ins. Co., 2020 WL59885, *3-4 (concluding that the plain language of NMAC 13.12.3.14(C)(3)(b) -- the regulations implementing New Mexico's UMA, NMSA 1978 § 66-5-301 -- "exclude[] an insured's stolen vehicle from coverage under the UMA"); Mortensen v. Liberty Mut. Ins., 2019 WL 1571730, at *4-6 (granting the defendant's motion to dismiss on the plaintiff's breach of contract claims relating to UM claims asserted under plaintiff's auto policy after concluding that the New Mexico Supreme Court has not yet decided if auto theft constitutes "injury to or destruction of property" under New Mexico's UMA)).   Ultimately, then, because Hartford Insurance argues that the Youngs are not entitled any benefits under the UM/UIM statutes, it states that the Youngs are not entitled to punitive damages under the statutes based on their property loss. MTD at 4 (quoting Complaint 31 at 4).

The Youngs' argument that their uninsured motorist policy covers the March 30, 2016, theft of their "2004 Ford F-350, 2010 JB trailer, 2007 Case Tractor with attachments, and other miscellaneous items" by an "unknown motorist," Complaint ¶ 10, at 2, is contingent on whether the phrase "injury to or destruction of property" in New Mexico's UMA, NMSA 1978, § 66-5-301(A) encompasses theft of their automobiles.   Mortensen v. Liberty Mut. Ins., 2019 WL 1571730, at *2. There are three relevant subsections in § 66-5-301 that govern "[i]nsurance against uninsured and unknown motorists." UMA, NMSA 1978, § 66-5-301. See Mortensen v. Liberty

<u>Mut. Ins.</u>, 2019 WL 1571730, at *2.  The Honorable Kirtan Khalsa, United States Magistrate Judge

for the United States District Court for the District of New Mexico, has explained:

> In Subsection A, the statute requires automobile liability policies in New Mexico to include coverage for injury to or destruction of property . . . for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of . . . injury to or destruction of property resulting therefrom[.]  NMSA 1978, § 66-5-301(A); *see Jordan v. Allstate Ins. Co.*, 245 P.3d 1214, 1221 (N.M. 2010)(holding that a policy that does not comport with New Mexico law regarding uninsured motorist coverage will be reformed to satisfy the law's requirements).  Subsection (B), in turn, requires "[t]he uninsured motorist coverage described in Subsection A" to include "underinsured motorist coverage," and defines an "underinsured motorist" as "an operator of a motor vehicle with respect to the ownership, maintenance or use of which the sum of the limits of liability under all bodily injury liability insurance applicable at the time of the accident is less than the limits of liability under the insured's uninsured motorist coverage."  NMSA 1978, § 66-5-301(B).  Finally, Subsection (C) sets a minimum deductible for, and discusses the insured's right to reject, uninsured motorist coverage.  NMSA 1978, § 66-5-301(C).

<u>Mortensen v. Liberty Mut. Ins.</u>, 2019 WL 1571730, at *2.   To date, however, the Supreme Court

of New Mexico has not clarified whether "auto theft," such as that which the Youngs allege here,

constitutes "injury to or destruction of property" under the UMA's § 66-5-301.  See <u>Arnold I</u>, 760

F. 2d at 1295-12962d at 1300-1301; <u>Arnold III</u>, Memorandum Opinion and Order, at 28.  <u>See also</u>

<u>Mortensen v. Liberty Mut. Ins.</u>, 2019 WL 1571730, at *3.

    In situations where the Supreme Court of New Mexico has not ruled on a legal issue

presented to a federal court, the Court must assess relevant authority to predict how the Supreme

Court of New Mexico would resolve the issue.  See <u>Wade v. EMCASCO Ins. Co.</u>, 483 F.3d 657,

666 (10th Cir. 2007); <u>Erie Railroad Co. v. Tompkins</u>, 304 U.S. at 72.   Accordingly, in this case,

the Court must predict how the Supreme Court of New Mexico would decide whether automobile

theft, damages to property related to theft, and loss of use of property constitutes "injury to or

destruction of property" under the NMSA 1978, § 66-5-301.  See <u>Wade v. EMCASCO Ins. Co.</u>,

483 F.3d 657, 666 (10th Cir. 2007).  See also Arnold I, 760 F. Supp. 2d at 1286; Mortensen v. Liberty Mut. Ins., 2019 WL 1571730, at *3.  In making a prediction regarding how the Supreme Court of New Mexico would decide the legal issue, "the Court should be guided by the decisions of New Mexico's lower courts, appellate decisions from other states with similar legal principles, district court decisions interpreting New Mexico law, and the general weight and trend of pertinent authority."  Wade v. EMCASCO Ins. Co., 483 F.3d at 666.

To predict the Supreme Court of New Mexico's conclusion regarding whether "auto theft" constitutes "injury to or destruction of property" under § 66-5-301,  the Court relies on its previous opinion in Arnold I, 760 F. Supp. 2d at 1295-1296, as well as its two subsequent opinions in the same case, Arnold II, 827 F. Supp. 2d at 1300-1301 and Arnold III, Memorandum Opinion and Order, at 28.  In Arnold I, the Court surveyed the text of the UMA, NMSA 1978, § 66-5-301, the text of the Mandatory Financial Responsibility Act, NMSA 1978, §§ 66-5-201 - 66-5-239 ("MFRA"), and relevant case law from around the country assessing whether theft or loss of property constitutes property damage.  Arnold I, 760 F. Supp. 2d at 1293, 1295-1296 (citing Harry Winston, Inc. v. Travelers Indem. Co., 366 F. Supp. at 988);); Travelers Insurance Companies v. P.C. Quote, Inc., 570 N.E.2d 614, 616-18 (Ill. App. Ct. 1991)(stating that the "loss of computers" is not property damage, and distinguishing "damage to property and loss of property"); General Insurance Co. of America v. Palmetto Bank, 233 S.E. 2d 699, 701-702 (1997)(concluding that the loss of use of the property was not "property damage" under the terms of the liability insurance policy -- which defined property damage as "injury to or destruction of tangible property" -- because the only damage alleged was "wrongful deprivation of property, not physical injury to property"); State v. Glens Falls Ins. Co., Inc., 315 A.2d 257 (1974).  Based on its assessment of relevant case law, as well as its assessment of the text of the UMA and MFRA, the Court concluded

that "there are reasonable grounds to believe that the Supreme Court of New Mexico would follow the analysis of the courts that have held that theft of property does not constitute property damages under the UMA." Arnold I, 760 F. Supp. 2d at 1301. The Court reached this conclusion by sequentially addressing the plaintiff's various contentions relating to the requisite liberal construction of the UMA under New Mexico state law and the remedial policy purposes underlying the UMA. See Arnold I, 760 F. Supp. 2d at 1295-1296 (citing Romero v. Dairyland Insurance Co., 1990-NMSC-111, 803 P.2d at 245).

First, the Court responded directly to the plaintiff's argument that the Court must "liberally" construe the UMA "to implement its remedial purpose." Arnold I, 760 F. Supp. 2d at 1295. The Court explained that it believed, instead, that the New Mexico Legislature deliberately omitted "loss of use or theft" within the UMA's § 66-5-301, see NMSA 1978, § 66-5-301:

> The Court finds that the omission of loss of use language in the UMA indicates that the New Mexico Legislature intended the omission, and declines to disregard the statute's plain language, even though New Mexico courts liberally construe the UMA. A court's central concern, in construing a particular statute "is to determine and give effect to the intent of the legislature," State ex rel. Klineline v. Blackhurst, 1988-NMSC-015, ¶ 11, 749 P.2d at 1114 (citation omitted), "using the plain language of the statute as the primary indicator of its intent," City of Santa Fe v. Travelers Cas. & Sur. Co., 2010-NMSC-010, 228 P.3d, 483, 486. The UMA states that, insurance policies should provide coverage for "bodily injury or death and for injury to or destruction of property," "for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness or disease, including death, and for injury to or destruction of property resulting therefrom." NMSA 1978, § 66-5-301. The statute's language does not require coverage for the loss of use of property. Because New Mexico courts look to the statute's plain language as the primary indicator of the Legislature's intent, the Court finds that the language of the statute indicates that the New Mexico Legislature did not intend to require coverage for loss of use in the UMA.

Arnold I, 760 F. Supp. 2d at 1295-96.

The Court then responded to the plaintiff's contention that the MFRA's language suggests that the New Mexico Legislature intended the UMA to require coverage for "loss of use of

property." Arnold I, 760 F. Supp. 2d at 1296.  The Court dismissed this argument as well by

outlining the rationale for its adherence to a narrow statutory construction of the UMA.  Arnold I,

760 F. Supp. 2d at 1296 (stating that the Court "does not believe that it is required to or should

consider the words in a separate and unrelated statute in its statutory interpretation, and add a

phrase from one missing in the other").

> The UMA is in Chapter 66, which relates to motor vehicles. The Court has not found any cases discussing loss of use damages in the context of the New Mexico Insurance Code. For these reasons, the Court does not believe that it must or should consider the language of the New Mexico Insurance Code in its interpretation of the UMA. The Court will, however, consider the language of the MFRA in its statutory interpretation. Chapter 66 of the New Mexico statutes contains both the UMA and the MFRA and the UMA references the MFRA. See NMSA 66-5-301 (stating that "unless coverage is provided therein or supplemental thereto in minimum limits for bodily injury or death and for injury to or destruction of property as set forth in Section 66-5-215 NMSA 1978").

> The Court is not convinced, however, that the inclusion of the language of loss of use in the MFRA means that it should read the language of loss of use into the UMA.  The subject matter of the MFRA and of the UMA is similar. Both the UMA and the MFRA were enacted in 1983.  The Court will presume that the New Mexico Legislature knew the intricacies of the laws that it was enacting in the same legislative session and was aware of the differences between the statutes concerning similar subject matter. See Herrera v. Quality Imports, 1999-NMCA-140, ¶ 7, 992 P.2d 313, 315-16 (stating that the New Mexico courts presume that the New Mexico Legislature knows of the existing law when it enacts legislation).  That the UMA does not contain the language of loss of use when the MFRA -- which was enacted at the same time -- does, is compelling evidence that the New Mexico Legislature intentionally excluded the language of loss of use in the UMA. See Hanson v. Turney, 2004-NMCA-069, ¶ 12, 94 P.3d 1, 4 (stating that, where the New Mexico Legislature has included language in one statute but not in another statute, it is "compelling evidence that the legislature" intended to exclude the language). The Court will decline to read such language into the UMA when it appears that the Legislature's omission of the language was intentional.

Arnold I, 760 F. Supp. 2d at 1296–97.

Finally, after clarifying its reading of the Legislative intent underlying the UMA, the Court

proceeded to address the plaintiff's policy argument that reading the UMA to include "theft" and

"loss of use" is required to further the remedial purpose of the statute.  Arnold I, 760 F. Supp. 2d

at 1297.  While the Court conceded that there are important remedial purposes underlying the New

Mexico Legislature's enactment of the UMA, the Court emphasized the "sound policy reasons for

the Legislature not to require loss-of-use coverage in uninsured motorist policies in the state of

New Mexico."  Arnold I, 760 F. Supp. 2d at 1297.

> An insurance company is free to provide coverage as broadly as it desires, and an insured is free to negotiate for more coverage; more coverage will likely come at a cost.  Insurance companies and consumers are free to let the market dictate their preferences, needs, costs, and choices. When the Legislature requires coverage, however, neither the insurance company nor the consumer have any choice in the matter; the motorists must purchase—and the insurance company must provide -- that coverage. The burden imposes a cost on motorists that they cannot avoid. The Legislature thus may desire to tailor the requirements as precisely and narrowly as possible to achieve its intended result without being any broader than necessary.

> Here, the Legislature primarily wanted motorists to carry insurance that would protect them against "bodily injury . . . , and . . . injury to or destruction of property," NMSA 1978, § 66-5-301A, if an uninsured motorist hit them. If a motorist is hurt in an automobile accident and loses his or her car, society could suffer in a number of ways—loss in productivity, and the public might have to assume the burden of medical care. The Legislature may not have been as concerned about theft, figuring that a motorist could insure in the market against that risk if he or she wished.

> The wealthy can handle increased costs to uninsured motorist coverage. As both the Legislature and the citizens of New Mexico know, many drivers do not buy insurance, because they cannot afford it. Many of New Mexico's poor, which contains illegal aliens who have drivers licenses, see 18.19-5-12 NMAC (June 29, 2001, as amended through July 31, 2009), often drive without coverage because of the cost. The Legislature could have made a sensible decision that minimal coverage was better than Cadillac coverage, if the cost for loss of a car and other bells and whistles would place an undue burden on people who could not afford increased costs to uninsured motorist coverage.

Arnold I, 760 F. Supp. 2d 1272, at 1297-98.  Ultimately, based on the Court's interpretation of the

UMA's plain language, as well as its discussion of the policy rationales underlying minimal

coverage under the UMA, the Court granted summary judgment on the plaintiff's claims against

an insurer for loss-of-use benefits under the UMA.  See Arnold I, 760 F. Supp. 2d 1272, at 1297-98.

Comparably, in Arnold II, 827 F. Supp. 2d at 1201, the Court also predicted that, "as a matter of law, the Supreme Court of New Mexico would conclude that UMA coverage would not include loss-of-use damages arising from theft of personal property[.]"  827 F. Supp. 2d at 1201. Analyzing the same question whether UMA coverage includes loss-of-use damages stemming from theft of an insured's personal property, in Arnold III, Memorandum Opinion and Order, at 28, the Court reconfirmed that "injury to or destruction of property" in the UMA's § 66-5-301 does not encompass loss or use from theft.  Arnold III, Memorandum Opinion and Order at 28. The Court predicted that the Supreme Court of New Mexico would not conclude that the theft of property constitutes property damage under § 66-5-301 by referencing the rationales it outlined in its prior Memorandum and Order, filed November 12, 2010, 750 F. Supp. 2d 1272 (D.N.M. 2010)(Browning, J.)(Doc. 99)("MOO"), which evaluated the specific issue whether the UMA provides coverage for loss of property use.

> In its MOO, the Court set forth the differences in the New Mexico insurance code between "property insurance" and "vehicle insurance"; law regarding whether the loss of property through theft is equated with "property damage"; and law regarding whether loss-of-use damages are recoverable without accompanying physical damage.  MOO at 24-25, 28-35.  The Court noted that "[t]he UMA provides coverage solely for 'injury to or destruction of property.'"  MOO at 46 (quoting NMSA 1978, § 66-5-301A).  Based on the applicable statutes and case law, the Court concluded that, "even if the UMA requires coverage for loss-of-use damages, it would not provide coverage for the theft of the Plaintiffs' property." MOO at 42-48 (analyzing the cases in light of Chavez v. State Farm Mut. Auto. Ins. Co., 1975-NMSC-011, ¶ 6, 533 P.2d 100, 102).  Chavez v. State Farm noted that the Legislative purpose in enacting "compulsory uninsured motorist coverage was to place the injured policyholder in the same position, with regard to the recovery of damages, that he would have been in if the tortfeasor had possessed liability insurance."  1975-NMSC-011, ¶ 6, 533 P.2d 100, 102 (internal quotation marks and citations omitted). Additionally, the Court concluded that the Supreme Court of New Mexico's opinion in Cress v. Scott, 1994-NMSC-008, ¶¶ 5- 6 868 P.2d 648, 650, indicated that they would not likely award loss-of-use damages

where there was no accompanying property damage.  See MOO at 49–52. . . . [T]he Supreme Court of New Mexico has consistently interchanged the phrase "injury to or destruction of property" in the vehicle-liability insurance statutes with the phrase "property damage."  See, e.g., Progressive Nw. Ins. Co. v. Weed Warrior Servs., 2010-NMSC-050, ¶ 5, 245 P.3d 1209, 1211 (stating that, "the minimum limits are defined in the [MFRA] as . . . $10,000 for property damage"); State Farm Auto. Ins. Co. v. Ovitz, 1994-NMSC-047, ¶ 7, 873 P.2d 979, 982 (stating that a policy that "pay[s] damages for bodily injury or property damage [that] an insured is legally entitled to collect" from an uninsured motorist "comports with" the UMA); Fernandez v. Farmers Ins. Co. of Ariz., 1993-NMSC-035, 857 P.2d 22, 24 n. 2 (noting that the UMA "requires that all automobile liability policies issued in New Mexico include coverage for bodily injury and property damage caused the insured by an uninsured motorist").

Arnold II, 827 F. Supp. 2d at 1301-02.

Based on the Court's assessment of cases, it concluded that, because "Clark v. Cassetty's broad definition of damage to a right could make the uninsured motorist coverage almost unlimited," Arnold II, 827 F. Supp. 2d at 1301-02 (citing Clark v. Cassetty, 1962-NMSC-150, 376 P.2d 37, then, "as a matter of law, the Supreme Court of New Mexico would conclude that UMA coverage would not include loss-of-use damages arising from theft of personal property," Arnold II, 827 F. Supp. 2d at 1301-02 (citing State Farm Auto. Ins. Co. v. Ovitz, 1994-NMSC-047, ¶ 12, P.2d at 982 ("While it is important to protect the public from irresponsible or impecunious drivers, uninsured motorist coverage is not intended to provide coverage in every uncompensated situation." (internal quotation marks omitted)).  In addition, the Court based this prediction on the fact that "New Mexico courts have indicated that they would not likely award loss-of-use damages without accompanying property damage."  Arnold II, 827 F. Supp. 2d at 1301-02.

Magistrate Judge Khalsa agreed with the Court's holdings in Arnold I, Arnold II, and Arnold III.  See Mortensen v. Liberty Mut. Ins., 2019 WL 1571730, at n.4.  Using this reasoning as backdrop, Magistrate Judge Khalsa conducted her own statutory analysis of the UMA's § 66-5-301(A).

The Uninsured Motorist Act does not define the phrase "injury to or destruction of property." Thus, unless legislative intent is to the contrary, it should be given its ordinary meaning. According to the vast majority of courts, the phrase "injury to or destruction of property" and its analog, "property damage," do not ordinarily denote theft. Steven Plitt *et al.*, Couch on Insurance, § 126.37 (3rd ed.) ("Consistent with the view that economic loss does not equal property damage, wrongful conversion or theft of property is also not regarded as 'property damage.' "); *see Collin v. Am. Empire Ins. Co.*, 26 Cal. Rptr. 2d 391, 407-08 (Cal. Ct. App. 1994)(collecting cases in support of the proposition that "[v]irtually every court to consider the question has agreed that 'conversion' of property is not 'property damage' "); *Arnold I*, 760 F. Supp. 2d at 1290-94, 1299-1300 (collecting cases concluding that loss or theft of property does not constitute "injury to or destruction of property"); *see also Lamb v. Randall*, 618 P.2d 379, 381 (N.M. Ct. App. 1980) (holding that a statute imposing parental liability for property their son "damaged or destroyed" did not render parents liable for the value of property their son stole because the property was not "physically mutilated or damaged"). Consistent with these authorities, the phrase "injury to or destruction of property" in Section 66-5-301(A) ordinarily signifies physical mutilation or damage, and not theft. *See Baker v. Hedstrom*, 309 P.3d 1047, 1054-55 (N.M. 2013)(indicating that in construing the language of a statute, the New Mexico Supreme Court presumes that the legislature is aware of existing common law, and that its enactments are consistent therewith).

Mortensen v. Liberty Mut. Ins., 2019 WL 1571730, at *3.

Ultimately, through both her statutory analysis and reliance on relevant authority, Magistrate Judge Khalsa concluded that, because "the New Mexico Supreme Court will not add requirements to the statute or read into it language that is not there . . . the Court predicts that the New Mexico Supreme Court would hold that the New Mexico Legislature did not intend uninsured motorist coverage to compensate insureds for automobile theft." Mortensen v. Liberty Mut. Ins., 2019 WL 1571730, at *3.

Notwithstanding the Court's holdings in Arnold I, 760 F. Supp. 2d at 1286, Arnold II, 827 F. Supp. 2d at 1300-1301; and Arnold III, Memorandum Opinion and Order, at 28, and Judge Khalsa's holding in Mortensen v. Liberty Mut. Ins., 2019 WL 1571730, at *3-*4, the Youngs urge the Court to adhere to a liberal interpretation of UMA coverage. See Response at 16. The Youngs rationalize their argument by referencing the holdings and dicta of the Supreme Court of New

Mexico in Schmick v. State Farm Mut. Auto. Ins. Co. v. Luebbers, 1985-NMSC-073, ¶ 10, 704 P.2d at 1095, and Phoenix Indem. Ins. Co. v. Pulis, 2000-NMSC-023, ¶¶ 7-8, 9 P.3d at 642, which they contend have interpreted the UMA liberally to advance the UMA's intended purpose: "to place insured persons in the same position as if the uninsured motorist had insurance." Response at 16 (citing Schmick v. State Farm Mut. Auto. Ins. Co. v. Luebbers, 1985-NMSC-073, ¶ 10, 704 P.2d at 1095). The holding in Schmick v. State Farm Mut. Auto. Ins. Co. v. Luebbers, 1985-NMSC-073, ¶ 10, 704 P.2d at 1095, in particular, according to the Youngs, means that "[u]ninsured motorist coverage is intended to act in place of the tortfeasor's liability policy, placing victims in the same position they would have been in if the tortfeasor had coverage." Response at 16 (citing Schmick v. State Farm Mut. Auto. Ins. Co. v. Luebbers, 1985-NMSC-073, ¶ 10, 704 P.2d at 1095). Equally, the Youngs argue that the UMA has been "interpreted liberally to implement its remedial purpose," meaning that "'any provision allowing for an exception to uninsured motorist coverage is strictly construed to protect the insured.'" Response at 16 (quoting Phoenix Indem. Ins. Co. v. Pulis, 2000-NMSC-023, ¶¶ 7-8, 9 P.3d at 642).

The Court agrees with the Youngs that the New Mexico Legislature intended for the UMA to be interpreted to further "its remedial purpose." Response at 16. Arnold II, 827 F. Supp. 2d at 1296. The Court also recognizes that the Supreme Court of New Mexico has indicated that § 66-5-301's purpose is to protect the public against "the hazard of culpable uninsured motorists." Mortensen v. Liberty Mut. Ins., 2019 WL 1571730, at *3 (quotations omitted). As the Court noted in Arnold II, 827 F. Supp. 2d at 1296:

> The Supreme Court [of New Mexico] interprets the UMA in a significantly different way than it does other statutes to effectuate the UMA's remedial purpose. In Jordan v. Allstate Ins. Co., 2010-NMSC-051, 245 P.3d 1213, the Supreme Court of New Mexico recently emphasized: "When construing the legislative intent behind our UM/UIM statute, this Court has long applied a 'qualitatively different analysis' than we use when construing many other types of statutes and insurance

> policies." Jordan v. Allstate Ins. Co., 2010-NMSC-051, ¶ 15, 245 P.3d at 1219. It also stated that, "[i]n a consistent line of cases, this Court has liberally interpreted [the UMA] and its implementing regulation . . . for their remedial purposes." Jordan v. Allstate Ins. Co., 2010-NMSC-051, ¶ 15, 245 P.3d at 1219.

Arnold II, 827 F. Supp. 2d at 1296.

Nonetheless, the Court considers the Supreme Court of New Mexico's discussion of § 66-5-301's legislative intent in light of the Supreme Court of New Mexico's holding in State Farm Auto. Ins. Co. v. Ovitz, 1994-NMSC-047, ¶ 12, 873 P.2d at 982, where the Supreme Court of New Mexico clarified that "uninsured motorist coverage is not intended to provide coverage in every uncompensated situation." 1994-NMSC-047, ¶ 12, 873 P.2d at 982. See Mortensen v. Liberty Mut. Ins., 2019 WL 1571730, at *4. Under the directive of the State Farm Auto. Ins. Co. v. Ovitz, 1994-NMSC-047, ¶ 12, 873 P.2d at 982, then, the Court agrees with Magistrate Judge Khalsa's assessment in Mortensen v. Liberty Mut. Ins., 2019 WL 1571730, at *4, where she explains that, because

> [c]omprehensive insurance coverage usually protects against the distinct hazard of vehicle theft, [and because] the Court [has not] uncovered, any authority for the proposition that vehicle theft falls under the umbrella of uninsured motorist coverage as well . . . [t]o construe Section 66-5-301 -- a statute intended to remedy the hazard of culpable uninsured motorists -- to cover theft, would expand the scope of the statute well beyond its purpose.

Mortensen v. Liberty Mut. Ins., 2019 WL 1571730, at *4. In addition, as Magistrate Judge Khalsa notes, construing § 66-5-301 broadly to cover vehicle theft would "also add a requirement that the New Mexico Legislature could have, but did not include in the statute, namely, that every automobile liability insurance policy in New Mexico provide coverage for auto theft. The Court cannot reasonably conclude that the New Mexico Supreme Court would take such a view." Mortensen v. Liberty Mut. Ins., 2019 WL 1571730, at *4 (citation omitted).

Finally, Section 66-5-301(A), when viewed as part of Section 66-5-301 as a whole, forecloses any reasonable possibility that the New Mexico Legislature intended uninsured motorist policies to compensate insureds for vehicle theft. As previously discussed, Section 66-5-301(B) requires the uninsured motorist coverage under Section 66-5-301(A) to include underinsured motorist coverage. *Id.* Critically, Subsection (B) goes on to define an "underinsured motorist" as "*an operator of a motor vehicle*" whose liability insurance "at the time of *the accident*" is less than the limits of liability under the insured's uninsured motorist coverage. *Id.* (emphasis added).

Read together as parts of a harmonious whole, Subsections (A) and (B) unequivocally indicate that the New Mexico Legislature intended Section 66-5-301 to require automobile liability insurers to provide coverage for, *inter alia*, "injury to or destruction of property" arising from an "accident" with the "operator" of an uninsured or underinsured motor vehicle. As such, Section 66-5-301 as a whole contradicts the notion that uninsured motorist policies must also provide coverage for the circumstances alleged in Plaintiff's Complaint -- where there has been no "accident," Plaintiff's property has not been "injured" or "destroyed," and the "operator[ ] of [an] uninsured motor vehicle[ ]" did not cause the claimed loss.

Mortensen v. Liberty Mut. Ins., 2019 WL 1571730, at *4.

As the Court recognized in Arnold II, 827 F. Supp. 2d at 1289, the Supreme Court of New Mexico "interprets the UMA in a significantly different way that it does other statutes to effectuate the UMA's remedial purpose," 827 F. Supp. 2d at 1296. The Court, however, continues to rationalize the UMA's remedial purpose with the Supreme Court of New Mexico's indication of limits to indefinite UMA coverage, pursuant to the principle that "uninsured motorist coverage is not intended to provide coverage in every uncompensated situation." State Farm Auto. Ins. Co. v. Ovitz, 1994-NMSC-047, ¶12, 873 P.2d at 982. These limits, in turn, as the Court has explained, are likely a function of the New Mexico Legislature "desir[ing] to tailor the [insurance] requirements as precisely and narrowly as possible" to provide a minimum amount of coverage to insurers, yet still allowing room for insureds to "negotiate for more coverage." Arnold I, 760 F. Supp. 2d 1272, at 1297-98. Ultimately, then, based on the Court's evaluation of the Supreme Court of New Mexico's holding in State Farm Auto. Ins. Co. v. Ovitz, 1994-NMSC-047, ¶12, 873

P.2d at 982,, and the Court's assessment of the New Mexico Legislature's intent in <u>Arnold I</u>, 760

F. Supp. 2d 1272, at 1297-98, when evaluating the Youngs' specific claims for UM/UIM benefits

here, the. Court reaffirms its position that § 66-5-301's coverage for "injury to or destruction of

property" does not include the Youngs' vehicle theft or related property damage.  <u>See</u> <u>Arnold II</u>,

827 F. Supp. 2d at 1201.  Although the Youngs argue that the Court should construe the statute

liberally in the insured's favor, the Court concludes that this reading would be beyond the scope

of the statutory language, and it would "purport[] to add a requirement [that] the New Mexico

Legislature did not express or imply,  namely, that every automobile liability insurance policy in

New Mexico must provide coverage for loss of use arising from the theft of a vehicle." <u>Mortensen</u>

<u>v. Liberty Mut. Ins.</u>, 2019 WL 1571730, at *4.  The Court, therefore, dismisses the Youngs' claim

for UM/UIM benefits against Hartford Insurance.

## IV.    BECAUSE THE YOUNGS' AUTOMOBILE THEFT AND PROPERTY DAMAGE ARE NOT COVERED UNDER THE UMA'S § 66-5-301, THE YOUNGS ARE NOT ENTITLED TO PUNITIVE DAMAGES UNDER THE UMA.

In the case that the UMA covers the Youngs' automobile theft, the Youngs urge this Court

to evaluate the awarding of punitive damages under a liberal interpretation of UMA.  <u>See</u> Response

at 16.  The Court's liberal interpretation of a punitive damages award under the UMA, would,

according to the Youngs, be consistent with the holding of the Supreme Court of New Mexico in

<u>Stinbrink v. Farmers Insurance Company of Arizona</u>, 1990-NMSC-108, 803 P.2d at 664-

65.  Although the Court agrees with the Youngs that punitive damages are available to insureds

under the UMA, <u>see</u> <u>Stinbrink v. Farmers Ins. Co. of Arizona</u>, 1990-NMSC-108, ¶ 4, 803 P.2d at

666, because of the Court's determination that the UMA's § 66-5-301 does not cover the Youngs'

March 30, 2016, automobile theft and related property damage, the Court concludes that punitive

damages are not available to the Youngs under the UMA in this case, see NMSA 1978, § 66-5-301.

In Stinbrink v. Farmers Insurance Company of Arizona, 1990-NMSC-108, ¶¶ 1-2, 803 P.2d at 664-65, the Supreme Court of New Mexico addressed whether the UMA requires an uninsured motorist insurance carrier to provide policyholders coverage for punitive damages against uninsured motorists. 1990-NMSC-108, ¶¶ 1-2, 803 P.2d at 664-65. When addressing the question, the Supreme Court of New Mexico acknowledged that the UMA does not provide specifically for punitive damages. Stinbrink v. Farmers Insurance Company of Arizona, 1990-NMSC-108, ¶¶ 1-2, 803 P.2d at 664-665. Nonetheless, after questioning whether the New Mexico Legislature intended that the UMA's phrase, "legally entitled to recover," encompasses punitive damages, the Supreme Court of New Mexico ultimately answered in the affirmative. Stinbrink v. Farmers Insurance Company of Arizona, 1990-NMSC-108, ¶¶ 1-2, 803 P.2d at 664-665. The Supreme Court of New Mexico, therefore, holds that, while punitive damages are not a mandatory part of liability coverage and an insurer can exclude punitive damages, under the UMA, UM coverage encompasses coverage for punitive damages under the UMA cannot exclude punitive damages -- even if the UMA's language does not explicitly address punitive damages. Stinbrink v. Farmers Ins. Co. of Ariz., 1990-NMSC-108, ¶¶ 1-2, 803 P.2d at 664-665)("We have thus determined that punitive damages are as much a part of the potential award under the Uninsured Motorist Statute as damages for bodily injury, and therefore they cannot be contracted away."). See NMSA 1978, § 66-5-301(A). The Youngs argue that the holding in Stinbrink v. Farmers Insurance Company of Arizona, 1990-NMSC-108, ¶¶ 1-2, 803 P.2d at 664-665, is applicable to this case, and, therefore, the Court should conclude that the UMA provides the Youngs coverage and punitive damages -- despite them being insured -- for the same amount and damages they

"would be entitled to recover against a culpable uninsured, even unknown motorists [sic]."  Response at 17.  See Stinbrink v. Farmers Insurance Company of Arizona, 1990-NMSC-108, ¶¶ 1-2, 803 P.2d at 664-665.

Hartford Insurance responds to the Youngs' request that the Court allow the Youngs to recover punitive damages under a liberal reading of the UMA with two arguments.  See MTD at 4.  First, Hartford Insurance argues that, because the UMA does not cover the Youngs' automobile theft, then the Youngs are not entitled to punitive damages for their UMA claim by default.  See MTD at 4.  In the alternative, however, Hartford Insurance argues that, because the Youngs lack any facts to support that the theft of their personal property included acts that were "malicious, willful, reckless and wanton," MTD at 4, the Youngs are, therefore, not entitled to "recover punitive damages stemming from the property loss,"  MTD at 4.

Based on the Supreme Court of New Mexico's holding in Stinbrink v. Farmers Ins. Co. of Arizona, 1990-NMSC-108, ¶ 4, 803 P.2d at 666, the Court agrees with the Youngs that, under New Mexico state law, punitive damages may be recoverable under UMA property damage limits.  See 1990-NMSC-108, ¶ 4, 803 P.2d at 666.  Nonetheless, because, as the Court discusses in Part III of the Analysis, the UMA's § 66-5-301(A)'s "injury to or destruction of property" clause does not cover the theft of the Youngs' 2004 Ford F-350, 2010 JB trailer, 2007 Case Tractor with attachments, and "other miscellaneous property that was identified," Complaint ¶ 6 at 2, the Court concludes that the Youngs are not entitled legally to punitive damages in this case.

The Youngs are correct in stating that, under New Mexico law, the UMA's § 66-5-301(A) "requires that an insurance policy contain uninsured motorist coverage for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury * * * death * * * or destruction of property."

Response at 17 (citing <u>Stinbrink v. Farmers Ins. Co. of Arizona</u>, 1990-NMSC-108, ¶ 4, 803 P.2d at 666 (internal quotations omitted)(emphasis in original).  Furthermore, in <u>Stinbrink v. Farmers Ins. Co. of Arizona</u>, 1990-NMSC-108, ¶ 4, 803 P.2d at 666, the Supreme Court of New Mexico emphasized that even though "[p]unitive damages are not specified in the statute . . . [t]hose damages that a victim of an uninsured tort-feasor might be legally entitled to recover undoubtedly include punitives," because the "legislature intend[ed] that punitive damages be included in Section 66-5-301(A)'s term 'legally entitled to recover.'"  <u>Stinbrink v. Farmers Ins. Co. of Arizona</u>, 1990-NMSC-108, ¶ 4, 803 P.2d at 665 (quoting NMSA 1978, § 66-5-301(A)).  The Supreme Court of New Mexico based its determination of the New Mexico Legislature's intent underlying § 66-5-301(A) on its prior reasoning in <u>Stewart v. State Farm Mutual Automobile Insurance Co.</u>, 1986-NMSC-073, ¶ 5, 726 P.2d at 1376.  In <u>Stewart v. State Farm Mutual Automobile Insurance Co.</u>, 1986-NMSC-073, ¶ 5, 726 P.2d at 1376, the Supreme Court of New Mexico evaluated an insured's similar request for punitive damages under the UMA's § 66-5-301(A).  When assessing whether §  66-5-301(A) allowed for the awarding of punitive damages, the Supreme Court of New Mexico reasoned that the important policy purposes of protecting the insured in New Mexico led to the reasonable inference that the New Mexico State Legislature intended to allow for the awarding of punitive damages pursuant to § 66-5-301(A)'s term "legally entitled to recover." <u>Stinbrink v. Farmers Ins. Co. of Arizona</u>, 1990-NMSC-108, ¶ 5, 803 P.2d at 665 (citing <u>Stewart v. State Farm Mutual Automobile Insurance Co.</u>, 1986-NMSC-073, ¶ 9, P.2d at 1376).

> In *Stewart v. State Farm Mutual Automobile Insurance Co.,* 1986-NMSC-073, ¶  5, 726 P.2d at 1376, we determined that the legislative purpose behind enacting compulsory uninsured motorist coverage is "'to protect the insured against the financially unresponsible motorist, not to protect the insurance company.' * * *. [T]he only condition to protection under the provision is that 'the injured person must be legally entitled to recover damages from the uninsured motorist.' " *Stewart*

> *v. State Farm Mutual Automobile Insurance Co.,* 1986-NMSC-073, ¶ 5, 726 P.2d
> at 1376 (quoting *Gantt v. L & G Air Conditioning,* 1983-NMCA-083, ¶ 17, 680
> P.2d 348, 353. The court in *Stewart* accordingly concluded that "*under the New*
> *Mexico statute, uninsured motorist coverage includes coverage for punitive*
> *damages.*" *Stewart,* 1986-NMSC-073, ¶ 5, 726 P.2d at 1376 (emphasis added).
> We have thus determined that punitive damages are as much a part of the potential
> award under the uninsured motorist statute as damages for bodily injury. . . .

Stinbrink v. Farmers Ins. Co. of Arizona, 1990-NMSC-108, ¶ 5, 803 P.2d at 665.

Based on the Supreme Court of New Mexico's directives in <u>Stinbrink v. Farmers Ins. Co.</u>

<u>of Arizona</u>, 1990-NMSC-108, ¶ 5, 803 P.2d at 665, the Court agrees with the Youngs that punitive

damages are available to insureds under UMA's § 66-5-301(A).  Notwithstanding this, the Court

disagrees with the Youngs that punitive damages are available to them in this case because of the

Court's rule above that UMA § 66-5-301(A)'s  coverage for "injury to or destruction of property"

clause does not cover the Youngs' March 30, 2016, auto theft and related property damage.

Ultimately, then, the Court grants Hartford Insurance's Motion to Dismiss Count V -- the Youngs'

claim that Hartford Insurance failed to provide them UMA coverage -- because the Youngs' theft

does not entitle them to UMA coverage pursuant to the UMA's § 66-5-301(A).  For similar

reasons, the Court dismisses the Youngs' prayer for punitive damages in the Complaint's ¶ 74, at

9, against the unknown tortfeasor pursuant to their UMA claim.  <u>See</u> Complaint ¶ 74, at 9.

**V.     THE YOUNGS STATE A PLAUSIBLE CLAIM FOR RELIEF UNDER NEW MEXICO'S UIPA AGAINST HARTFORD INSURANCE BECAUSE THEY ADVANCE FACTS SHOWING THE SPECIFIC UNFAIR INSURANCE PRACTICES ACT SUBSECTIONS THAT HARTFORD INSURANCE ALLEGEDLY VIOLATED IN ITS UNDERPAYMENT OF THE YOUNGS UNDER THE HARTFORD INSURANCE AUTOMOBILE POLICY AND HOMEOWNERS POLICY.**

With respect to their UIPA claim against Hartford Insurance, the Youngs allege facts

showing a plausible claim for rule 12(b)(6) purposes.

"The New Mexico Legislature passed the Unfair Insurance Practices Act 'to regulate trade practices in the insurance business and related businesses,' including 'practices in this state which constitute unfair methods of competition or unfair or deceptive acts or practices.'"   Estate of Gonzales v. AAA Life Ins. Co., 2012 WL 1132332, at *8 (quoting NMSA 1978, § 59A-16-2).

> The Unfair Claims Practices Act (UCPA), found at N.M. Stat. Ann. 1978 §§ 59A-16-20 et seq. provides that fifteen specific practices with respect to claims, by an insurer or other person, knowingly committed or performed with such frequency as to indicate a general business practice, are defined as unfair and deceptive practices and are prohibited.

 N. River Ins. Co. v. Am. Home Assurance Co., 2003 WL 27384925, at *4.   Of the fifteen prohibited practices under UIPA, which the UCPA, NMSA 1978, § 59A-16-20 outlines, the Court focuses its analysis on the Youngs' specific allegations that Hartford Insurance committed the following prohibited conduct: (i) Hartford Insurance has misrepresented to the Youngs "pertinent facts or policy provisions relating to coverages at issue" under the Automobile Policy, Complaint ¶ 15, at 3 (quoting NMSA 1978, § 59A-16-20(A)), (ii) Hartford Insurance has "not attempt[ed] in good faith to effectuate prompt, fair and equitable settlements" of the Youngs' claims under the Automobile Policy "in which liability" became "reasonably clear" after the Youngs filed their insurance claims under the Automobile Policy related to the March 30, 2016, theft, Response at 6 (quoting NMSA 1978, § 59A-16-20(E)); (iii) Hartford Insurance's actions in allegedly underpaying the Youngs ultimately "compel[ed]" them to "institute litigation to recover" compensatory and punitive damages amounts under both policies, because Hartford Insurance has offered "substantially less than the amounts ultimately recovered in actions brought by such insureds when such insureds have made claims for amounts reasonable similar to amounts ultimately recovered," Response at 6 (quoting NMSA 1978, § 59A-16-20(G)); and, (iv) Hartford Insurance has "fail[ed] to promptly provide the Youngs a reasonable explanation for the basis

relied on in the policy in relation to the facts or applicable law for denial of a claim or for the offer

of a compromise settlement," Response at 6 (quoting NMSA 1978, § 59A-16-20(N)).  In addition,

the Youngs allege that Hartford Insurance persisted in these unfair insurance practices -- including

"fail[ing] to pay, or delay[ing] payment" to the Youngs on their claims arising under the

Automobile Policy, and delaying payment "without just cause" to the point of compelling the

Youngs to bring suit against Hartford Insurance -- "with such frequency as to indicate its general

business practice" in New Mexico.  Response at 6 (quoting NMSA 1978, § 59A-5-26(c)(2)(a) and

§ 59A-5-26(b)).

The Court has found previously that plaintiffs failed to state a claim under rule 12(b)(6)

when the plaintiffs' complaint did not contain even "a formulaic recitation of the elements of a

cause of action" under the UIPA.  Estate of Gonzales v. AAA Life Ins. Co., 2012 WL 1132332, at

*7 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555).  The Court reasoned that, "[b]ecause the

UIPA "contains a voluminous number of statutory sections and subsections, it is not possible to

tell from the Plaintiffs' pleadings what cause of action they attempt to assert under the Unfair

Insurance Practices Act."  Estate of Gonzales v. AAA Life Ins. Co., 2012 WL 1132332, at *18.

The Court emphasized that the plaintiffs' failure to indicate the specific UIPA sections that their

insurer violated could not provide the insurer with "fair notice" of its prohibited conduct.  Estate

of Gonzales v. AAA Life Ins. Co., 2012 WL 1132332, at *18.  The Court proceeded to emphasize

the important distinctions separating a well-pleaded UIPA claim with an insufficient UIPA claim

that does not give fair notice to the defendant:

> The need at the pleading stage for allegations plausibly . . . reflects the
> threshold requirement of Rule 8(a)(2) that the "plain statement" possess enough
> heft to "sho[w] that the pleader is entitled to relief."  Bell Atlantic Corp. v.
> Twombly, 550 U.S. at 557.  While there are various factual allegations contained
> in the Complaint, the Court cannot determine what cause of action the Plaintiffs
> intend to set forth under the Unfair Insurance Practices Act.  There is no attempt to

> set forth the elements of a specific statutory cause of action under the Unfair Insurance Practices Act, a lengthy statute with comprehensive insurance regulations that contains approximately thirty-six different statutory sections, some of which contain a voluminous number of subsections proscribing a variety of different conduct. See NMSA 1978, §§ 59A-16-1 to 59A-16-30. These different statutory sections contain a large amount of potential causes of action and proscribe a wide variety of different conduct. It is difficult for the Court to say that the Plaintiffs' allegations, when the Court cannot even determine what cause of action the Plaintiffs intend to bring, provide MetLife with fair notice of the claim asserted against it. See Bell Atlantic Corp. v. Twombly, 550 U.S. at 555 n. 3 ("Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests.").

Estate of Gonzales v. AAA Life Ins. Co., 2012 WL 1132332, at *18.

The Court then proceeded to offer another example, Yumukoglu v. Provident Life & Accident Ins. Co., 131 F. Supp. 2d at 1227, where the Judge Black, concluded that a plaintiff's pleadings were inadequate under the UIPA because the plaintiff had failed to "specify which of the fifteen provisions of Section 59A-16020 NMSA (1978) that the plaintiff alleged his insurer had violated." Estate of Gonzales v. AAA Life Ins. Co., WL 1132332, at *19 (quoting Yumukoglu v. Provident Life & Accident Ins. Co., 131 F. Supp. 2d at 1227).

> Dr. Yumukoglu alleges generally that Provident's conduct "violates one or more of the provisions of Section 59A-16-20 NMSA 1978 (1984)," the section of the New Mexico Unfair Insurance Practices Act that prohibits unfair claims practices. Dr. Yumukoglu does not specify which of the fifteen provisions of this section he feels Provident has violated, and after a review of the statute, the Court cannot perceive which subsection could have been violated under the fact alleged. At the very least, Dr. Yumukoglu has failed to comply with the pleading requirements of Federal Rule of Civil Procedure 8(a)(2). Rule 8(a)(2) requires that a civil complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." Here, it is not clear either what Dr. Yumukoglu is claiming or to what relief he is entitled under § 56A-16-20. Dr. Yumukoglu's claim appears, like his claim for breach of the duty of good faith and fair dealing, to be based on Provident's alleged bad faith in terminating his disability benefits. As discussed above, the Court finds that Provident's decision to terminate Dr. Yumukoglu's benefits did not amount to bad faith. Provident's motion for summary judgment on Plaintiff's claim for statutory violation is granted.

Estate of Gonzales v. AAA Life Ins. Co., 2012 WL 1132332, at *18-19 (quoting Yumukoglu v. Provident Life & Accident Ins. Co., 131 F. Supp. 2d at 1227.

In contrast to the plaintiffs' UIPA claims that the Court dismissed in Estate of Gonzales v. AAA Life Ins. Co., WL 1132332, at *18-19, and Judge Black dismissed in Yumukoglu v. Provident Life & Accident Ins. Co., 131 F. Supp. 2d at 1227, the Youngs' Complaint contains more than "a formulaic recitation of the elements of a cause of action" under the UIPA's UCPA, see NMSA 1978, § 59A-16-20, to guide the Court and Hartford Insurance in determining what claim the Youngs intend to assert under this statute, see Estate of Gonzales v. AAA Life Ins. Co., 2012 WL 1132332, at *19 (citing Bell Atlantic Corp. v. Twombly, 550 U.S. at 555). Specifically, as compared to the plaintiffs' complaints in Estate of Gonzales v. AAA Life Ins. Co., 2012 WL 1132332, at *18-19, and Yumukoglu v. Provident Life & Accident Ins. Co., 131 F. Supp. 2d at 1227, here, the Court and Hartford Insurance can assess the merits of the Youngs' claim under the UIPA, because the Youngs (i) specify the subsections of § 59A-16-20 that they allege Hartford Insurance has violated, including §§ 59A-16-20(A), 59A-16-20(E), 59A-16-20(G), and 59A-16-20(N);); (ii) and provide facts showing how Hartford Insurance's alleged conduct in relation to its payout under the Youngs' Automobile Policy violated these subsections, see Complaint ¶ 57, at 7-8. See also Response at 6

As the Court emphasized in Estate of Gonzales v. AAA Life Ins. Co., 2012 WL 1132332, at *19, the UIPA "is not a simple statute that contains one or two causes of action; it contains many potential causes of action," some of which, are outlined in the UIPA's UCPA, NMSA 1978, § 59A-16-20. Furthermore, "many of those fifteen subsections" within the UCPA "contain similar or overlapping elements, see NMSA 1978, §§ 59A-16-20(A) -59A-16-20(O). In light of the UCPA's various causes of action and elements, see NMSA 1978, §§ 59A-16-20(A) - 59A-16-

20(O), the Court concludes that the Youngs state UIPA claims for 12(b)(6) purposes because, (i) the Youngs identify the distinct UCPA subsections that they allege Hartford Insurance violated in its alleged underpayment to the Youngs on their Automobile Policy and Homeowners Policy; and (ii) the Youngs advance sufficient facts, that, when viewed "in the light most favorable" to the Youngs, support that Hartford Insurance committed the outlined prohibited conduct under the UIPA's UCPA, NMSA 1978, §§ 59A-16-20(A) - 59A-16-20(O). Smith v. United States, 561 F.3d at 1098 (citing Moore v. Guthrie, 438 F.3d at 1039.

First, the Youngs advance facts with enough specificity to show that Hartford Insurance violated NMSA 1978, **§** 59A-16-20(A) by misrepresenting to the Youngs "pertinent facts or policy provisions" in the Automobile Policy's Declaration Page, see Automobile Policy at 2; Complaint ¶ 26, at 4, relating to the scope of the Youngs' coverage under the Automobile Policy. According to the Youngs, the Automobile Policy stated that it would provide the Youngs, as insureds, "comprehensive coverage as well as coverage for UM/UIM . . . in the amount of $50,000." Complaint ¶ 26, at 4. Although the Court determined in Part III of the Analysis that the UMA's § 66-5-301(A) does not cover the Youngs' March 30, 2016, automobile theft and related property damage, see NMSA 1978, § 66-5-301(A), the Court still finds plausible the Youngs' allegations that, they were under the impression, based on the Automobile Policy Declaration Page's statements, that they would receive UM/UIM benefits under the Automobile Policy, and they also would receive "comprehensive coverage" related to any theft or damages to their 2007 Case Tractor. See Complaint ¶¶ 24 -30, at 3-4; id. ¶ 70, at 9. As to the 2007 Case Tractor, in particular, the Court finds plausible the Youngs factual allegations that, because they classified the 2007 Case Tractor as personal property, they did not expect their Automobile Policy to cap the compensatory damages related to the 2007 Case Tractor at $ 2,500, which Hartford Insurance ultimately did in

its compensatory payout to the Youngs, because it classified the 2007 Case Tractor as "business property."  Complaint ¶ 44, at 5.   See Complaint ¶¶ 37-39, at 4-5.   Comparably, in connection to the Youngs' Homeowners Policy, the Court finds plausible the Youngs' allegations that, Hartford Insurance misrepresented to the Youngs the coverage they would receive based on statements it made in the Homeowners Policy's Declaration Page that it would provide the Youngs coverage for personal property at an amount of "$140,250," Complaint ¶ 19, at 3, -- an amount that would include coverage for (i) "the materials and supplies located at or next to the residence premises used to construct, alter or repair the dwelling or other structures on the residence's premises," Complaint ¶ 21, at 3, and (ii) all "personal property owned or used by an insured while it is anywhere in the world,"[12] Complaint ¶ 23, at 3.   These statements, according to the Youngs, were "misrepresentations," because the Youngs allege that, under the Homeowners Policy, they only received "$8,554.09 or 12.48% of the total loss" they suffered  related to the March 30, 2016, theft. Complaint ¶ 42, at 5.

Furthermore, the Court finds plausible the Youngs' factual allegations supporting that Hartford Insurance violated NMSA 1978, §§  59A-16-20(E), 59A-16-20(G), and 59A-16-20(N), when Hartford Insurance (i) allegedly paid only "$8,554.09 or 12.48%" of the Youngs' damages under the Homeowners Policy, Complaint ¶ 42, at 6, and (ii) allegedly underpaid the Youngs under their Automobile Policy, which involved Hartford Insurance allegedly violating the Policy by placing a $2,500 cap on the compensatory payment of  damages  to the Youngs related to their

---

[12] The Homeowners Policy clarifies that the "insured location includes the grounds of [the Youngs' residence," Complaint ¶ 20, at 3 (citing Homeowners Policy at 2), and explains that "[a]fter a loss and at the insureds' request, the homeowner's policy will cover personal property owned by others with the party is on the part of the residence premises occupied by the insured." Complaint ¶ 23, at 3.

2007 Case Tractor claim, based on Hartford Insurance classifying the 2007 Case Tractor as "business property," Complaint ¶ 44, at 5. Specifically, the Court concludes that the Youngs advance plausible factual allegations that support their claim that Hartford Insurance, in refusing to pay the Youngs the full amount for their claims under the Automobile Policy and Homeowners Policy -- even after the Youngs submitted to Hartford Insurance an itemized list of the stolen personal property related to the March 30, 2016, theft, Complaint ¶ 35, at 4, -- did not "attempt[] in good faith to effectuate prompt, fair and equitable settlements," in which Hartford Insurance's "liability ha[d] become reasonably clear." Complaint ¶ 56, at 7 (quoting § 59A-16-20(E)). See Complaint ¶¶ 24 -30, at 3-4; id. ¶ 70, at 9; id. ¶ 44, at 5. The Youngs' factual allegations in support of § 59A-16-20(E), in turn, support the Youngs factual allegations in support of the UCPA's § 59A-16-20(G) -- that they are now "compelled to institute" the current litigation against Hartford Insurance to recover amounts due under the Homeowners Policy and Automobile Policy, because Hartford Insurance offered "substantially less" to them than they had expected, and failed to provide the Youngs " a reasonable explanation" for the basis of their rejections of the Youngs' request for: full coverage on their 2007 Case Tractor under their Automobile Policy and $ 68,542.39 under their Homeowners Policy. Response at 6 (citing NMSA 1978, § 59A-16-20(G)). See Complaint ¶ 15, at 3; See also id. ¶ 26-35, 37, 39, 42, 45-47, at 4-6.

At the motion-to-dismiss stage, the Court does not weigh the evidence,' and 'is interested only in whether it has jurisdiction and whether the [p]laintiffs plead a claim to relief that is plausible on its face.'" Rivero v. Bd. of Regents of Univ. of New Mexico, 2019 WL 1085179, at *47 (quoting Begay v. Pub. Serv. Co. of N.M., 710 F. Supp. 2d at 1199). Accordingly, "on the assumption that all the allegations in the complaint are true (even if doubtful in fact," Bell Atlantic Corp. v. Twombly, 550 U.S. at 555, the Youngs' allegations in support of §§ 59A-16-20(E), 59A-

16-20(G), and 59A-16-20(N), in turn,  give the Court "reason to believe that" the Youngs have a

reasonable likelihood of "mustering factual support," <u>Ridge at Red Hawk, LLC v. Schneider</u>, 493

F.3d at 1177, to support their claims under the UIPA's §§ 59A-5-26(c)(2)(a) and § 59A-5-26(b),

that Hartford Insurance has "fail[ed] to pay or delay[ed] payment of claims," and has done so

"without just cause," which has compelled the Youngs "to accept less than the amount due to

them,"  Response at 6 (citing NMSA 1978, §§ 59A-5-26(C)(2)(a) and  59A-5-26(C)(2)(b)).  At

the motion-to-dismiss stage, however, the Court cannot rule as a matter of law for the Youngs, that

Hartford Insurance acted "knowingly and willfully, or with such frequency" as to indicate its

general  business practice in the State of New Mexico.  § 59A-5-26(C)(2).  Ultimately, then,

because the Court can reasonably conclude that the Youngs' current allegations give Hartford

Insurance fair notice of the UCPA claims asserted against it, and it is possible to determine what

cause of action" the Youngs attempt to set forth,  <u>Estate of Gonzales v. AAA Life Ins. Co.</u>, 2012

WL 1132332, at *19; <u>see</u> NMSA 1978, §§ 59A-16-20(A), the Court, therefore, denies Hartford

Insurance's Motion to Dismiss the Young's UIPA claim pursuant to NMSA 1978, **§§**  59A-16-

20(E), 59A-16-20(G), 59A-16-20(N), and 59A-5-26(C)(2)(a) and  59A-5-26(C)(2)(b)).

**VI.    THE NMUPA ENCOMPASSES A RANGE OF DECEPTIVE TRADE PRACTICES
        THAT AN OFFENDING PARTY CAN COMMIT, AND A PLAINTIFF NEED
        ONLY SHOW THAT THE OFFENDING PARTY MAKING THE ALLEGED
        FALSE MISREPRESENTATIONS SHOULD HAVE BEEN AWARE THAT THE
        STATEMENT WAS FALSE OR MISLEADING; THEREFORE, THE YOUNGS
        ALLEGE FACTS SUPPORTING THEIR CLAIM THAT HARTFORD
        INSURANCE SHOULD HAVE BEEN AWARE THAT STATEMENTS IN THE
        YOUNGS' AUTOMOBILE POLICY AND HOMEOWNERS POLICY RELATED
        <u>TO THE YOUNGS' COVERAGE MAY HAVE BEEN FALSE OR MISLEADING.</u>**

Under rule 12(b)(6), the Youngs allege facts showing a plausible NMUPA claim against

Hartford Insurance.  <u>See</u> NMSA 1978, § 57-12-2(D).  The NMUPA § 57-12-2(D) provides:

The  term  'unfair  or  deceptive  trade  practice'  covers  an act specifically  declared
unlawful pursuant to the Unfair Practices Act, a false or misleading oral or written

statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services or in the extension of credit or in the collection of debts by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person.

NMSA 1978, § 57-12-2(D)(quotation for emphasis).

To state a claim under the NMUPA, a complaint must show three elements.  See Valdez v. Metro. Prop. & Cas. Ins. Co., 2012 WL 1132414, at *19 (citing Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 2, 166 P.3d 1091, 1093).  See also NMSA 1978, § 57-12-2(D).  First, the complaining party must show that the party charged made an "'oral or written statement, visual description or other representation that was either false or misleading.'"  Valdez v. Metro. Prop. & Cas. Ins. Co., 2012 WL 1132414, at *19 (quoting Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 2, 166 P.3d at 1093).  See Ashlock v. Sunwest Bank of Roswell, N.A., 1988-NMSC-026, ¶ 4, 753 P.2d at 347.  Second, "the false or misleading representation" must have been "knowingly made in connection with the sale, lease, rental or loan of goods or services in the regular course of the defendant's business," Valdez v. Metro. Prop. & Cas. Ins. Co., 2012 WL 1132414, at *19 (quoting Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 2, 166 P.3d at 1093).  See Ashlock v. Sunwest Bank of Roswell, N.A., 1988-NMSC-026, ¶ 4, 753 P.2d at 347. Third, the representation must have been "'of the type that may, tends to or does, deceive or mislead any person.'"  Valdez v. Metro. Prop. & Cas. Ins. Co., 2012 WL 1132414, at *19 (quoting Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 2, 166 P.3d at 1093).  See Ashlock v. Sunwest Bank of Roswell, N.A., 1988-NMSC-026, ¶ 4, 753 P.2d at 347; Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, 811 P.2d at 1311.   "Generally speaking, [this NMUPA provision] is designed to provide a remedy against misleading identification and false or deceptive advertising." Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 2, 166 P.3d at 1093. "The

gravamen of an unfair trade practice is a misleading, false, or deceptive statement made knowingly in connection with the sale of goods or services."  Diversey Corp. v. Chem-Source Corp., 1998-NMCA-112, ¶ 17, 965 P.2d at 338.  "The 'knowingly made' requirement is met if a party was actually aware that the statement was false or misleading when made, or in the exercise of reasonable diligence should have been aware that the statement was false or misleading."  Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 6, 811 P.2d at 1311-12.  The Court has noted that, "in the right circumstances, it could grant judgment as a matter of law on whether a statement is deceptive or misleading," although "generally the question is a matter of fact."  Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 728 F. Supp. 2d 1170, 1192-93 (D.N.M. 2010)(Browning, J.)(reasoning that, although the Supreme Court of New Mexico has not ruled on what statement is "deceptive or misleading" under the NMUPA, "the weight of authority from other jurisdictions leans in this direction" that "whether a certain act is deceptive or misleading for the purposes of a consumer-protection statute is a question of fact that the fact-finder must decide").  The Court also has concluded that a communication can mislead even if the representation is not false.  See Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 728 F. Supp. 2d at 1193-95 (reasoning that the Supreme Court of New Mexico would reach this conclusion, as well, based on statutory interpretation rules).

> The New Mexico legislature included two categories of wrongful conduct -- deception and misleading.  The two terms have different meanings.  If the New Mexico legislature had intended to include within the NMUPA's scope only statements that were false, it could have used the phrase "may, tends to or does deceive any person."  The American Heritage Dictionary of the English Language at 482 (3d ed. 1992)("**de•ceive** . . . To cause to believe what is not true....").  Instead, it included also the broader term "mislead."  The American Heritage Dictionary of the English Language at 1155("**mis•lead** . . .  1. To lead in the wrong direction. **2.** To lead into error of thought or action. . . .")

Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 728 F. Supp. 2d at 1195 (emphasis in original).

The Court concludes that the Youngs' allegations are sufficient to state a claim under the NMUPA's § 57-12-2(D).  See NMSA 1978, § 57-12-2(D); Ashcroft v. Iqbal, 556 U.S. at 678; Bell Atlantic Corp. v. Twombly, 550 U.S. at 555.  First, the Youngs show element one of an NMUPA claim, because they allege that Hartford Insurance made "numerous representations in the Automobile Policy and Homeowners Policy regarding the coverages available" to the Youngs, as well as "representations as to what damages are compensable," that were "either false or misleading."   Response at 6-7.  See NMSA 1978, § 57-12-2(D).  Under the Homeowners Policy, specifically, the Youngs advance factual allegations showing that Hartford Insurance misled the Youngs because, as of March 30, 2016, they were under the impression, based on the Homeowners Policy's Declaration page, that the Homeowners Policy would provide coverage to the Youngs for personal property at an amount of "$140,250," Complaint ¶ 19, at 3.  See Homeowners Policy at 2.  The Youngs, believed, in turn, that the Homeowners Policy coverage amount would encompass coverage for (i) "the materials and supplies located at or next to the residence premises used to construct, alter or repair the dwelling or other structures on the residence's premises," and (ii) all "personal property owned or used by an insured while it is anywhere in the world."  Complaint ¶ 23, at 3.  See Homeowners Policy at 2.  The Youngs allege that the Homeowners Policy's statements related to the Youngs' coverage were "misrepresentations," because the Youngs only received "$8,554.09 or 12.48% of the total loss" they suffered  related to the March 30, 2016, theft, Complaint ¶ 42, at 5.  Under the Automobile Policy, as well, the Youngs allege that Hartford Insurance misled the Youngs through statements related to the Youngs' coverage in the Automobile Policy's Declaration page.  See Complaint ¶ 26, at 4; Automobile Policy at 2. Specifically, as of March 30, 2016, the Youngs were under the impression, based on the Automobile Policy's Declaration page, that the Automobile Policy would provide the Youngs

"comprehensive coverage as well as coverage for UM/UIM . . . in the amount of $50,000," Complaint ¶ 26, at 4, meaning, according to the Youngs, that they would receive UM/UIM benefits and full coverage related to any theft or damages to their insured property, including their 2007 Case Tractor.  Complaint ¶ 26, at 4; Automobile Policy at 2.  The Youngs allege that Hartford Insurance's representations under the Automobile Policy were "misrepresentations," however, because Hartford Insurance (i) "offered significantly less  than what was provided for" in the Automobile Policy, Response at 9, which, included, (i) not compensating the Youngs fully for the theft of their 2007 Case Tractor, see Complaint ¶ 44, at 5, and (ii) "failing to open a UM claim for the Youngs" without a "valid rejection for the $50,000.00 Step-down in coverage . . . .," Complaint ¶ 28 at 4.  Furthermore, the Youngs allege that Hartford Insurance's failure to open a UMA claim for the Youngs pursuant to their Automobile Policy, meant ultimately, that the Youngs were denied "stacked property damage coverage totaling at least $200,000.00."  Complaint ¶ 29, at 4.[13]

Second, the Youngs meet element two of a NMUPA claim because they allege that Hartford Insurance's "false or misleading representations" related to their coverage under the Homeowners Policy and the Automobile Policy were "knowingly made in connection with the sale" of the policies to the Youngs, Response at 7 (citing Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 2, 166 P.3d at 1093).  The Youngs can meet the "knowingly made"

---

[13]In Part III of the Court's Analysis, above, the Court dismisses the Youngs' UMA claim, determining that automobile theft was not intended by the New Mexico Legislature to be included under the UMA's § 66-5-301.  The Court determined, however, in the Analysis' Part I that, the Youngs allege sufficient allegations to state a breach-of-contract claim based on Hartford Insurance's alleged underpayment of the Youngs for the March 30, 2016, theft of their 2007 Case Tractor.  Based on the Court's conclusion that Hartford Insurance breached the Youngs' Automobile Policy, the Court, therefore, determines that, the Youngs show element two of an NMUPA claim.

requirement under NMUPA's element two, if they show that Hartford Insurance "was actually aware that the statement was false or misleading when made, or in the exercise of reasonable diligence should have been aware that the statement was false or misleading." Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 6, 811 P.2d at 1311-12. In addition, as the Court noted in Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 28 F. Supp. 2d at 1193, although, "in the right circumstances, it could grant judgment as a matter of law on whether a statement is deceptive or misleading . . . generally the question is a matter of fact." 28 F. Supp. 2d at 1193. Because the Youngs and Hartford Insurance dispute whether the statements in the Homeowners Policy's Declaration Page and the Automobile Policy Declaration Page were "deceptive or misleading," Complaint ¶ 47, at 5; see MTD at 4; id. at 9, at the motion-to-dismiss stage, the Court cannot conclude, as a matter of law, whether Hartford Insurance's statements were "deceptive or misleading." Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 28 F. Supp. 2d at 1193. The Court, however, concludes that, based on the Youngs' factual allegations relating to their impressions and expectations of the amount of coverage they would receive under the Automobile Policy and the Homeowners Policy, which were not met based on Hartford Insurance's final payout to the Youngs under the Automobile Policy and Homeowners Policy, the Court concludes that the Youngs allege plausible factual allegations to support their claim that Hartford Insurance, as a sophisticated insurer, "should have been aware" that its statements to the Youngs regarding the scope of their coverage may have been "misleading." Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 17, 811 P.2d at 1311-12. Specifically, the Court finds plausible the Youngs' factual allegations supporting their claim that Hartford Insurance represented to the Youngs, pursuant to the Youngs' Automobile Policy, that the Youngs would receive "comprehensive coverage as well as coverage for UM?UIM . . . in the amount of $50,000," Complaint ¶ 26, at 4, which misled the

Youngs into believing that they would receive full UM/UIM benefits and full coverage for their 2007 Case Tractor related to the March 30, 2016, theft.  See Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 17, 811 P.2d at 1311-12.  The Court also finds plausible the Youngs' factual allegations supporting their claim that Hartford Insurance misrepresented to the Youngs, pursuant to the Youngs' Homeowners Policy, that the Youngs would receive coverage for personal property at an amount of "$140,250,"  which would cover all of "the materials and supplies located at or next to the residence premises used to construct, alter or repair the dwelling or other structures on the residence's premises," and (ii) all "personal property owned or used by an insured while it is anywhere in the world."  Complaint ¶ 23, at 3.  See Homeowners Policy at 2, which, in turn, gave the Youngs the impression that they would receive up to $140,250 in property damage coverage related to the March 30, 2016, theft  see Complaint at ¶ ¶ 19-20, at 3; Homeowners Insurance Policy at 3.  See also Stevenson v. Louis Dreyfus Corp., 1991-NMSC-051, ¶ 17, 811 P.2d at 1311-12.

Relatedly, the Youngs show element three of a NMUPA claim, because they advance plausible allegations to support their claim that Hartford Insurance misrepresented to them the scope of their coverage under the Homeowners Policy and the Automobile Policy, and the misrepresentations were "of the type that may, tends to, or does deceive or mislead any person." Valdez v. Metro. Prop. & Cas. Ins. Co., 2012 WL 1132414, at *19 (quoting Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 2, 166 P.3d at 1093).  On the question of misrepresentation, in particular, the Court has emphasized that a communication can mislead, even if the representation is not false.  See Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 728 F. Supp. 2d at 1193-95 (a parenthetical would be useful).  Furthermore, the Court acknowledges the Youngs' argument that, under NMSA 1978, § 57-12-2(D)(l)(17)), unconscionable practices can

include the party (i) "causing confusion or misunderstanding as to the source, sponsorship, approval or certification of services," Response at 6 (citing NMSA 1978, § 57-12-2(D)(2)); (ii) "representing that services have sponsorship or approval that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that the person does not have," Response at 6 (citing NMSA 1978, § 57-12-2(D)(5)); (iii) "representing that services are of a particular standard, quality or grade," Response at 6 (citing NMSA 1978, § 57-12-2(D)(7)); and (iv) "using exaggeration, innuendo or ambiguity as to a material fact or failing to state a material fact if doing so deceives or tends to deceive; or failing to deliver the quality of services contracted for" Response at 6 (citing NMSA 1978, § 57-12-2(D)(14)).  The Court emphasizes the importance of alleging facts that show unconscionable practices that could be committed by an offending party - - including Hartford  Insurance allegedly causing "confusion" to the Youngs regarding the scope of their coverage under the Homeowners Policy Automobile Policy -- because the:

> NMUPA's provisions regarding unconscionability evince[] a legislative recognition that, under certain conditions, the market is truly not free, leaving it for courts to determine when the market is not free, and empowering court to inspect and preclude those who prey on the desperation of others from being rewarded with windfall profits.

State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 27, 329 P.3d 658, 671 (internal quotations omitted).  The Court also recognizes that unconscionability can be both procedural and substantive, with the former examining the "particular factual circumstances surrounding the formation of [a] contract, including the relative bargaining strength, sophistication of the parties, and the extent to which either party felt free to accept or decline terms demanded by the other," Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 22, 208 P.3d at 907-08, and the latter, "concern[ing] the legality and fairness of the contract terms themselves," Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 22, 208 P.3d at 907-08, and "focus[ing] on such issues as whether the

contract terms are commercially reasonable and fair, the purpose and effect of the terms, the one-sidedness of the terms, and other similar policy concerns," Cordova v. World Fin. Corp., 2009-NMSC-021, ¶ 22, 208 P.3d at 907.  In light of the Court's holding in Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 728 F. Supp. 2d at 1193-95, and in light of the Supreme Court of New Mexico's holding in State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 27, 329 P.3d at 671, the Court concludes that the Youngs advance plausible factual allegations showing that Hartford Insurance caused them "confusion" related to the scope of their Homeowners Policy coverage, based on the terms of the coverage in the Policy's Declaration.  Response at 6 (citing NMSA 1978, § 57-12-2(D)(2)).  The Court finds plausible the Youngs' facts supporting that they were confused about the scope of their Homeowners Policy coverage, because the Youngs allege that, after submitting claims totaling an itemized list of stolen personal property, including the 2007 Case Tractor with attachments, totaling approximately $68,541.90 (not including the 2004 Ford F-350 vehicle), Complaint ¶ 35, at 4 -- of which they expected to be fully covered under the Homeowners Policy -- they received only "$8,554.09 or 12.48%" of the total loss attributable to the March 30, 2016, theft, Complaint ¶ 42, at 5.  Equally, the Court concludes that the Youngs advance plausible facts showing that they were confused as to the scope of their coverage under the Automobile Policy, because, the Youngs believed that, under the terms of their Automobile Policy as of March 30, 2016, they would receive "comprehensive coverage," including full coverage for their 2007 Case Tractor, which would not be limited by a $2,500.00 cap based on Hartford Insurance's subsequent classification  of the 2007 Case Tractor as "business property," Complaint ¶ 44, at 5.  The Court reaches these conclusions based on its recognition, as well, of the potential disproportionate power that Hartford Insurance, a sophisticated insurer with learned skill and expertise in the art of negotiating insurance policies, might have over the Youngs, as

insureds who lack background in insurance contract negotiation.  See State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 27, 329 P.3d at 671,  Accordingly, the Court concludes that the Youngs have shown element three of an NMUPA claim.  Ultimately then, the Court denies Hartford Insurance's Motion to Dismiss the Youngs' NMUPA claim.

VII.  **BECAUSE QUESTIONS OF FACT EXIST WHETHER HARTFORD INSURANCE BREACHED THE YOUNGS' AUTOMOBILE POLICY AND HOMEOWNERS POLICY, AND THE COVENANT OF GOOD FAITH AND FAIR DEALING IS INHERENT IN CONTRACTUAL RELATIONSHIPS, PARTICULARLY IN INSURANCE CONTRACTUAL RELATIONSHIPS,  THE COURT CONCLUDES THAT THE YOUNGS ADVANCE SUFFICIENT FACTUAL ALLEGATIONS TO SUPPORT THAT HARTFORD INSURANCE DID NOT GIVE EQUAL CONSIDERATION TO ITS OWN INTERESTS AND THE YOUNGS' INTERESTS.**

The Court has determined already that the Youngs have sufficiently alleged that they are in a contractual relationship with Hartford Insurance and that there are existing questions of fact whether Hartford Insurance breached its compensatory payment obligations under the Youngs' Automobile Policy and Homeowners Policy.  The Court will not, therefore, dismiss the Youngs' fourth cause of action, because the Youngs may bring a claim alleging Hartford Insurance's bad-faith breach of contract as part of the parties' insurance contractual relationship.  See Anderson Living Tr. v. ConocoPhillips Co., LLC, 952 F. Supp. 2d 979, 1035 (D.N.M. 2013)(Browning, J.). "Whether express or not, every contract imposes upon the parties a duty of good faith and fair dealing in its performance and enforcement."  Watson Truck & Supply Co., Inc. v. Males, 1990-NMSC-105, ¶12, 801 P.2d 639, 642 (citations omitted).  "Broadly stated, the covenant requires that neither party do anything which will deprive the other of the benefits of the agreement."  Watson Truck & Supply Co. v. Males, 1990-NMSC-105, ¶ 12, 801 P.2d at 642 (internal quotation marks omitted).  "The breach of this covenant requires a showing of bad faith or that one party wrongfully and intentionally used the contract to the detriment of the other party."  Sanders v. FedEx Ground Package Sys., 2008-NMSC-040, ¶ 7, 188 P.2d at 1200 (internal quotations

- 160 -

omitted).   The Supreme Court of New Mexico has expressed reluctance, however, to use the

covenant of good faith and fair dealing "under circumstances where . . . it may be argued that from

the covenant there is to be implied in fact a term or condition necessary to effect the purpose of a

contract." Watson Truck & Supply Co. v. Males, 1990-NMSC-105, ¶12, 801 P.2d at 642.

> "Generally, in the absence of an express provision on the subject, a contract
> contains an implied covenant of good faith and fair dealing between the parties.
> Under the implied covenant of good faith and fair dealing, courts can award
> damages against a party to a contract whose actions undercut another party's rights
> or benefits under the contract.   [The Supreme Court of New Mexico] has
> nevertheless refused to apply this implied covenant to override an express at-will
> termination provision in an integrated, written contract."

Elliott Industries Ltd. Partnership v. BP America Production Co, 407 F.3d 1091, 1114-15 (10th

Cir. 2005)(quoting Kropinak v. ARA Health Services, Inc., 2001-NMCA-081, ¶¶ 3-4, 33 P.3d 679,

680)(secondary citations omitted)).

The Supreme Court of New Mexico has recognized that a cause of action for a breach of

the covenant of good faith and fair dealing sounds in contract.   See Bourgeous v. Horizon

Healthcare Corp., 1994-NMSC-038, ¶ 17, 872 P.2d at 857.   The Supreme Court of New Mexico

also has held that tort recovery for breach of the covenant of good faith and fair dealing is

permissible only where a special relationship exists, such as between an insurer and its insured.

See Bourgeous v. Horizon Healthcare Corp., 1994-NMSC-038, ¶ 17, 872 P.2d at 857.   The

"relationship of insurer and insured is inherently unbalanced; the adhesive nature of insurance

contracts places the insurer in a superior bargaining position." Bourgeous v. Horizon Healthcare

Corp., 1994-NMSC-038, ¶ 17, 872 P.2d at 857 (citations omitted)(internal quotation marks

omitted).  Similarly, the Court of Appeals of New Mexico has held that "[t]he claim of breach of

good faith and fair dealing sounds in contract, at least when no 'special relationship' such as that

between an insured and insurer exists." Heimann v. Kinder-Morgan CO2 Co., 2006-NMCA-127,

¶ 18, 144 P.3d at 111.

The Supreme Court of New Mexico has indicated that "the duty to not act in bad faith or

deal unfairly," which an implied covenant of good faith and fear dealing within a contract imposes,

"becomes part of the contract and the remedy for its breach is on the contract itself." Bourgeous

v. Horizon Healthcare Corp., 1994-NMSC-038, ¶ 17, 872 P.2d at 857 (discussing an Arizona case

and distinguishing this measure of damages from tort damages that are available for breach of this

covenant in the insurance context). In the insurance context, however, a plaintiff can recover tort

damages for breach of this implied covenant. See Bourgeous v. Horizon Healthcare Corp., 1994-

NMSC-038, ¶ 17, 872 P.2d at 857.

The Youngs argue that, under New Mexico precedent and UJI 13-1701 NMRA, they show

facts to establish that Hartford Insurance violated its duty of "good faith and fair dealing that the

insurer will not injure its policyholders' right to receive the full benefits of the contract." Response

at 8 (quoting Dairyland Ins. Co. v. Herman, 1998-NMSC-005, ¶ 11, 954 P.2d 56, 60). See Lujan

v. Gonzales, 1972-NMCA-098, ¶¶ 41-42, 501 P.2d at 680. First, according to the Youngs, "there

was a valid insurance contract" between themselves and Hartford Insurance, which meant that

there was "the implied covenant of good faith and fair dealing . . . inherent in the contract,"

Response at 8. Second, the Youngs explain that they advance facts showing that Hartford

Insurance "did not act honestly and in good faith in performance of the contract," Response at 8,

because they show that Hartford Insurance "offer[ed] substantially less than what Plaintiffs were

entitled to recover" in punitive and compensatory damages under the Automobile Policy.

Response at 9 (citing Complaint ¶¶ 26-34, 37-39, 46, at 3-6). Furthermore, according to the

Youngs, under New Mexico law, Hartford Insurance, as an "insurer," "assume[d] a fiduciary

obligation" toward them, which "pertain[ed] to the *performance* of obligations in the insurance

contract."  Response at 8 (quoting Azar v. Prudential Ins. Co. of America, 2003-NMCA-062, ¶ 54,

68 P.3d at 925 (emphasis in original)(citation omitted)).  The Youngs next reference N.M.R.A.,

Civ. UJI 13-1701 to explain the duties required of Hartford Insurance as an insurer:

> A policy of insurance is a contract. There is implied in every insurance policy a
> duty on the part of the insurance company to deal fairly with the policy holder. Fair
> dealing means to act honestly and in good faith in the performance of the contract.
> [The insurance company must give *equal consideration* to its own interests and the
> interest of the policy holder.]

N.M.R.A., Civ. UJI 13-1701 (emphasis added)(brackets in original).  This means, as the Youngs

explain further, that "[t]o fulfill the duty of giving equal consideration of the interest of the insured

and the insurer," Hartford Insurance must ensure that "there must be a fair balancing of these

interests."  Response at 8 (quoting Lujan v. Gonzales, 1972-NMCA-098, ¶¶ 41-42, 501 P.2d at

680).  Accordingly, the Youngs alleged that their implied covenant of good faith and fair dealing

claim against Hartford Insurance is tied to their breach-of-contract claim against Hartford

Insurance.  Response at 9.  See Anderson Living Tr. v. ConocoPhillips Co., LLC, 952 F. Supp. 2d

at 1038–39 ("Indeed, the second cause of action alerts the Court that the Plaintiffs' theory for relief

is, in part, that the Defendants' conduct breached their duty of good faith and fair dealing.").  The

Court, however, has already determined that the Youngs' UMA claims are not covered under the

UMA's § 66-5-301; therefore, the Court analyzes the Youngs' breach-of-contract claim, and in

turn, the Youngs' claim that Hartford Insurance breached its implied covenant of good faith and

fair dealing, based on (i) Hartford Insurance's alleged underpayment to the Youngs for their

compensatory damages related to the March 30, 2016, theft of the Youngs' 2007 Case Tractor

theft, pursuant to the Youngs' Automobile Policy,  See Complaint ¶ 6, at 2, and (ii) Hartford

Insurance's alleged underpayment to the Youngs' for the full extent of their March 30, 2016, property damages, pursuant to the Youngs' Homeowners Policy.

The Youngs are correct "that New Mexico law imposes a duty of good faith and fair dealing into every contract," Anderson Living Tr. v. ConocoPhillips Co., LLC, 952 F. Supp. 2d at 1038-39 (citations omitted). The Youngs are also correct in their arguments that New Mexico law imposes special obligations on the insurer in the context of an insurance contract. See Rummel v. Lexington Ins. Co., 1997 NMSC 041, ¶ 18, 945 P.2d 970, 976 . "Thus, with insurance contracts, as with every contract, there is an implied covenant of good faith and fair dealing that the insurer will not injure its policyholder's right to receive the full benefits of the contract." Dairyland Ins. Co. v. Herman, 1998-NMSC-005, ¶ 14, 954 P.2d 56, 61 (citing Ambassador Ins. Co. v. St. Paul Fire & Marine Ins. Co., 690 P.2d 1022, 1024 (1984)("New Mexico recognizes this duty of good faith between insurer and insured.")). "This means that 'an insurer cannot be partial to its own interests, but must give its interests and the interests of its insured equal consideration.'" Dairyland Ins. Co. v. Herman, 1998-NMSC-005, ¶ 14, 954 P.2d at 61 (quoting Lujan v. Gonzales, 1972-NMCA-098, ¶¶ 41-42, 501 P.2d at 680. See Dairyland Ins. Co. v. Herman, 1998-NMSC-005, ¶ 12, 954 P.2d at 60–61. "Under such circumstances, the insurer should place itself in the shoes of the insured and 'conduct itself as though it alone were liable for the entire amount of the judgment.'" Dairyland Ins. Co. v. Herman, 1998-NMSC-005, ¶ 14, 954 P.2d at 61 (quotations omitted).

At the motion-to-dismiss stage, the Court "accept[s] as true" all of the Youngs' "well-pled factual allegations," Smith v. United States, 561 F.3d at 1098. Pursuant to their implied covenant of good faith and fair dealing claim against Hartford Insurance, the Youngs contend that they advance factual allegations showing that (i) Hartford Insurance breached the Youngs' Automobile

- 164 -

Insurance contract by "offering substantially less than what they were entitled to recover" based on the theft of their 2007 Case Tractor, see Complaint ¶ 6, at 2; and (ii) Hartford Insurance breached the Youngs' Homeowners Policy by allegedly only paying the Youngs "$8,554.09 or 12.48% of the total loss" attributable to the March 30, 2016, theft, which the Youngs contend "was covered by the policy in force" at the time, Complaint ¶ 42, at 2.    The Court also "accept[s] as true" the Youngs' factual allegations that Hartford Insurance offered "no reasonable explanation" for its rejection of the Youngs' claims under the Automobile Policy and Homeowners Policy related to the March 30, 2016, theft, Smith v. United States, 561 F.3d at 1098; Response at 8, which, subsequently,  "compelled" the Youngs to bring the current litigation against Hartford Insurance to recover, what they allege to be the full extent of their benefits under the Automobile Policy and the Homeowners Policy.  Response at 6.  See Complaint ¶ 15, at 3; id. ¶¶ 26-35, 37, 39, 45-47, at 4-6.    Upon viewing the Youngs' factual allegations in support of their implied covenant of good faith and fair dealing claim against Hartford Insurance "in the light most favorable" to the Youngs, as the nonmoving parties, and "draw[ing] all reasonable inferences" in the Youngs' favor,  Smith v. United States, 561 F.3d at 1098, the Court finds plausible the Youngs' factual allegations that Hartford Insurance failed to "give equal consideration to its own interests and the interests of the policy holder" in performing its contractual obligations under the Youngs' Automobile Policy and Homeowners Policy.  Response at 8 (quoting UJI 13-1701 NMRA).  See Complaint ¶¶ 26-34, 37-39, 46, at 3-6.

"Broadly stated, the covenant requires that neither party do anything which will deprive the other of the benefits of the agreement."  Watson Truck & Supply Co. v. Males, 1990-NMSC-105, ¶ 12, 801 P.2d at 642.  Here, the Court determines that, if the Youngs were under the false impression, based on the Automobile Policy's Declaration page, see Automobile Policy at 2, that:

(i) they would receive comprehensive coverage for all property damage during the life of the Automobile Policy, Complaint ¶¶ 27-28, at 4, and, (ii) their 2007 Case tractor, which they alleged to be "personal property," would not be subject to a $2,500.00 cap on payout in compensation, Complaint ¶ 44, at 5, then the Court concludes that the Youngs plead an implied covenant of good faith and fair dealing claim against Hartford Insurance that "is plausible on its face," Rivero v. Bd. of Regents of Univ. of New Mexico, 2019 WL 1085179, at *47. The Court reaches this conclusion because, even after the Youngs alleged they had established all conditions precedent of the Automobile Policy, Complaint ¶ 7, at 2, the Youngs show that Hartford Insurance's alleged underpayment could deprive the Youngs of the full benefits -- in the form of comprehensive compensatory coverage -- of the Automobile Policy contract that they had entered into with Hartford Insurance. See Watson Truck & Supply Co. v. Males, 1990-NMSC-105, ¶ 12, 801 P.2d at 64. Equally, if the Youngs were under the false impression, based on the Homeowners Policy's Declaration Page, that the Homeowners Policy would provide coverage at an amount of "$140,250," Complaint ¶ 19, at 3, which would include all of "the materials and supplies located on or next to the residence premises used to construct, alter or repair the dwelling or other structures on the residence premises," Complaint ¶ 21, at 3, and all of "the personal property owned or used by an insured while it is anywhere in the world," Complaint ¶ 23, at 3, then the Court determines that the Youngs plead an implied covenant of good faith and fair dealing claim against Hartford Insurance that "is plausible on its face" in connection with the Homeowners Insurance Policy, as well. Rivero v. Bd. of Regents of Univ. of New Mexico, 2019 WL 1085179, at *47. The Court reaches this conclusion because, even after the Youngs alleged they had established all conditions precedent of the Homeowners Policy, see Complaint ¶ 21, at 3. Hartford Insurance's alleged underpayment pursuant to the Youngs' Homeowners Policy could deprive the

Youngs of the full benefits -- in the form of comprehensive property damage coverage -- of the Homeowners Policy Contract that they had entered into with Hartford Insurance. See Watson Truck & Supply Co. v. Males, 1990-NMSC-105, ¶ 12, 801 P.2d at 64.

Importantly, as well, in analyzing the Youngs' claim for breach of the implied covenant of good faith and fair dealing against Hartford Insurance, the Court recognizes the Supreme Court of New Mexico's noted concerns about the potentially imbalanced relationship between the insurer and insured. See Bourgeous v. Horizon Healthcare Corp., 1994-NMSC-038, ¶ 17, 872 P.2d at 856. Specifically, as the Supreme Court of New Mexico notes in Bourgeous v. Horizon Healthcare Corp., 1994-NMSC-038, ¶ 17, 872 P.2d at 856,

> In *Wagenseller [v. Scottsdale Memorial Hospital*., 147 Ariz., 370, 385 (1985)]*, the Arizona Supreme Court held that the duty to not act in bad faith or deal unfairly becomes part of the contract and the remedy for its breach is on the contract itself. *Id.* at 1038. Other courts have allowed tort recovery for breach of implied covenant of good faith and fair dealing in actions brought on insurance contracts. *See Foley [v. Interactive Data Corp.,* 47 Cal. 3d 654, 684 (1988)]; *Wagenseller.* The strongest basis for permitting tort recovery for breach of the implied covenant is in the insurance context and "has been founded largely upon the existence of a 'special relationship' between insurer and insured." *Wagenseller [v. Scottsdale Memorial Hospital*., 147 Ariz., at 385], *see generally Egan v. Mutual of Omaha Ins. Co.,* 169 Cal. Rptr. 691, 696, (1979) (in bank), *appeal dismissed and cert. denied,* 445 U.S. 912, 100 (1980). "[T]he relationship of insurer and insured is inherently unbalanced; the adhesive nature of insurance contracts places the insurer in a superior bargaining position." *Egan.*

Bourgeous v. Horizon Healthcare Corp., 1994-NMSC-038, ¶ 17, 872 P.2d at 856.

Informed by the Supreme Court of New Mexico's concerns about the potential abuse of insureds in their dealing with insurers, such as Hartford Insurance, the Court agrees with the Youngs that Hartford Insurance's implied covenant of good faith and fair dealing is "inherent in the contract" with the Youngs, Response at 8, meaning the "remedy" for Hartford Insurance's breach "is on the contract itself," Bourgeous v. Horizon Healthcare Corp., 1994-NMSC-038, ¶ 17, 872 P.2d at 856 (citing Wagenseller v. Scottsdale Memorial Hospital, 147 Ariz., at 385).

Accordingly, the Court will not dismiss the Youngs' second cause of action alleging Hartford Insurance's breach of its implied duty of good faith and fair dealing in the performance of its obligations to the Youngs under the Youngs' Automobile Policy.

**VIII.  THE COURT GRANTS HARTFORD INSURANCE'S MOTION TO DISMISS THE YOUNGS' DECLARATORY JUDGMENT CLAIM RELATED TO THEIR UM/UIM BENEFITS, BECAUSE OF THE COURT'S DETERMINATIONS THAT THE UMA's § 66-5-301 DOES NOT COVER THE YOUNGS' MARCH 30, 2016, THEFT AND RELATED PROPERTY DAMAGE, AND THAT, THE YOUNGS, THEREFORE, ARE NOT ENTITLED TO PUNITIVE DAMAGES UNDER THE UMA.**

Finally, the Youngs seek a Declaratory Judgment from the Court, pursuant to New Mexico's Declaratory Judgment Act, NMSA 1978 §§ 44-6-1 to -15, in which the Youngs request that the Court declare the rights, status, and liabilities of the parties under the Hartford Insurance Automobile Policy related to the Youngs' UMA coverage.  See Complaint ¶ 75-80, at 10-11. Specifically, the Youngs request that the Court determine that "stacked UM/UIM coverage equal to the liability limits exists for Plaintiff on all policies issued to Plaintiffs by Hartford Casualty Insurance Company due to the company's failure to comply with statutory and common law." Complaint ¶ 79, at 11.  The Youngs emphasize that they bring the Declaratory Judgment action "to recover the full extent of all available policy limits from any and all underinsured motorist policies issued by Hartford Casualty Insurance Company and which might be available" to them stemming from their March 30, 2016, theft.  Complaint ¶ 80 at 11.  Furthermore, in support of their request for the Court's Declaratory Judgment, the Youngs state that they are entitled "to all compensatory and punitive damages caused by the unknown motorist."  Complaint ¶ 75, at 10. Referencing the arguments they advance in support of their UMA claim against Hartford Insurance, the Youngs emphasize that Hartford Insurance acted improperly in its failure to "stack the UM/UIM coverage equal to the liability limits on one or more automobile insurance policies,"

Complaint ¶ 76, at 10, and failed to offer "a proper rejection for the aforementioned step-down in coverage," Complaint ¶ 77, at 10.[14]

Hartford Insurance argues that the Youngs' request for a Declaratory Judgment, stemming from how much money they contend that they should have received from insurance proceeds based on what might be available under the UMA, see Complaint ¶¶ 75-80, at 10-11, is moot, because under Mortensen v. Liberty Mutual Insurance, 2019 WL 1571730, at *1-2 and Dockery v. Allstate Insurance Co., 2020 WL59885, *3-4, UMA coverage does not encompass automobile theft.  MTD at 4.

As an initial matter, although the Youngs bring their Declaratory Judgment cause of action under the New Mexico Declaratory Judgment Act, NMSA 1978 §§ 44-6-1 to -15, the federal Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 controls the Court's consideration of the Youngs' claim for a Declaratory Judgment.  See Erie Railroad Co. v. Tompkins, 304 U.S. at 72; Farmers Alliance Mut. Ins. Co. v. Jones, 570 F.2d 1384, 1386 (10th Cir. 1978).  The federal Declaratory Judgment Act controls, because Hartford Insurance removed this case to federal court on the basis of the Court's diversity jurisdiction.  See Notice of Removal, filed July 26, 2019 (Doc. 1)("Removal").  Under Erie Railroad Co. v. Tompkins, 304 U.S. at 72 and its progeny of cases, see Byrd v. Blue Ridge Rural Electrical Cooperative, Inc., 356 U.S. 525 (1958); Guaranty Trust Co. v. York, 326 U.S. 99 (1945); Hanna v. Plumer, 380 U.S. 460 (1965), Gasperini v. Center for Humanities, 518 U.S. 415 (1996), a federal court exercising jurisdiction over a case based on diversity looks to federal procedural law and to state substantive law.  See Erie Railroad

---

[14]In Part III of the Analysis, the Court did not address the issue of whether Hartford Insurance acted improperly in its failure to "stack the UM/UIM coverage equal to the liability limits on one or more automobile insurance policies," Complaint ¶ 76, at 10, because of the Court's initial legal conclusion that the Youngs' March 30, 2016, automobile theft is not covered under the UMA's § 66-5-301(A).

Co. v. Tompkins, 304 U.S. at 72.  See also Martinez v. City of Santa Fe, No. 14-CV-0016 SMV/KBM, 2014 WL 12493737, at *2–3 (D.N.M. Sept. 24, 2014)(Vidmar, M.J.).  The federal Declaratory Judgment Act is procedural, see Farmers Alliance Mut. Ins. Co. v. Jones, 570 F.2d at 1386, meaning it "does not create substantive rights for parties . . . [but] merely provides another procedure whereby parties may obtain judicial relief."  Farmers Alliance Mut. Ins. Co. v. Jones, 570 F.2d at 1386.  Accordingly, the Court decides the substantive issues of the case under New Mexico law, but assesses the Youngs' Declaratory Judgment claim under the federal Declaratory Judgment Act.  See Erie Railroad Co. v. Tompkins, 304 U.S. at 72.  See also Miller v. Cincinnati Insurance Co., 290 F. Supp. 3d 1204, 1206-07 (D.N.M. 2018)(Yarbrough, M.J.).

The federal Declaratory Judgment Act, in turn, grants the Court discretionary authority "to declare the rights and other legal relations of any interested party seeking such declaration" because the Youngs have filed "an appropriate pleading." 28 U.S.C. § 220l (a).  See Martinez v. City of Santa Fe, 2014 WL 12493737, at *2.

> Under the Federal Rules of Civil Procedure, a 'pleading' must be one of the following: a complaint or answer to it; an answer to a counterclaim designated as a counterclaim; an answer to a crossclaim; a third-party complaint or answer to it; or, if the court orders one, a reply to an answer.

Martinez v. City of Santa Fe, 2014 WL 12493737, at *2 (quoting Fed. R. Civ. P. 7).  "The Federal Rules 'govern the procedure for obtaining a declaratory judgment under 28 U.S.C. § 2201.'" Martinez v. City of Santa Fe, 2014 WL 12493737, at *2 (quoting Fed. R. Civ. P. 57).  "Courts and commentators have concluded that an action for declaratory judgment is 'an ordinary civil action' subject to the Federal Rules."  Martinez v. City of Santa Fe, 2014 WL 12493737, at *2 (quoting Int'l Bd. of Teamsters v. E. Conference of Teamsters, 160 F.R.D. 452, 455-56 (S.D.N.Y. 1995)(Edelstein, J.)(quoting 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2768 (1983)).

In conformance with the Declaratory Judgment Act, 28 U.S.C. § 22012201(a), the "interested party" in this case -- the Youngs -- request a Declaratory Judgment in their Complaint, which is an appropriate pleading form under rule 7, see Fed. R. Civ. P. 7.  Notwithstanding the Youngs' proper compliance with 28 U.S.C. § 2201(a), the Court dismisses the Youngs Declaratory Judgment claim under the federal Declaratory Judgment Act -- b-- in which the Youngs' request that the Court declare the parties' rights, statuses, and liabilities related to the Youngs' coverage under the UMA pursuant to their Hartford Insurance Automobile Policy -- because of the Court's conclusions in Part III and Part IV of the Analysis, respectively, that: (i) under Mortensen v. Liberty Mutual Insurance, 2019 WL 1571730, at *1-2, Arnold III, Memorandum Opinion and Order, at 28, Arnold II, 827 F. Supp. 2d at 1300-1301, and Arnold I, 760 F. Supp. 2d at 1286, the phrase "injury to or destruction of property," as used in the UMA's § 66-5-301, does not include the theft or loss of use of the Youngs' "2004 Ford F-350, 2010 JB trailer, 2007 Case Tractor with attachments, and other miscellaneous items" by an "unknown motorist," as alleged in the Youngs Complaint, Complaint ¶ 10, at 2, and (ii) because UMA's § 66-5-301 does not cover the Youngs' March 30, 2016, automobile theft and related property damage, the Youngs are not entitled to punitive damages under the UMA.  Hartford Insurance, therefore, has no contractual obligations to provide UM/UIM benefits to the Youngs to cover the loss of their "2004 Ford F-350, 2010 JB trailer, 2007 Case Tractor with attachments, and other miscellaneous items," Complaint ¶ 10, at 2, and the Court, thus, dismisses the Youngs' UMA claim against Hartford Insurance based on Hartford Insurance's refusal to provide such coverage.  Consequently, the Court grants Hartford Insurance's Motion to Dismiss the Youngs' Declaratory Judgment claim.

## IX.   THE COURT WILL NOT CERTIFY THE YOUNGS' NEW MEXICO STATE LAW ISSUES TO THE SUPREME COURT OF NEW MEXICO.

The Youngs ask the Court to certify all "relevant issues" presented in this case to the Supreme Court of New Mexico, pursuant to rule 12-607 of the New Mexico Rules of Appellate Procedure, NMSA 1978, § 39-7-4.  Tr. at 24:15-21 (Zamora).  See Response at 23.  Although the Youngs do not specify which issues they request that the Court certify to the Supreme Court of New Mexico, the Court assumes, based on the Youngs' arguments at the hearing, that the Youngs' "relevant issues" for certification include:  (i) whether punitive damages are available on a breach-of-contract claim in the context of an insurance contract; (ii) whether the UMA's § 66-5-301 covers automobile theft and loss-of-use damages arising from the theft of personal property, see NMSA 1978, § 66-5-301(A); and (iii) whether punitive damages are available to insureds under the UMA's  § 66-5-301(A).  See Tr. at 24: 15-21 (Zamora).  See Tr. at 25:10-18 (Court).

The Tenth Circuit has stated:

> When it comes to certification, we don't seek to "trouble our sister state courts every time an arguably unsettled question of state law comes across our desks.  When we see a reasonably clear and principled course, we will seek to follow it ourselves." Pino v. United States, 507 F.3d 1233, 1236 (10th Cir. 2007).  But when important and close questions of state legal policy arise, we recognize that certification may "in the long run save time, energy, and resources and help[ ] build a cooperative judicial federalism." Lehman Bros. v. Schein, 416 U.S. 386, 391 (1974).  Certification in these circumstances "give[s] meaning and respect to the federal character of our judicial system, recognizing that the judicial policy of a state should be decided when possible by state . . . courts." Pino v. United States, 507 F.3d at 1236.  See also 10th Cir. Rule 27.1.

United States v. Reese, 505 Fed. App'x 733, 734 (10th Cir. Dec. 11, 2012)(Gorsuch, J.).

The Court has adhered to its proper procedure in diversity cases under Erie Railroad Co. v. Tompkins, 304 U.S. 64, and this case is a routine insurance case that does not call for the Supreme Court of New Mexico's certification.  The Court has faithfully followed Supreme Court and Tenth Circuit precedent, which give federal courts the duty to predict how the state's supreme court will rule on an issue.  See Stoner v. New York Life Insurance Co., 311 U.S. at 467; Adams–

Arapahoe Joint School Dist. No. 28–J v. Continental Ins. Co., 891 F.2d at 774.  As directed, the Court: (i) "sought guidance from decisions rendered by lower courts" in New Mexico, Wade v. EMCASCO Insurance Co., 483 F.3d at 666 (citing Progressively Cas. Co. v. Engemann, 268 F.3d 985, 988 (10th Cir. 2001)); (ii) assessed "appellate decisions in other states with similar legal principles," Wade v. EMCASCO Insurance Co., 483 F.3d at 666 (citing United States v. DeGasso, 369 F.3d 1139, 1148 (10th Cir. 2004));)); (iii) analyzed "district court decisions interpreting the law of the state in question," Wade v. EMCASCO Insurance Co., 483 F.3d at 666 (citing Sapone v. Grand Targhee, Inc., 308 F.3d 1096, 1100, 1104-05 (10th Cir. 2002));)); and, (iv) sought guidance from "the general weight and trend of authority in the relevant area of law," Wade v. EMCASCO Insurance Co., 483 F.3d at 666 (citing MidAmerica Construction Management, Inc. v. MastEc North America, Inc. 436 F.3d 1257, 1262 (10th Cir. 2006)).  See Rimbert v. Eli Lilly and Co., 577 F. Supp. 2d 1174, 1214 (D.N.M. Aug. 22, 2008)(Browning, J.)(declining to certify a legal question and noting that the "Court's task is to consider [Courts of Appeals of New Mexico] opinions carefully and determine whether there is a good indication of how the Supreme Court of New Mexico would rule if the question was presented to it").

The Court determines that New Mexico courts have charted a "reasonably clear and principled course," Pino v. United States, 507 F.3d at 1236, whether: (i) punitive damages can be awarded on a plaintiff's breach-of-insurance contract claim, (ii) the UMA's § 66-5-301(A) provides coverage for loss-of-use damages arising from the theft of an insured's personal property, see NMSA 1978, § 66-5-301(A), and (iii) punitive damages can be awarded for covered insureds under the UMA's § 66-5-301(A).  The Court has followed those courses here.  See Pino v. United States, 507 F.3d at 1236.  See also Martinez v. Martinez, 2013 WL 3270448, at *46.  As a result, the Court determines that (i) punitive damages can be awarded under a plaintiff's breach-of-

contract claim, even in the insurance contract context, <u>Paiz v. State Farm Fire & Cas. Co.</u>, 880 P.2d at 308; (ii) the UMA's § 66-5-301(A) does not provide coverage for loss-of-use damages arising from the theft of an insured's personal property, <u>see Arnold I</u>, 760 F. Supp. 2d 1272, at 1297-98; <u>Arnold II</u>, 827 F. Supp. 2d at 1201; <u>Arnold III</u>, Memorandum Opinion and Order, at 28, and (iii) although punitive damages are available to insureds under the UMA's § 66-5-301(A), punitive damages are not available in this case, because the Court determines that the UMA's § 66-5-301(A) does not cover the Youngs' March 30, 2016 automobile theft and related property damage. The Court, therefore, will not exercise its discretion to now certify the Youngs' questions to the Supreme Court of New Mexico. <u>See Martinez v. Martinez</u>, 2013 WL 3270448, at *47 (declaring that "there is no sound reason" to send the case to the Supreme Court of New Mexico when the Court has "good precedent from the [Supreme] Court of New Mexico, supported by New Mexico law"); <u>Arnold II</u>, 827 F.Supp.2d at 1297 (refusing to certify a question after the Court had already ruled on it).

   **IT IS ORDERED** that: (i) the Defendants Hartford Casualty Insurance Company's and Property & Casualty Insurance Company of Hartford's Amended Motion to Dismiss and to Strike the Youngs' Complaint, filed February 4, 2020 (Doc. 23)("MTD"), is granted in part and denied in part; (ii) Counts V and VI, and the Plaintiffs' request for punitive damages pursuant to Count I of the First Amended Complaint for Breach of Contract and Related Causes of Action, to Recover UM/UIM Benefits for Property Damage and for Declaratory Judgment, filed November 8, 2019 (Doc. 11)("Complaint") are dismissed; and (iii) all other requests in the MTD are denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Richard J. Valle
Matthew J. Zamora
Carter & Valle Law Firm, P.C.
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Lisa M. Wilson
Kimberly A. Wilson Trykoski
Wilson, Elser, Moskowitz, Edelman & Dicker, LLP
Dallas, Texas

     *Attorneys for the Defendants*